# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

SHARON TUNNELL, EDISON GBOR, GREGORY
GORDON, FRANCESCO ODDO, JOHN CLARKE,
DAVID R. BURGOS, JOHN D. BRANCACCIO, JR.,
JOHN KENNEDY, MARC ROBINSON, TIMOTHY
RIVICCI, JOHN V. SCHAEFER, MATTHEW
PASIEKA, ROMMEL A. PEREZ, MATTHEW
DEMEREST, ARETHA SIMMONS, JANE AND JOHN
DOES 1-100, individually and on behalf of all other
persons similarly situated,

Case No.    25-1781

PROPOSED CLASS-ACTION
COMPLAINT

                    Plaintiffs,

JURY TRIAL DEMANDED

        - against -

THE CITY OF NEW YORK; and JOHN and JANE DOES
1-10 in their personal and official capacities.

                    Defendants.
------------------------------------------------------------------- x

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, A Memorial And Remonstrance, On The Religious Rights Of Man: Written In 1784-85

Plaintiffs, proceeding as individuals and as a proposed class, herein complain of the Defendants as follows:

## NATURE OF ACTION

1.    This lawsuit arises because the City of New York unlawfully attempted to limit the number of employees who received religious accommodation from its' Covid-19 vaccine mandate by enacting discriminatory policies that categorically excluded most religious objections from protection.

1

2.      Plaintiffs were each dedicated City workers denied religious accommodation as a result of these policies.

3.      Plaintiffs allege violations of their fundamental statutory and constitutional rights. On behalf of themselves and all others similarly situated, they seek declaratory and injunctive relief, as well as reinstatement, nominal, compensatory, actual and punitive damages, attorneys' fees and other remedies, for harms arising from the actions complained of herein.

<u>THE PARTIES</u>

***<u>Plaintiffs</u>***

4.      Plaintiff Sharon Tunnell is a resident of Brooklyn. She was employed by the Fire Department of the City of New York ("FDNY") as a Fire Protection Inspector when she was denied religious accommodation and terminated on or about July 27, 2022.

5.      Plaintiff Edison Gbor is currently homeless. He was employed by the FDNY as a firefighter in the Bronx when he was denied religious accommodation and terminated in 2022.

6.      Plaintiff Gregory J. Gordon no longer lives in New York State. He was a resident of Staten Island and employed by the New York City Police Department ("NYPD") as a detective in Richmond County when he was denied religious accommodation and forced to retire in or around September 2022.

7.      Plaintiff Francesco Oddo no longer lives in New York State. He was employed by the NYPD as a police officer in the Bronx when he was denied religious accommodation and forced to retire in or around October 2022.

8.      Plaintiff John Clarke is a resident of Brooklyn. He was employed by the New York City Department of Parks & Recreation ("Parks") as a gardener in Kings County when he was denied religious accommodation and terminated in 2022.

9.      Plaintiff David R. Burgos was employed by the NYPD as a police officer in Queens working in

fleet services when he was denied religious accommodation and forced to retire in or around October 2022.

10.    Plaintiff John D. Brancaccio, Jr., lives in Queens and was employed by the Department of Sanitation ("DSNY") New York as a sanitation worker in Queens County when he was denied religious accommodation and forced to violate his sincerely held religious convictions to keep his job.

11.    Plaintiff John Kennedy is a resident of Rockland County. He was employed by the NYPD as a police officer in charge of the CRC canine unit when he was denied religious accommodation and forced to retire in or around September 2022.

12.    Plaintiff Marc Robinson is currently homeless. He was employed by the NYPD as a police officer when he was denied religious accommodation and forced to retire in or around April 2022.

13.    Plaintiff Timothy Rivicci ("Mr. Rivicci") lives in Staten Island. He was employed by the FDNY as a firefighter in Richmond County until he was denied religious accommodation and terminated in or around March 2022.

14.    Plaintiff John V. Schaefer was employed by the NYPD as a detective working in Queens until he was denied religious accommodation and forced to retire in or around August 2022.

15.    Plaintiff Matthew Pasieka was employed by the New York City Police Department ("NYPD") as a police officer until he was denied religious accommodation and terminated in or around June 2022.

16.    Plaintiff Rommel A. Perez was employed by the NYPD as a Sergeant working in Manhattan when he was denied religious accommodation and forced to retire in or around September 2022.

17.    Plaintiff Matthew Demerest was employed by the NYPD as a police officer working in an administrative job when he was denied religious accommodation and terminated in or around June 2022.

18.    Plaintiff Aretha Simmons was employed by the Department of Citywide Administrative Services ("DCAS") in an administrative job that could be fully remote when she was denied religious

accommodation and terminated in 2022.

### *Defendants*

19.     Defendant City of New York (the "City") is a municipal corporation constituting the local municipal government of the population residing in New York, Bronx, Queens, Kings and Richmond Counties in New York State. The First Amendment of the United States Constitution applies to this defendant by virtue of the Fourteenth Amendment. The City operates and employs people through its' agencies, including the agencies that employed Plaintiffs, among others.

## JURISDICTION AND VENUE

20.     Federal Jurisdiction. This Court has jurisdiction to adjudicate all federal claims raised in this matter under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits arising under the Constitution and laws of the United States; the Supremacy Clause of the United States Constitution, which supports federal court authority to address claims alleging preemption of state and local laws by the Constitution and federal laws enacted pursuant thereto; and 42 U.S.C. § 1983 and 28 U.S.C. § 1343, which grant jurisdiction over claims alleging that Defendants, acting under color of law, deprived Plaintiffs of rights, privileges, and immunities secured by the United States Constitution and federal laws, as detailed further herein.

21.     Supplemental Jurisdiction. This Court has supplemental jurisdiction over all state law claims raised in this matter under 28 U.S.C. § 1367(a), as such claims—including but not limited to violations of the New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL)—are so related to the federal claims within this Court's original jurisdiction that they form part of the same case or controversy. The state and federal claims arise from a common nucleus of operative facts, namely Defendants' allegedly unlawful policies and actions, thereby warranting the exercise of supplemental jurisdiction to promote judicial efficiency and consistency in adjudication.

22.     Venue is proper in the United States District Court for the Eastern District of New York for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the district in which Defendants reside or operate and unlawfully deprived many of the Plaintiffs and Class members of their rights under the laws and Constitution of the United States, as further alleged herein. It is also the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred and continue to occur.

<u>CLASS ACTION ALLEGATIONS</u>

23.     The Plaintiffs bring this class action pursuant to Rule 23 in their representative capacity on behalf of themselves and the Class of all others similarly situated as defined in this complaint. Plaintiffs propose a Class consisting of all persons covered by the Mandates who have religious objections to the vaccine requirement (the "Class").

24.     This action meets the following prerequisites of Rule 23(a):

    a.  Numerosity: The Class includes thousands of members. Due to the high number of class members, joinder of all members is impracticable and, indeed, virtually impossible.

    b.  Ascertainability: The proposed class is ascertainable. It includes all municipal employees and contractors who were denied religious accommodation to the City's Covid-19 vaccine requirements by the City of New York or one of its' agencies.

    c.  Commonality: A substantial pool of common questions of law and fact exists among the Class and subclasses, including but not limited to:

        i.  Whether the denials of accommodation are subject to strict scrutiny because the religious accommodation policies were either not neutral or not generally applicable.

        ii.  Whether the denials of religious accommodation are subject to strict scrutiny because the City violated the Establishment Clause by adopting facially

5

discriminatory criteria for judging religious objections and imposed special disability on disfavored beliefs;

iii. Whether the adoption and expansion of the discriminatory religious exemption policy along with other evidence of animus towards personally held beliefs and those associated with an objection to abortion constitute "direct evidence" of discrimination, and whether Defendants can "rebut" this claim through any affirmative defense;

iv. Whether the religious accommodation process triggers strict scrutiny, as it provides a mechanism for individualized discretionary exemption;

v. Whether the City engaged in a pattern or practice of discrimination by inconsistently applying religious accommodation policies or denying exemptions based on arbitrary or pretextual grounds or applying and encouraging discriminatory criteria;

vi. Whether the Citywide Panel's review process constituted a centralized mechanism of discrimination by systematically rejecting religious accommodation requests using uniform, impermissible criteria;

vii. Whether the City's religious accommodation policies are preempted by the Supremacy Clause facially or as applied, particularly with regard to their undue hardship approach;

vi. Whether the City's accommodation policies violate statutory requirements;

vii. The irrationality and arbitrariness of particular provisions of the Mandates and religious accommodation policies; and

viii. Appropriate remedies to address the discrimination that occurred.

d.  Typicality: Named Plaintiffs' claims are typical of the claims of the Class. Plaintiffs were all employed by the City of New York. The harm suffered by Plaintiffs and the cause of such harm is representative of the prospective Class.

    i.  The claims or defenses of the Named Plaintiffs and the Class arise from the same events and actions by Defendants and are based on the same legal theories.

    ii.  The Named Plaintiffs include most subgroups of the proposed Class– including inter alia impacted municipal and private employees.

e.  Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class.

f.  Plaintiffs do not have any interests that conflict with the interests of the members of the Class. Plaintiffs have engaged competent counsel who are experienced in complex litigation, including class actions.

g.  Superiority: A class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein. A class action will permit numerous similarly situated individuals to prosecute their common claims in a single forum simultaneously without duplication of evidence, expense, and resources. This action will result in uniformity of decisions and avoid risk of inconsistency and incompatible standards of conduct in the judicial system. It will also more efficiently allow adjudication of the pattern and practice claims.

h.  Maintainability: This action is properly maintainable as a class action for the above-mentioned reasons and under Rule 23(b):

    i.  The individual amount of restitution involved is often so insubstantial (considering the substantial cost of federal litigation against a municipality with deep pockets) that the individual remedies are impracticable and individual

litigation too costly;

ii.    Individual actions would create a risk of inconsistent results and duplicative litigation;

iii.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby rendering final injunctive relief or declaratory relief appropriate for the Class as a whole; and

iv.    Individual actions would unnecessarily burden the courts and waste judicial resources.

i.    Predominance: The questions of law or fact common to Class Members predominate over any questions that may affect only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

<u>FACTS COMMON TO ALL CLAIMS</u>

25.    In March 2020, ex-Governor Cuomo declared a statewide disaster emergency due to the emergence of the COVID-19 pandemic.

26.    On March 12, 2020, Mayor de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City posed by COVID-19.

27.    On March 25, 2020, Commissioner Chokshi declared the existence of a public health emergency within the City to address COVID-19.

28.    Throughout New York City and elsewhere, businesses and public authorities transitioned to remote work and tele-commuting wherever possible for much of the rest of the spring of 2020.

29.    Most Plaintiffs and proposed class members, however, were required to continue working in person, even through these early and most serious days of the pandemic.

30.     They were called heroes for keeping the City running during this fraught time.

31.     They all were exposed repeatedly to the most virulent strains of Covid, and most got Covid and acquired robust natural immunity.

32.     On June 8, 2020, New York City began reopening more locations, putting in place safety protocols that included limitations on occupancy of public interior spaces.

33.     By the fall of 2020, the City opened up substantially. New York City public schools even began offering in person instruction again.

34.     In December 2020, the Covid-19 vaccines became available to the public but City workers were not required to take them to work in person.

35.     On June 23, 2021, ex-Governor Cuomo issued a declaration that the state of emergency due to COVID-19 was officially over in New York.

36.     On July 1, 2021, ex-Mayor de Blasio re-opened New York City without restriction.

37.     By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with presently available vaccines; (3) vaccine protection wanes significantly after a short period of time. Entire governments began to acknowledge that we will need to learn to live with COVID-19 as an endemic part of human life, and everyone (vaccinated and unvaccinated alike) will at some point catch and spread COVID-19.

38.     Nonetheless, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the still-experimental COVID-19 vaccines. At a press conference, he described the goals of the program as

9

follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. **But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**. The Key to NYC Pass will be a first-in-the-nation approach. It will require vaccination for workers and customers in indoor dining, in indoor fitness facilities, indoor entertainment facilities. This is going to be a requirement. The only way to patronize these establishments indoors will be if you're vaccinated, at least one dose. The same for folks in terms of work, they'll need at least one dose. This is crucial because we know that this will encourage a lot more vaccination.[1]

39.    No religious exemptions existed under the Key to NYC program, leaving religious minorities unable to participate in fundamental aspects of life in the City, including aspects "literally necessary to living a good and full and healthy life" according to the mayor.

40.    Two days after the "Key to NYC" was announced, on August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the then-dominant delta variant are conclusive: though the vaccines appeared to prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."[2]

41.    Instead of pausing his mandates, Mayor de Blasio began what appears to be a crusade in earnest against the unvaccinated, intruding his ever-expanding mandates into the workplace.

42.    On August 10, 2021, Commissioner Chokshi issued an order requiring staff providing City operated or funded services in residential and congregate settings to demonstrate proof of COVID-19

---

[1]https://www1.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability
[2]http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

vaccination or undergo weekly testing.

43.     In discussing his planned vax-or-test policy in mid-August 2021, Mayor de Blasio remarked that he hoped that the testing requirements would be so burdensome that people would need to get vaccinated to avoid them – demonstrating his animus toward persons who refused to get vaccinated for religious or other reasons and the coercive goals of the mandates.

44.     On August 20, 2021, Mayor de Blasio issued Emergency Executive Order No. 226, substituting new rules for the Key to NYC program for those he had issued in E.E.O. 225. Further amendments to the Key to NYC E.E.O's allowed fast food workers to automatically be considered to have been terminated for "just cause" if they did not get vaccinated and carved out (without any public health justification) exceptions to the Mandate for non-resident athletes and entertainers and their entourages.

45.     Then, on August 23, 2021, once again with no justification from the data or case numbers, Mayor de Blasio and Commissioner Chokshi announced that employees of the New York City Department of Education ("DOE") would not have an option to undergo weekly testing but would now be terminated if they did not receive at least their initial COVID-19 vaccinations by September 27, 2021. All other municipal employees could continue to meet the "Vax or Test" requirements from a previous Emergency Executive Order.

46.     On August 24, 2021, Commissioner Chokshi promulgated a written vaccine mandate ("Original DOE Mandate"), incorporating the policy announced on August 23rd. The Original DOE Mandate included no exemptions for employees of DOE, no matter whether they were employed in DOE school buildings or remotely (with various exceptions for certain categories of employees or reasons other than religious accommodation provided).

47.     Lawsuits and labor disputes ensued. Mass protests erupted and continue to be held.

48.     The City and the DOE openly refused to agree to consider any religious exemptions or

accommodations to the DOE policy as the parties tried to negotiate.

49.    Lawsuits and labor disputes forced the City to agree to accommodate religious beliefs, and the DOE to implement a religious accommodation process.

50.    Sixteen labor unions representing employees of DOE filed a lawsuit ("Municipal Labor Committee Litigation") in the New York State Supreme Court in New York County on or about September 9, 2021, mounting a facial challenge to the constitutionality of the Original DOE Mandate.

51.    Justice Laurence Love issued a Temporary Restraining Order in the Municipal Labor Committee Litigation against enforcement of the Original DOE Mandate because it failed to provide for religious and medical exemptions.

52.    In advance of the return before Justice Love, Commissioner Chokshi issued a new mandate (as amended on September 28, 2021, the "DOE Mandate"), which rescinded the Original DOE Mandate, as amended. The amendment extended the vaccination requirement to staff of charter schools and their contractors. The primary change was that following language was also added as part of the DOE Mandate: "Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law."

53.    Justice Love dissolved the TRO on the City's promise that they would no longer oppose offering legally required reasonable religious and medical accommodation.

54.    In parallel proceedings, the United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse against the City and the DOE. On September 10, 2021, an arbitrator, Martin F. Scheinman, issued an order that required the City and DOE to permit religious exemptions to its DOE vaccine requirements.

55.    This order stated provided that as "an alternative to any statutory reasonable accommodation process, the City" and DOE could use the facially discriminatory criteria and process set forth in the

arbitration order ("Stricken Standards").

***Unconstitutional Stricken Standards Formally Adopted by City and DOE***

56.     On their face, the Stricken Standards, attached hereto as <u>Exhibit 1</u> (not for the truth of what lies therein, but for the fact that the policy was issued and what it said) preferenced Christian Scientists, and categorically excluded "personally held" religious beliefs, and also any religious applicant whose so called "leader" of their faith had publicly supported vaccination.

57.     The Stricken Standards require the state to impermissibly pass judgment on which religions are "valid" and which it will decline to acknowledge or give its blessing.

58.     The Stricken Standards provided that religious objections based on personally held religious beliefs, and not necessarily echoed by the official doctrine of a church as relayed by "clergy", will be denied.

59.     Moreover, to be considered, the exemption "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have religious beliefs that differ from those of their priest or church leadership.

60.     The policy did not only forbit accommodation for employees who follow personal religious paths, which itself is unconstitutional, but went a step further. Under the discriminatory criteria, accommodation was not available to anyone who belonged to religions that were not deemed "established" and "recognized" by the reviewing administrator either.

61.      To the extent that employees had "recognized" church leaders that wrote letters attesting that a person has religious beliefs against vaccination and these beliefs are the beliefs of the church, the Stricken Standards held that the employee should still be denied if the information was available online. If the church has placed a description of their ministry online, the person would therefore be denied an

exemption.

62.     Additionally, if a person did happen to belong to an "established" and "recognized" religious organization that is hierarchical and provided letters from clergy in support (that are not available online), that person would still have to be denied if any "leader" of that person's "religious organization" had ever spoken publicly in favor of vaccination.

63.     The one thing that the policy did do for employees was that for those lucky few who met all the unconstitutional criteria for a qualifying religious belief, those employees "shall be permitted the opportunity to remain on payroll without regard to undue hardship.

*DOE's Initial Implementation of the DOE Mandate*

64.     The City and the DOE were ordered to provide a religious accommodation policy to DOE employees, and they elected to use the Stricken Standards as the exclusive procedure pursuant to which DOE employees were able to file applications for religious exemptions from the DOE Mandate with one exception.

65.     That is, in the initial review, DOE sent out autogenerated denials to every single applicant, without reviewing any application individually, stating that any accommodation would be an "undue hardship" for DOE to accommodate anyone as it would likely be "more than a minimal burden" to do so. These denials stated that they were made in accordance with the Stricken Standards and other applicable laws.

66.     This same email was even sent to DOE employees who were already approved to work remotely that school year and those who could easily be accommodated remotely (such as IT or administrative positions and those who gave trainings or instruction through zoom).

67.     Though the state and federal accommodation statutes require employers to review a request for accommodation in good faith, engage in cooperative dialogue and accommodate employees absent

significant or substantial hardship, DOE failed to even read a single application, leave aside offer a cooperative dialogue prior to denial.

68.    Applicants were given one day to file an appeal with the SAMS arbitration firm, which provided the exclusive method of appeal, and which required conformity with the Stricken Standards.

69.    Pursuant to the DOE's blatantly unconstitutional religious accommodation policy, thousands of DOE employees were denied religious accommodation and suspended without pay beginning October 4, 2021.[3]

***The City and the DOE Aggressively Discriminated During the Arbitrations***

70.    During the arbitration reviews, the City and the DOE colluded to enforce an even more discriminatory policy than the written standards required, as further detailed below.

71.    The Defendants were represented by Corporation Counsel in all of the Zoom hearings that were conducted in SAMS Appeals under the Exemption Standards procedures.

72.    In each appeal, Government representatives repeatedly and zealously presented unconstitutional reasons for denial, repeatedly arguing that employees' applications should be rejected because they conflict with the Pope's decision to get vaccinated, or sometimes the opinions of another popular faith leader (often one that had little or nothing to do with the religious beliefs of the applicant being assessed).

73.    In early lawsuits, the complaints and moving materials did not mention the City's critical role in these discriminatory policies. Further discovery and analysis shows the City was intimately involved.

74.    First, there is the fact that Commissioner Chokshi wrote a letter instructing the arbitrators to deny religious objections based on a concern about the use of aborted fetal cell lines.

---

[3] The original date of September 27, 2021 was pushed back to October 4, 2021 because of a temporary restraining order from the Second Circuit.

75.    This letter, written by Commissioner Chokshi to the arbitrators and disseminated at DOE, instructs reviewers to deny all objections grounded in objection to the use of aborted fetal cell lines in the development of the Covid-19 vaccines. In the letter, Commissioner Chokshi admits that cell lines from aborted fetuses were used in the development of the vaccines, either directly (for example to make tissues to grow the adenovirus used in one of the vaccines) or for safety and efficacy testing required pre-licensure. Nonetheless, he asserts that religious objection was unwarranted because "[a]n array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development." A true and accurate copy of the letter is attached hereto as Exhibit 2 (not for the truth of the assertions, many of which are contested).

76.    Government representatives and arbitrators themselves frequently cited a letter from Defendant Commissioner Chokshi as a basis for denial in the appeals, which questioned the validity of religious objections to the use of fetal cells in the development of COVID-19 vaccines.

77.    Next, it is now known that the City also provided arbitrators and corporation counsel representatives with an instruction to categorically exclude all Catholics, Jews, Buddhists, Seventh Day Adventists and many others regardless of their specific objection, asserting that the "leaders" of these faiths were all in support of vaccination and provided several articles supporting their religious view.

78.    "Leader" is not defined and in practice, but the arbitrators and corporation counsel advocates repeatedly admitted that their official policy, directed by the City, was to view the term very broadly to maximally and categorically deny most religions from accommodation eligibility.

79.    For example, DOE representatives repeatedly brought up an article (provided by the City) showing that a rabbi in Israel was vaccinated, and on this basis claiming no Jew could qualify (even if

her own rabbi submitted a letter supporting her religious objection). Similar articles were provided by City decision makers like Eric Eichenholtz ("Mr. Eichenholtz") to establish a categorical bar for Buddhists (Dalai Lama), Muslims, Seventh Day Adventists, and even non-denominational Christians.

80.    Moreover, there is the fact that the City was a party to the arbitration and was jointly ordered to offer a religious accommodation policy to employees.

81.    We now know that the City also drafted a lot of the discriminatory language of the Stricken Standards, which on their face show an intention is to deny a religious exemption or accommodation to everyone or virtually everyone. In fact, the policy gives only one example of a religion that will be accepted for exemption: Christian Science.

82.    DOE and the City's widespread, acknowledged policy reflected ex-Mayor de Blasio's specific guidance and admission of how the City intended to handle the applications for religious accommodation. In a press briefing held on September 23, 2021, ex-Mayor de Blasio was asked how the City intended to implement the religious exemption policies at DOE and what criteria would be used to select those who would qualify for accommodation. He responded:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. **And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated**. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly the faiths all around the world have been supportive of vaccination. So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection**.

83.    In light of the other evidence of the City's involvement in the DOE religious accommodation process, it is no longer possible to afford an inference on a motion to dismiss to defendants that these comments were merely personal beliefs, divorced from any relationship to the DOE's discriminatory religious accommodation policy.

84.     The Mayor's answer to the press is a clear admission that the City was involved in the DOE religious accommodation process, as ordered in the Stricken Standards. He does not state that the City is not involved, when asked how the City planned to decide who to accommodate, instead, he described the exact unconstitutional criteria that was being applied as intentional, and used the phrase "we are saying very clearly" to emphasize that the City was jointly participating in enacting these policies. On a motion to dismiss, the inference must be afforded to Plaintiffs that the Mayor was not just spouting "personal" opinions, but rather, was admitting to an official City policy and participation in the original discriminatory scheme.

85.     There is no excuse for the adoption of these discriminatory policies.

86.     It is long-settled that discrimination against personally held religious beliefs is unconstitutional and the Defendants were on notice that such criteria violates their employees' rights.

87.     In the 1980s, the New York State Legislature similarly limited religious exemptions, only allowing exemption from vaccination to families who were "bona fide members of a recognized religious organization" with teachings that were contrary to immunization.

88.     After parents with personally-held religious beliefs challenged the language codified into the Public Health Law, a federal court determined that the statute violated the Establishment Clause of the United States Constitution in a number of ways, one of which was to exclude those with personally held religious beliefs from protection.

89.     As a result of that holding, New York State had to change its statutory language to provide religious exemptions to anyone who holds a religious objection, whether personally held or echoed by an established religious organization. In accordance with the court's clear instruction, the statute stated that no certification from clergy or attestation of membership could be required.

90.     To this day, the amended Section 2165 of the New York State Public Health Law, which governs

immunization requirements for adults, states: "this section shall not apply to a person who holds genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such person being admitted or received into or attending an institution."

91.    Such broad and equal protection is the Constitutional floor. The City violated the rights of thousands of employees by adopting a facially unconstitutional policy to administer accommodations required by the First Amendment and Title VII.

***Kane and Keil Lawsuits and Early Proceedings***

92.    A group of educators filed for emergency relief from federal court just before the DOE Mandate's effective date of October 4, 2021. They filed seeking relief for themselves and all others similarly situated and named the City of New York and the DOE as co-defendants.

93.    At that time, many of the *Kane* Plaintiffs still did not know whether their applications were accepted or denied yet. They did know, however, that whatever the outcome, the process itself was boldly discriminatory and harmful. [*Kane* lawsuit].

94.    As part of their application, the *Kane* plaintiffs submitted two expert affidavits. One was from Dr. Marty Makary, M.D., M.P.H., who was at the time a professor and public health expert at Johns Hopkins and is now the Commissioner of the F.D.A. The other was from Dr. Jay Bhattacharya, M.D., PhD, who was at the time a professor and public health expert and is now the Director of the NIH. True and accurate copies of these affidavits are attached hereto as <u>Exhibit 3</u> (Makary) and <u>Exhibit 4</u> (Bhattacharya).

95.    These expert affidavits affirmed that unvaccinated employees posed no significant safety risk, and set forth multiple ways they could be safely accommodated through testing, temperature checks and other measures. The affidavits were served on the City as well as DOE, and put them on notice of the objective science at the time showing that these employees did not pose a direct threat.

96.    Though the district court initially denied relief, a Second Circuit motions panel granted relief and referred the case to an expedited merits panel. Even Corporation Counsel admitted in open court during oral arguments before the motions panel that the policies they had adopted and used to determine religious accommodations were "constitutionally suspect."

97.    The November 28, 2021, merits panel decision of the Second Circuit Court of Appeals found that the DOE Mandate, as applied through the Exemption Standards, was likely to be unconstitutional. *Kane v De Blasio*, 19 F4th 152, 167-169 (2d Cir. 2021) *(Kane I)*. In *Kane I,* The Second Circuit held that the *Kane* plaintiffs were likely to succeed on their free exercise claims against the City and the DOE, vacated and remanded the denial of injunctive relief and ordered that each of the plaintiffs in that suit receive "fresh consideration of their requests for a religious accommodation by a central citywide panel consisting of representatives of the Department of Citywide Administrative Services, the City Commission on Human Rights, and the Office of the Corporation Counsel" (the "Citywide Panel") adhering to "standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law."

98.    The Citywide Panel was a sham. It was created and overseen by Mr. Eichenholtz, who was at the time the Defendants' chief defense attorney in the *Kane I* litigation. And at all times, it was wholly under the control of the Mayor's office and the City of New York. Faced with the claims of thousands of DOE employees who had been denied under the Stricken Standards, Mr. Eichenholtz (and the City) had a motivation to try to mitigate the damage to his client by upholding as many denials as possible.

99.    Motive is not the only evidence that the Citywide Panel's determinations were pretextual. Out of about five hundred applicants reviewed, Mr. Eichenholtz admitted in depositions that the Citywide Panel only reversed and reinstated two DOE employees – one classroom teacher and also one employee, William Castro, who was one of the *Kane* plaintiffs.

100.    The rest were all denied based on pretextual undue hardship and/or continued application of discriminatory criteria as set forth below.

101.    For example, the City denied *Kane* plaintiff Heather Clark's application because they deemed her religious beliefs (grounded in prayer and an objection to the use of aborted fetal cells) as sincerely held but wrong. The Second Circuit reversed the dismissal of Clark's first amendment claims and reinstated her case, holding that the Citywide Panel could not reject personally held beliefs without violating the first amendment. *New Yorkers for Religious Liberty v. City of New York*, 125 F.4th 152 (2d Cir. 2024).

102.    The explanation given to other *Kane* Plaintiffs by the Citywide Panel displayed the same type of discriminatory animus. For example, in denying Sarah Buzaglo, who had been told initially that she was denied because she was Jewish, and thus could not be accommodated due to the City's claim that a Jewish rabbi in Israel was vaccinated, the Citywide Panel referenced the Chokshi letter as a basis for denial, showing that they continued to use the Chokshi letter to deny religious concerns about the use of aborted fetal cell lines. Similarly, the Citywide Panel denied the applications of *Kane* plaintiffs Kane, Chu, Gladding and others as sincerely held but invalid because these plaintiffs' received guidance from God and prayer, which the Panel deemed too personal to qualify.

103.    The Citywide Panel also applied a blanket undue hardship claim as an alternative basis for denying all teachers.

104.    The Citywide Panel never explained why 169 DOE employees who had been accommodated under the Stricken Standards, many of them teachers, could continue to be accommodated while teachers with disfavored beliefs could not.

105.    By allowing this capricious double standard, the City and DOE created a two-tiered system that only further entrenched the discrimination that the Second Circuit had chastised them for.

***The City Adopted Additional Mandates Applicable to Separate Groups***

106.    After the District Court initially declined to issue a preliminary injunction against the DOE Mandate in early October, the City began issuing a flurry of additional vaccine mandates, despite their receipt of the expert declarations of Dr. Makary and Dr. Bhattacharya showing that accommodation would not present a safety issue.

107.    These Mandates were not guided by the science or emerging scientific consensus.

108.    On the contrary, as more and more studies came out showing that the Covid-19 vaccines cannot stop the spread of the virus, and are for personal protection, not community protection, new mandates seemed to follow rather than any rollback.

109.    The City's own databases showed the vaccine mandates were not working. For example, at DOE, the case numbers were far higher among the fully vaccinated staff than they had ever been when unvaccinated staff were allowed to work in person. Their daily report was publicly available, and showed an average of about 30 total covid-19 cases on any given day prior to the date all unvaccinated staff were put on leave without pay or accommodated remotely in October 2021. After that date, cases rose to 50-60 and sometimes as high as 5,000 in a day among the fully vaccinated staff.

110.    Later commissioners of health admitted that the goal had been for all the mandates to work together, and piecemeal result in COVID-19 vaccine mandates for everyone.

111.    But instead of doing it all at once and risking widespread organized resistance, the City picked people off, group by group, each group hoping that perhaps in their agency, reasonable religious accommodations would be granted.

### *The City Employee Mandate*

112.    On October 20, 2021, after issuing a series of additional mandates outside of DOE, Commissioner Chokshi issued a mandate covering all municipal employees (the "Municipal Mandate")

rescinding the option of testing weekly and requiring each employee to get two doses of the Covid-19 vaccine unless provided with religious or medical accommodation. A true and accurate copy of the Municipal Mandate is attached hereto as <u>Exhibit 5</u>, not for the truth of anything therein but rather for a record of what it stated.

113.    The Municipal Mandate provided explicitly for religious and medical accommodation and provided further carve outs.

114.    For example, due to staffing shortages, it did not initially apply to most Department of Correction ("DOC") uniformed employees. And it did not apply to any employee subject to another vaccine mandate that had been provided with reasonable religious accommodation, or to certain per diem employees working in public facing jobs regardless of accommodation status.

115.    On October 28, 2021, the City issued guidance for applying for reasonable religious and medical accommodation from the Municipal Mandate, stating that accommodation could *only* be granted for "documented" religious reasons. A true and accurate copy of the policy is attached hereto as <u>Exhibit 6</u> (not for the truth of anything therein but rather for a record of what it stated) ("October Guidance").

116.    According to October Guidance, "A sincerely held religious, moral or ethical belief may be a basis for a religious accommodation. A request based solely on a personal, political, or philosophical preference does not qualify for a religious accommodation."

117.    Upon information and belief, Mr. Eichenholtz assisted with the drafting of this provision, even though he and the City were on notice from the district court proceedings and *Kane* filings that personally held religious beliefs are just as protected as those that are decreed by orthodoxy.

118.    The Municipal Mandate also allowed employees to work in person while awaiting a decision on appeal, stating "For reasonable accommodation requests filed on or before October 27, 2021, employees will be permitted to continue to submit weekly negative PCR test results while their accommodation

23

request is under consideration or on appeal", and "Any employee who requests a reasonable accommodation from their agency on or before October 27, 2021 and is awaiting a reasonable accommodation determination from their agency or on any appeal must continue to submit a negative PCR test result within every seven-day period, as previously required."

119.    The October Guidance also stated that "the primary accommodation from the vaccination mandate that will not cause an undue hardship and/or disruption is weekly testing and submission of negative PCR results. While this accommodation is available for most positions, there will be a few positions, particularly those with significant close and prolonged public contact where even weekly testing may cause an undue hardship and/or direct threat and leave may be the only reasonable accommodation."

*Implementation of the Municipal Mandate*

120.    Pursuant to the Municipal Mandate, each agency of the City was to inform its employees that they could request religious exemptions from the vaccine mandate by submitting accommodation requests within a very short time frame to committees controlled by the agencies.

121.    Initial agency determinations of religious exemption requests were either adjudicated under the Stricken Standards or under no standards at all.

122.    Agency employees tasked with making such determinations were instructed to deny as many accommodation requests as possible.

123.    DCAS instructed agencies to deny any religious beliefs that were "personally held" (including those derived from prayer and guidance from the moral conscience) and especially those that were grounded in objections about abortion.

124.    Emails between head EEO officer Tanya O'Neill and reviewers reveal particular animus towards beliefs grounded in a religious objection to abortion. Ms. O'Neill instructed reviewers that they could

deny sincere religious objections related to the use of aborted fetal cells based on wrong facts.

125.    The City sent Commissioner Chokshi's letter to the agencies instructing the agencies to deny religious accommodation requests based on religious objection to abortion, providing them the same letter he'd impermissibly sent to DOE and the arbitrators.

126.    The City and policy makers also sent around articles to reviewers suggesting that no religious accommodation requests should be granted, including an article in the New York Times entitled "I'm a Former Pastor and I don't Believe in Religious Exemptions to Vaccines," which agency reviewers discussed as persuasive evidence that religious objections to vaccines were wrong.

127.    Tanya Meisenholder, then Deputy Commissioner, Equity and Inclusion at the New York City Police Department, emailed reviewers an article by a "former pastor" suggesting that all religious objection to vaccination was invalid.

128.    Mr. Eichenholtz, architect of the Citywide Panel, told reviewers to deny beliefs related to abortion objections and those that were personally held, and to apply a "de minimis" standard to undue hardship assessments.

129.    Despite the fact that the City's own guidance stated that weekly testing was the preferred accommodation for most employees, most applicants were denied religious accommodation by their agencies and given the choice to appeal under the unconstitutional Stricken Standards criteria or a newly created "Citywide Panel" process.

***The Citywide Panel***

130.    In addition to maintaining the facially discriminatory Stricken Standards option in most City departments, the City extended the Citywide Panel appeals process as an alternative across all agencies and departments.

131.    The Citywide Panel was created by Mr. Eichenholtz and Georgia Pestana, who each have

participated intimately in defending the City against the discrimination claims in the *Kane* and related lawsuits.

132.    The Citywide Panel process is just another veiled attempt to continue to discriminate against employees with sincerely held religious beliefs against COVID-19 vaccination. Mr. Eichenholtz, who trained panel members and was chosen by the City as the Rule 30(b)(6) witness to testify about the Citywide Panel, also participated in crafting and defining the blatantly unconstitutional Stricken Standards and in drafting the policy that personally held religious beliefs would be rejected under the Municipal Mandate. He was also the City's chief defense attorney in litigation over the unconstitutional religious accommodation policies.

133.    As might be expected given the conflicts of interest, the Citywide Panel does not provide adequate safeguards to meet the basic constitutional or statutory standards. Some but not all of the widespread deficiencies of the Citywide Panel process are set forth in the paragraphs below.

134.    First, according to the deposition testimony of Mr. Eichenholtz, the Citywide Panel applied the wrong undue hardship standard. Even though Mr. Eichenholtz acknowledged that the City was bound by Title VII, the New York State Human Rights Law and the New York City Human Rights Law, each of which require the employer to prove significant hardship or expense through analysis of statutorily defined factors, he continued to instruct the Citywide Panel to deny most applications based on "undue hardship" on the assumption that any claimed hardship would meet the "de minimis" standard he asked them to apply.

135.    Second, Mr. Eichenholtz also admitted that the Citywide Panel did not engage in any analysis of the statutory factors before determining economic hardship or direct threat, did not review any objective evidence (economic or scientific) to support their undue hardship denial, and did not even independently evaluate any undue hardship assertion or require any agency to justify it before denying

an applicant based on undue hardship.

136.     Rather, the Citywide Panel routinely denied people on undue hardship well into the late summer of 2022, after the City itself admitted that unvaccinated employees did not pose a safety issue.

137.     Third, no Plaintiff was given any meaningful opportunity to be heard, or adequate notice of the reasons for their denial. Nor was any Plaintiff provided with a cooperative dialogue before denial by the Citywide Panel, despite this being a statutory requirement.

138.     Fourth, the issuance of autogenerated denials reveals that individualized determinations required by law are not taking place in good faith. Accommodation applicants are routinely and summarily rejected with an autogenerated explanation "does not meet criteria" email.  The Citywide Appeals Panel has no published rules or regulations to govern its actions, keeps inadequate records of its decision-making process, and is not required to give any reasoned explanation of its decisions.

139.     Sixth, the First Amendment's religion clauses require the Defendants to provide accommodation to Plaintiffs that is the least restrictive alternative available to the Defendants, a requirement that is ignored in virtually every denial issued by the Citywide Panel. It is not constitutional for the Defendants, as governmental actors, to deny Plaintiffs – and thousands of other religiously motivated employees – their constitutional rights simply because the City finds it to be inconvenient to accommodate those rights.

140.     Seventh, as set forth more fully above, reviewers were instructed to impose special disability on certain beliefs.

### *Preliminary Discovery Reveals the Citywide Panel is Not following Constitutional or Statutory Standards*

141.     The City's undue hardship determinations violate statutory and constitutional standards. The Citywide Panel rejected applications of many of the named Plaintiffs and many others on the grounds

that though their religious belief is sincere, they cannot be safely accommodated due to "undue hardship." But:

a.      Mr. Eichenholtz admitted in his sworn testimony that no other Department than the Department of Corrections provided any information that they could base an "undue hardship" determination on; and

b.      The Department of Corrections submission does not contain any individualized assessment of direct threat or undue hardship as required by law; and

c.      Mr. Eichenholtz also admitted in his sworn testimony that the City did not engage in any "direct threat" analysis at all in making their determinations. Rather, they relied on the fact that Mandates were issued to assume that any unvaccinated employee must present an unacceptable risk to their peers, with no review of any scientific or other evidence to support that assumption;

d.      Mr. Eichenholtz also admitted that the Mandates state on their face that nothing in them should preclude reasonable accommodation as required by law, and this therefore means that the Mandates do not provide any justification for finding that it would be a direct threat to accommodate religious employees since they specifically contemplate religious accommodation.

e.      Nonetheless, Mr. Eichenholtz stated that the Citywide Panel believed it could reject religious accommodations on the generalized assumption that it must create at least a *de minimus* burden to accommodate employees who apply; and

f.      Mr. Eichenholtz admitted that the Citywide Panel did not even attempt to consider whether accommodation could be made under the far more rigorous standards set forth under the New York State and New York City Human Rights Laws, which require accommodation unless it would present a *significant* hardship; and

g.    Mr. Eichenholtz admitted that the Citywide Panel did not consider whether accommodation was possible under constitutional standards required of government employers.

142.    The City also violated the First Amendment and statutory standards in assessing applicants' sincere religious beliefs.

143.    For example, Mr. Eichenholtz testified under oath that that applicants' religious objections were not implicated if they were based on the belief that the vaccine contained aborted fetal cells because "a misunderstanding by the employee about the vaccine's ingredients . . . doesn't constitute a religious practice or belief[.]"

144.    When questioned repeatedly on this point, Mr. Eichenholtz doubled down, asserting that incorrect facts do not constitute religious beliefs, even if someone is following the advice of her clergy, concluding: "[i]t's not a religious belief. They cannot -- an employee cannot claim a vaccine contains something they don't claim. If the clergy says it, if -- regardless. If someone says the sky is green, that is -- you know, and we know the sky is blue, then the sky is blue."

145.    The First Amendment (as well as the EEOC's guidance) demands that government actors may not assess the veracity of a religious belief. *Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) (plaintiff's religious objections to a tuberculosis test on the basis that it contained artificial substances were entitled to First Amendment protection regardless of their factual accuracy, even when defendants submitted objective, scientific evidence that test was derived from natural substances).

146.    Mr. Eichenholtz also instructed Citywide Panel members to deny religious accommodation requests from employees who had concerns about the use of aborted fetal cells in the development or testing of the Covid-19 vaccines, even if those beliefs were sincere, as documented in an email from a Panelist confirming that this was his instruction, which he did not refute.

147.    Mr. Eichenholtz and DCAS further instructed reviewers to deny applicants with concerns about

abortion if they did not think to mention other medical products they avoided because of the connection to abortion, including Tylenol and other vaccines.

148.   Mr. Eichenholtz admitted that the Citywide Panel had no good faith basis to even conclude that these other medications did in fact have the same connection to abortion.

149.   In fact, they do not. Some of the medications that the Citywide Panel assumed were developed using aborted fetal cell lines never had any such association, and others never used fetal cell lines to bring the product to market, only in testing after licensure, which to some is a meaningful religious distinction.

150.   Moreover, most people had no idea that aborted fetuses were used to develop any kind of medication before it became a topic of national conversation in the context of the Covid-19 vaccines.

151.   Mr. Eichenholtz also instructed Citywide Panel members to deny religious objections that were derived from prayer, or guidance from conscience, or anything he believed was personally held as opposed to doctrinally required.

152.   The Citywide Panelists routinely did reject "personally held" or "idiosynchratic" beliefs in agreement with this advice.

153.   Mr. Eichenholtz testified that the agencies were required to comply with EEOC standards and said that trained EEO professionals were making decisions at the agency level. He also stated that agencies were not using the standards struck down in *Kane v. de Blasio* and *Keil v. City of New York*. Nevertheless, the FDNY required applicants to present a clergy letter in the religious exemption application process, a requirement struck down in *Kane v. de Blasio* and *Keil v. City of New York*.

154.   Mr. Eichenholtz admitted that inconsistent conduct should not be a basis of rejection for those whose religious conversions occurred after the fact, or for those who had an explanation. Yet discovery shows he denied numerous class members and similarly situated employees because they received a

vaccine before their religious conversion, or even in cases where the applicant could explain the reasons why one was allowed but the other was not.

155.    Mr. Eichenholtz testified that the panelists on the Citywide Appeals Panel have the discretion to review cases as they see appropriate, that the different panelists may come to different conclusions based on the facts and circumstances of the case, that the review is exceedingly discretionary and individualized, and that each panelist was entitled to his or her own judgment and opinion with no formal training. He also testified that the panelists were not provided with one or more objective criteria which would determine whether an exemption request ought to be granted or denied by itself.

156.    Mr. Eichenholtz also affirmed that he had discretion to and did sometimes change a Panelists final determination.

157.    Internal emails reveal that the City adopted a policy of denying religious objections based on the connection between vaccines and aborted fetal cells.

158.    Multiple named Plaintiffs and others were denied because though their religious beliefs were deemed "sincere" and "religious in nature", the City did not agree with the applicant that the belief required them to abstain from vaccination.

### *Implementation of the City Employee Mandate by the Department of Parks and Recreation*

159.    On or about October 26, 2021, Parks notified some of its personnel by email that the deadline to submit applications for reasonable accommodation from the City Mandate's vaccination requirement was 5 p.m. on October 27. The Parks' notices attached application forms, which stated the following: "[r]eligious accommodation requests should be submitted with documentation from clergy, identifying religion or describing the religious belief\practice\observances and identify the accommodation required."

160.    After receiving individual accommodation applications, employees of Parks contacted

applicants informing them that as part of the review process, the Parks' Equal Employment Opportunity (EEO) office typically enters into "a cooperative dialogue/interactive process" in which they "ask follow-up questions . . . in order to make a final determination." Such questions included, *inter alia*, the following: "How long have you had this belief? When did your belief develop and how do you adhere to it? Have you been vaccinated before? Flu? What about the vaccination is inconsistent with your faith?"

161.    Upon denying an application, Parks emailed outlines to applicants with information about their options to appeal their denials. The outlines informed Parks employees who were union members that they had two such options.

162.    The first option was to appeal through the City panel made up of representatives from the Department of Citywide Administrative Services, the Law Department, and the Department of Health and Mental Hygiene (for medical) or the City Commission on Human Rights (for religious). The outline stated that the City panel "will make decisions as required by law, based on the documents you submitted to your agency to request your accommodation." The outlines informed applicants that if the panel granted an appeal, "the Panel will provide you with a reasonable accommodation of their choosing; and if were on unpaid leave, you will retroactively be granted paid leave."   On information and belief, this was the only appeal option that was available to Parks employees who were not represented by a labor union.

163.    The second option was to appeal to Scheinman Arbitration and Mediation Services ("SAMS"), in which an arbitrator would use the Stricken Standards.

164.    Specifically, the notice of appeal options stated that under the second option,

> - ***SAMS will only grant your Religious Exemption*** if: 1) your exemption is in writing by a religious official (e.g., clergy); and 2) your religious organization is recognized and established.

- ***SAMS will deny your religious exemption if***: 1) the leader of your religious organization has spoken publicly in favor of vaccines; 2) the documentation you provide appears to be copy-pasted from a readily available source (e.g., from the internet); or 3) your objection to vaccination is personal,  political, or philosophical in nature.

165.    The outline also informed appellants that if they qualified under the Stricken Standards criteria, "you shall be allowed to continue working and remain on payroll; you must submit to weekly COVID-19 testing; and if you have been placed on unpaid leave, you will retroactively be granted paid leave."

166.    Parks employees also received the following information about employment pending determination of their reasonable accommodation requests:

> II. EMPLOYMENT STATUS PENDING REVIEW OF YOUR REQUEST
>
> If you requested a reasonable accommodation, by the end of the day on 11/02/2021 - You will remain working and on payroll, subject  to weekly COVID-19 testing, pending your agency's determination and your appeal.
>
> If your request was made after 11/02/2021 but by the end of the day on 11/05/2021- You will remain working and on payroll, subject to weekly COVID-19 testing, pending your agency's determination. While your appeal is pending, you may be placed on unpaid leave.
>
> If your request was made after 11/05/2021 - You will be placed on unpaid leave starting on 11/01/2021, and will remain on unpaid leave until the final determination of your request.
>
> If your request for reasonable accommodation is denied, you will be placed on unpaid leave from 11/01/2021 to 11/30/2021 (unless you can temporarily remain working based on the criteria above). If you choose to become vaccinated prior to 11/30/2021, you can return to work at the same work location within one (1) week of your notice and submission of proof of vaccination.

167.    On information and belief, the Citywide Panel denied the vast majority of the accommodation applications submitted by Parks employees, typically informing denied applicants by emails stating that

"[t]he decision classification for your appeal is as follows: Does Not Meet Criteria." However, some Parks employees who did not submit letters from their pastors received exemption grants.

168.    Denied Parks applicants were informed that pursuant to the City's policy concerning the mandate, they had three business days to submit proof of vaccination, or be placed on leave without pay ("LWOP").

169.    Applicants who replied to Citywide Panel denials asking which criteria they had failed to meet received no response.

170.    Parks employees who failed to submit proof of vaccination after denial of their appeals by the Citywide Panel received an email giving them a short deadline to choose either to separate voluntarily from Parks and maintain health insurance through June 30, 2022 (while waiving any right to challenge this separation), remain on LWOP through June 30 and maintain health insurance until that time (while waiving any right to challenge separation after June 30), or be terminated on the deadline.

171.    Parks employees who agreed to accept either of the LWOP or voluntary separation options were required to return a signed waiver to Parks within ten days, in violation of federal and state employee protection laws.

172.    Parks never submitted any documentation to the Citywide Panel regarding undue hardship, and the Citywide Panel never reviewed whether it would be an undue hardship to accommodate any Parks employee.

173.    Two lifeguards were given religious accommodations to work in person by Parks, and were allowed to engage in all their duties, including mouth to mouth resuscitation, without being vaccinated.

174.    Yet Plaintiff Clarke, a gardener, and many of his colleagues who had jobs that were not public facing, were denied religious accommodation.

***Implementation of the City Employee Mandate by the Department of Sanitation***

175.    DSNY employees were required to submit accommodation applications soon after the City Mandate was issued.

176.    DSNY officials sent emails to applicants asking for details concerning the applicants' length of religious beliefs concerning COVID-19 vaccines and how the applicants' religious beliefs have affected their use of other medications, among other questions.

177.    When the DSNY denied accommodation requests, an DSNY employee sent out an email with a short statement of the reason for denial, for example: "Because the information you provided in support of your request has not sufficiently demonstrated to DSNY that there is a basis for granting you an exemption to the above Order, DSNY is denying your request for an accommodation."

178.    DSNY supplied its denied employee applicants with information about a two-option appeal process that was similar to the outline that Parks sent to its employees. It differed, however, in it statement of the accommodation results of approval under the two options.

179.    DSNY employees were told:

> If your appeal is granted by the City panel, you will be permitted to report to work so long as you continue to submit a weekly negative COVID test.

> And:

> If your appeal is granted by the arbitrators, you will be permitted to report to work so long as you continue to submit a weekly negative COVID test.

180.    When Citywide Appeals Panel panels denied religious exemption appeals, typically the only information they provided to DSNY applicants was "Does Not Meet Criteria."

181.    While DSNY claims the power to terminate the employment of unvaccinated employees, as a practical matter, many unvaccinated employees remained in its workforce. They were never terminated by DSNY.

35

182.    Yet others were forced to choose between faith and career.

### *Implementation of the City Employee Mandate by the Fire Department*

183.    FDNY sent out forms for its employees to submit religious exemption applications.

184.    FDNY adjudicators did not, for the most part, contact applicants to conduct individual conversations with them, or, if they did, it was a hasty phone call with no good faith discussion of potential accommodations.

185.    Most religious accommodation applications were denied at the administrative level. Typically, denial notices stated the following: "The asserted basis for the accommodation is insufficient to grant the requested accommodation, particularly in light of the potential undue hardship to the Department."

186.    Some FDNY employees who received initial administrative denials of exemption requests were given the options to appeal either to the Citywide Panel or to a SAMS arbitrator using the Stricken Standards.

187.    Those who chose the Stricken Standards could not be denied based on undue hardship, but did have to meet the discriminatory criteria for what constitutes an acceptable religious belief.

188.    FDNY conceded in related litigation that it allowed over 1,175 employees whose appeals were left pending indefinitely to continue to test weekly in lieu of vaccination throughout the entire mandate.

189.    Many of them were firefighters and other personnel with significant and regular direct contact with the public and fellow employees.

190.    Many of these employees with pending religious accommodation requests who were never suspended or terminated still work at FDNY today, with no break in service.

191.    FDNY also granted many religious accommodations, including to many firefighters and other personnel with public facing job duties and who worked in close contact with other employees. *See, e.g.,* Exhibit 7 [declarations of firefighters including lieutenants with religious accommodations granted

by FDNY to work in person in heavily public facing jobs throughout the pandemic].

192.    In December 2021, FDNY sent a memo around explaining that blood donors do not have to be vaccinated. This was an exception for secular reasons for personnel that posed no different level of danger than those who were not blood donors.

193.    FDNY never submitted any documentation to the Citywide Panel regarding undue hardship, and the Citywide Panel never reviewed whether it would be an undue hardship to accommodate any FDNY employee.

### *Implementation of the City Employee Mandate by the Police Department*

194.    The NYPD supplied accommodation request forms to its employees along with notices that informed them of the City Employee Mandate and procedures to apply for religious exemption. The form informed applicants that "Supporting documentation from you and/or your religious official explaining your religious exemption from the COVID-19 vaccine is strongly suggested."

195.    The NYPD forms also contained the following advice to applicants: "Please be advised that this Reasonable Accommodation, if granted, does not preclude you from adhering to the mandates established in New York City Mayoral Vaccination Mandate for New York City Workforce, which requires the wearing of a facial covering AND mandatory testing in lieu of vaccination."'

196.    The initial administrative denial notifications from NYPD did not state reasons for the denial.

197.    On or about February 8, 2022, as a result of a lawsuit, NYPD employees who had received cursory denial letters received a second, amended denial letter that contained a checklist of boilerplate reasons for the denial.

198.    Uniformed members of NYPD were informed that they could appeal to the Citywide Appeals Panel.

199.    Some NYPD employees were also given an option to file a SAMS arbitral appeal, under the

Stricken Standards.  If they qualified under the Stricken Standards, they were to be accommodated without regard to undue hardship.

200.    NYPD employees were also informed as follows: "Employees with pending appeals will remain on active duty status and continue to work while providing proof of negative COVID-19 testing through CPRS while awaiting final decision of their appeal based upon the applicable agreement with their collective bargaining unit (CBU)."

201.    Mr. Eichenholtz testified under oath that all agencies were required to engage in a cooperative dialogue with applicants.

202.    Nevertheless, an EEO director told trainees at the NYPD who were to evaluate religious exemption requests at the agency level that they could deny people's applications without making any contact with them.

203.    The EEO director also told trainees at the NYPD that if an applicant objects to the vaccine based on its connection to aborted fetal cells but does not mention that the applicant also avoids Tylenol and Pepto Bismol on this basis, then the request should be rejected.

204.    Employees were not told about this arbitrary criteria.

205.    Tylenol and Pepto Bismol did not use aborted fetal cell lines in the development of the product, but instead, upon information and belief, were allegedly tested against cell lines in experiments that had nothing to do with the product licensure, unlike Covid-19 vaccines, which depended on the use of aborted fetal cells for licensure. Many religious people draw this line.

206.    Moreover, there was widespread public discussion of the use of aborted fetal cell lines used in the development of the Covid-19 vaccines, so many religious people were aware of that connection, but it was relatively uknown that Tylenol and Pepto Bismol were tested in experiments that used aborted fetal cell lines, to the extent this is true.

207.    The EEO director also told trainees at the NYPD that the question of whether to grant a religious exemption request was "subjective."

208.    The City intentionally slowed the review process down for NYPD religious exemption applications so that thousands of NYPD employees remained in "pending" status and were able to continue to work.

209.    This policy of pausing the reviews was an intentional policy that was communicated to management and officers, as documented in a recent press article. https://nypost.com/2022/05/21/nypd-puts-4650-vaccine-firings-on-hold-insiders/

210.    Thousands and thousands of NYPD employees, many of them with public facing jobs, were allowed to continue to work in person unvaccinated throughout the entire pandemic through this policy as they waited for their religious accommodation denial appeals to be decided.

211.    Much of this pause appeared to be political as Mayor Adams came under fire for the staffing crisis his vaccine mandates have caused on the force, and the simultaneous unchecked horrific crime wave that the City was experiencing.

212.    The NYPD also granted many permanent religious accommodation requests, including for employees who worked in person in public facing jobs.

213.    Yet, hundreds of other NYPD officers, including Plaintiffs were terminated or forced to resign or retire early, though they pose no greater danger than those allowed to continue working while their application indefinitely pends.

214.    There is no explanation for why employees are not a direct threat to others while their application pends for months on end but somehow cannot be safely accommodated once the agency reviews an application.

215.    The NYPD's decision to pause the reviews highlights that in the NYPD, just as in all of the other

departments, there is no public health necessity to refuse to accommodate religious objectors.

***Continued pressure through reinstatement offers***

216.    Notwithstanding that thousands of religious objectors were temporarily saved from termination through arbitrary carve outs and pauses, thousands of other employees were terminated because they could not get vaccinated due to their sincerely held religious beliefs.

217.    This was especially sinister, in that the City had admitted, before any of the Plaintiffs and other municipal employees were terminated, that there was no longer a public health emergency.

218.    Mayor Eric Adams announced the lifting of the "Key to NYC" requirements on February 27, 2022, stating that, provided COVID-19 indicators continued to show a low level of risk and no unexpected spikes occurred, the mandate would end on March 7, 2022. This decision was confirmed and took effect as planned, allowing businesses such as restaurants, bars, gyms, and theaters to stop requiring proof of vaccination for entry. The rollback was part of a broader effort to ease restrictions as case numbers dropped significantly following the Omicron wave, reflecting a shift toward economic recovery and normalcy.

219.    At the very least, this rollback should have alerted the Citywide Panel and each City agency that the Mandates were temporary in nature, and likely ending soon, so short term accommodations should have been considered.

220.    Instead, the agencies began firing employees in February 2022, just as the Mayor was announcing that the emergency was coming to an end.

221.    Many discretionary carve-outs occurred for secular reasons. For example, the City first made an exception to the Key to NYC private employer mandates by exempting certain non-resident employees. Then, on March 7, 2022, Mayor Adams repealed the Key to NYC Mandates for patrons but kept the Mandates in place for employees. Then later the same month, Mayor Adams carved out athletes,

entertainers, assistants of athletes and entertainers, and other arbitrary categories of employee in an effort to improve economic conditions for his large donors and lobbyists.

222.    In related litigation, Defendants themselves argued that by June of 2022, there was no safety issue or undue hardship at FDNY or any other City agency any longer.

223.    Yet, in June 2022, Defendants offered employees who were previously terminated under the vaccine mandate the opportunity to be reinstated ONLY if they show proof that they have received at least one dose of the vaccine by June 30, 2022.

224.    Toward that end, on June 15, 2022, City agencies were sent a sample notification letter template which said

> As of {insert date} you were terminated from your employment with {insert agency name}. {insert agency name} would like to offer you the opportunity to return to employment if you become fully vaccinated, provided that you share a copy of your vaccination record to {agency contact information} indicating that you have received or will receive at least the first dose by close of business on Thursday, June 30th, and that you intend to receive the second dose by August 15th. Compliance with this requirement is a condition of your return to employment with the City. Once you provide proof of full vaccination (both doses), you will be reinstated to your civil service title at your most recent salary within two weeks of submission of proof of full vaccination, with no change to benefits or break in service.
>
> If you wish to resume employment with the City of New York, you must provide proof of receipt of at least one dose of the vaccine by close of business on June 30th, 2022.
>
> For information regarding where to get vaccinated, please click here: NYC COVID-19 and Flu Vaccine Finder.

225.    Employers are required to accommodate current employees but also potential employees if they are aware they seek religious accommodation.

226.    June 30, 2025 constituted a continuing failure to accommodate employees. The City agencies knew that Plaintiffs and their colleagues required religious accommodation, and they knew it was not an undue hardship to accommodate them. They should have reinstated them with accommodations, not just on the condition that they get vaccinated in violation of their faith.

227.    In or around June 2025, Mayor Adams admitted that the City had never enforced the Private Sector vaccine mandate issued in or around December 13, 2021.

228.    This mandate was officially rescinded in 2022.

229.    By August of 2022, the CDC issued official guidance requiring that vaccinated and unvaccinated employees be treated alike and stressing that both were just as likely to spread Covid-19.

230.    Still, the City kept denying Plaintiffs and class members religious accommodation

<u>FACTS RELATING TO INDIVIDUAL PLAINTIFFS</u>

231.    Detailed facts concerning the individual Plaintiffs are set forth below. Each Plaintiffs' individual section incorporates by reference all paragraphs of this complaint, which are relevant in assessing the individual claims.

***Sharon Tunnell***

232.    Plaintiff Sharon Tunnell (Ms. Tunnell) began working as a fire inspector at FDNY in 2019.

233.    She was well-respected at her job, and had even been approached by her supervisor to see if she would like to be nominated as "employee of the year." She appreciated the compliment but said that she did not want the added mental stress of maintaining that status.

234.    Ms. Tunnell is a Christian and has a deep and abiding personal relationship with God, especially around issues of health and healing.

235.    Her spiritual and cultural traditions, passed down from her mother, an African American woman who came from the south, was to use God's healing herbs and tonics for most illness, like castor oil, soups, and especially prayer.

236.    When she was just five years old, as her mother lay dying, Ms. Tunnell prayed to God with all her might to heal her mother, and she believes her prayers were answered. Her mother had gone instantly blind in one health scare when Ms. Tunnell was only eight years old. Ms. Tunnell prayed and prayed,

and her mother's sight returned. Her mother passed away last year from what Ms. Tunnell believes was an adverse reaction to a vaccine.

237.    Since that time, Ms. Tunnell routinely turns to God and prayer when she encounters illness and generally avoids medications and other material interventions.

238.    She has not taken a single vaccine as an adult, and she routinely rejects medications, even for things like a tooth abscess or other conditions, turning instead to God to heal her.

239.    Ms. Tunnell worked in person throughout the entire pandemic.

240.    Even in March 2020, when much of the City was shut down, she still had to go out in person and conduct inspections and she continued to do so throughout the entire pandemic emergency, until she was placed on leave without pay in 2022.

241.    Ms. Tunnell declined the Covid-19 vaccine in December 2020 when it became available, instead relying on God to keep her healthy.

242.    Despite working in person all throughout the pandemic unvaccinated, and testing weekly, to this day, Ms. Tunnell never once tested positive for Covid-19.

243.    When she was informed that the testing option would no longer be available, Ms. Tunnell prayed to God to give her an answer about what to do. She heard a voice giving her a clear and unequivocal answer that she must not get vaccinated against Covid-19.

244.    Ms. Tunnell prepared a religious accommodation request on or about October 23, 2021 explaining that her sincerely held religious beliefs precluded vaccination and offering to test weekly, wear an N-95 mask, social distance, sanitize, and continue to make the Most High her dwelling place so that "no evil shall befall me and no plague shall come near my dwelling place" (quoting Psalm 91).

245.    Ms. Tunnell explained the basic tenants that she believes support her guidance from prayer, including foundational passages of the Bible commanding that the body is a temple, and the Christian

obligation to keep it clean, as well as passages commanding Christians to place their faith in God for healing.

246.    Ms. Tunnell asserted that it was her personal religious belief that mankind is incapable of healing and sustaining health better than God, and that participating in the Covid-19 vaccine scheme prevents her from worshipping the Creator in the way she sees fit.

247.    Ms. Tunnell also articulated her sincerely held religious concerns that the vaccine appeared to have all the hallmarks of the mark of the beast, and she believed it was the mark of the beast, which she was forbidden from participating in. She noted that the Covid-19 vaccines used genetic coding instructions, which change God's design, and expressed concern about the fact that they used aborted fetal cell lines and a substance called "Luciferase" in their development, which to her were more clear signs that they were tainted by sin and not appropriate under her Christian beliefs.

248.    Ms. Tunnell emailed her request on October 23, 2021, but did not hear back. She then mailed it and also delivered it through an online system on or around October 27, 2021.

249.    While she was waiting for confirmation that her application was received, Ms. Tunnell also put in a request for a thirty-day unpaid personal leave on October 26, 2021. She explained that the Covid-19 vaccine mandate was extremely stressful and that she needed time to clear her mind and make potentially life-changing decisions about her future with FDNY in light of the conflicts it brought up. She hoped to use this time to continue to pray to God and seek affirmation of her understanding of what was required of her.

250.    FDNY denied Ms. Tunnell's request for a thirty-day unpaid leave of absence on the same day, with the "Main reason being our current and predicted manpower shortage."

251.    On or about December 30, 2021, FDNY denied Ms. Tunnell's religious accommodation request with a generic letter stating:

The request for a religious exemption from the vaccine mandate is denied. The asserted religious basis for the accommodation is insufficient to grant the requested accommodation in light of the potential undue hardship to the Department. Given the state of the public health emergency, the nature of the Department's life-saving mission, and the threat to the safety and health of the Department members and the members of the public that the Department members regularly interact with, the requested accommodation cannot be granted.

252.    Importantly, FDNY did not say it would be an undue hardship to accommodate Ms. Tunnell, which they are required to prove before denying any request, but rather, that there was a "potential" for undue hardship, which was unspecified and unsupported by any documentation as required by statute.

253.    This generic determination was widely disseminated by the agency and was based on the unlawful "de minimis" standard, with no individualized assessment.

254.    It was also untrue as it would not be an undue hardship to accommodate Ms. Tunnell.

255.    As set forth above, the City's own guidance provided that weekly testing was the preferred accommodation and would not present an undue hardship in most cases other than in a "few" instances.

256.    Ms. Tunnell's job did not involve extraordinarily close public contact to rise to this level. Though she did typically do walk -throughs of commercial buildings with an escort. A large portion of the inspections would take place outdoors, and the escort or others could easily stand six feet away from Ms. Tunnell during any inside portion of the inspection.

257.    Moreover, though the FDNY issued this denial in December 2021, they continued to allow Ms. Tunnell to work in person unvaccinated so long as she tested weekly through February 6, 2022, showing that she was not in fact a direct threat.

258.    The only reason that they placed her on leave without pay (LWOP) on February 7, 2022 was that they realized her appeal to the Citywide Panel, while under consideration, had been submitted late so they determined that they would not allow her to test weekly while she awaited a decision, as some of her colleagues were allowed to do.

259.    This determination had nothing to do with safety, or a determination that it would not have been safe to allow Ms. Tunnell to continue to test weekly and work in person while she awaited a decision.

260.    FDNY also allowed over a thousand other employees, many of whom had jobs with far more contact with the public, to continue to test weekly in lieu of vaccination throughout the pandemic while they awaited a decision on their religious accommodation requests.

261.    FDNY also granted permanent religious accommodation requests to firefighters and others who had much closer contact with colleagues and the public than Ms. Tunnell did in their daily job duties.

262.    FDNY also had a policy, effective December 2021, that blood donors did not need to comply with the Covid-19 vaccine mandate, showing discretion to grant secular reasons for exemption while claiming "potential for undue hardship" on religious accommodations.

263.    On or about July 11, 2022, Ms. Tunnell received a generic denial from a no reply email vaxappeal@dcas.nyc.gov stating that the Citywide Panel denied the appeal, and that "This determination represents the final decision with respect to your reasonable accommodation request."

264.    The only reason provided was "The decision classification for your appeal is as follows: Does not Meet Criteria."

265.    Mr. Eichenholtz admitted in depositions that nothing supported any undue hardship reason for affirming denial of FDNY employees.

266.    He stated that the FDNY did not provide the panel with any materials to justify or argue for undue hardship, either economic or safety related, that the panel did not independently assess undue hardship, and that neither the panel nor the agency assessed whether any FDNY employee was a direct threat or assess the economic or safety impact of any reasonable accommodation request.

267.    Rather, Ms. Tunnell was denied pursuant to the Citywide Panel's default policy of denying those with personally held religious beliefs, such as hers, and any applicant that mentioned aborted fetal cell

lines, as she had.

268.    On July 27, 2022, Ms. Tunnell was terminated for failing to violate her sincerely held religious beliefs by getting vaccinated.

269.    Ms. Tunnell timely filed a complaint with the EEOC explaining that the City and FDNY were failing to accommodate her sincerely held religious beliefs were being burdened by widespread discriminatory policies that did not comport with the requirements of Title VII to accommodate employees in good faith, and that she was not being accommodated in good faith as required by Title VII. Ms. Tunnell pointed out that the mandates were discretionary, and exceptions were being made for things like "blood donors" while she and her colleagues were being denied based on the potential for undue hardship and other discriminatory reasons.

270.    On or after December 30, 2024, Ms. Tunnell received a right to sue letter from the EEOC.

271.    She timely files this lawsuit within 90 days of receipt of this letter.

272.    Ms. Tunnell also faced retaliation after the Mandate was lifted in February 2023.

273.    Though her unit is still very short staffed, she was told she could not come back without signing a waiver of her right to sue over the civil rights violations she reported.

274.    FDNY also stated that even then she would also have to waive her seniority and start over, with a drastically reduced salary.

275.    Unable to accept such terms, Ms. Tunnell is effectively shut out of her career.

276.    She has lost everything and is just trying to hold on to her life in New York City by a thread through babysitting and odd jobs.

277.    Her emotional, mental and physical health have been significantly impacted by the City's arbitrary and discriminatory policies.

278.    She lost all her savings, which totaled $15,000. In order to survive, she used her savings to pay

her rent and other expenses. She had to go to the food pantry in order to get enough to eat on a tight budget.

279.    More profound and troubling was the psychological toll this loss had on Ms. Tunnell. She was told numerous times that securing a civil service job was supposed to mean a lifelong job.

280.    She had spent years healing from the untimely death of her son, finally getting her life together, holding down a great job that she loved, only to have it taken away from her.

281.    In August of 2022, she went in for a promotion exam with the FDNY. She inquired whether the vaccine was required, and she was told it was.

282.    She passed the exam but could not move forward as she was already placed on leave without pay.

283.    Once the mandate was lifted in 2023, she decided to be proactive and reapply for the same position. Only this time, she was told that because of her educational background she was no longer qualified for the job. This was obviously untrue, as the City knew she had qualified before when she initially took the exam in 2022.

284.    She feels robbed of her dream job, and of the possibility to move up within the ranks. She had dreams and goals to accomplish, which now seem impossible for her to attain. This has taken a heavy emotional toll on Ms. Tunnell's psychological wellbeing.

285.    Ms. Tunnell seeks relief for herself and all the other hard-working City employees who were forced to work through the worst of the pandemic, then thrown away without a thought due to the City's disdain for their religious practices.

### *Edison Gbor*

343.    Plaintiff Edison Gbor ("Mr. Gbor") worked for the FDNY for ten years before he was denied religious accommodation, placed on leave without pay and eventually terminated in 2022.

344.    Mr. Gbor was an EMT for seven years and for the three years prior to his termination, he was employed by FDNY as a firefighter at Engine 92 in the Bronx.

345.    Mr. Gbor was a hero during the pandemic. Early on in the pandemic, the FDNY asked him to go into a fully Covid-19 infected unit in Coney Island to work in person with the sick and ailing staff.

346.    He went without complaint, and when he caught Covid-19, he bore it through meditation and faith and reliance on healing herbs, and then quickly returned to work.

347.    He then continued to go wherever he was needed and tend to New Yorkers in need however he could help and without a thought for his own safety and well-being.

348.    What anchored him through this difficult time was his sincerely held religious practices.

349.    Mr. Gbor grew up in Liberia, and his religious beliefs are deeply rooted in the indigenous nature-based spiritual practices reflecting a worldview in which everything – land, trees, rivers, stones, animals, people and even illnesses, have a spiritual component and humans must maintain harmony with their energies. In his spiritual tradition, natural remedies are used which address not just the physical but also the spiritual aspect of disease.

350.    In or around 2019, Mr. Gbor recommitted to living his life in alignment with the faith of his people and his childhood. Since then, has practiced nature-based religion, maintains strict dietary and lifestyle practices, and believes that healing comes from connecting with the spiritual energy of the earth and humanity and using spiritual energies and faith to grow when challenged with illness. To stay in alignment with the correct energetic flow, he practices Capoera and other energy-based practices, and he avoids vaccines or anything that will interfere with his spiritual and energetic body.

351.    Mr. Gbor used these practices to get through Covid-19 when he was exposed during the early days of the pandemic.

352.    FDNY had no issue continuing to send Mr. Gbor unvaccinated into the most dangerous areas

through the height of the pandemic, and they called him a hero for his work during that time.

353.    When the mandate came out, Mr. Gbor timely applied for accommodation, explaining that he had sincerely held religious beliefs that precluded vaccination and the basis for this belief.

354.    While he waited for a decision, he tested weekly and was allowed to keep doing his same job.

355.    As the weeks dragged on with no answer on his religious accommodation request with no answer, Mr. Gbor's mental health was extremely impacted. He started to have what felt like a nervous breakdown, uncertain how to live with the uncertainty and the constant pressure to violate his faith to keep his job.

356.    Mr. Gbor attempted to seek help from the FDNY's counseling unit. But the unit denied access to him and all of his unvaccinated colleagues and he was unable to get the help he should have been entitled to.

357.    In or around February 2022, FDNY gave him an ultimatum – get vaccinated or placed on leave without pay (even though he still did not have a final answer on his religious accommodation request).

358.    He could not afford to live in New York City and wait for a decision unpaid, so he resigned and moved out of state with his wife.

359.    He felt it was futile to keep trying to get accommodation, given the stories he heard from others being denied without reason, and the hostility that FDNY and the City were showing towards religious beliefs like his, grounded in personal belief and practice.

360.    The stress of living without money, and the emotional and mental consequences of the City's requirement that he choose between faith and a job took a huge toll on Mr. Gbor.

361.    He and his wife separated because of the economic and emotional toll that the City's actions caused.

362.    He tried to get work but could not find comparable work starting over in Florida.

363.    Eventually, Mr. Gbor lost everything – his wife, a home. He had to live in his car, and eventually in the forest.

364.    After some time, he found someone who would rent him space in a barn to sleep for $250 a month and he saved up to be able to come back to New York City area after the Municipal Mandate was rescinded in February 2023.

365.    But this proved futile. Despite repeated efforts, FDNY refuses to hire him back.

366.    Mr. Gbor is still homeless and is in a desperate situation.

367.    He has four children to support, who live in the New York City area, and so he must remain here.

368.    Without a home, or a job, it is very difficult to get back on any kind of career track.

***Gregory Gordon***

369.    Plaintiff Gregory Gordon ("Detective Gordon") worked at the NYPD for sixteen years before they denied him religious accommodation in late 2022 and forced him to choose between his job and faith.

370.    For approximately nine years prior to his denial of religious accommodation, Detective Gordon worked as a squad detective in numerous NYPD detective squads throughout the city.

371.    At the time the Municipal Mandate was enacted, he was working in the 121st Precinct Detective squad in Richmond County, New York.

372.    Detective Gordon and his wife are devout Catholics.

373.    They resided at the time in Richmond County, where Detective Gordon had grown up, and been baptized, christened and confirmed under the rites of the Roman Catholic Church, and where he and his wife were members in good standing.

374.    Detective Gordon has been a sponsor two times over for young Catholics receiving

Confirmation and is a Godfather to his nieces.

375.    The Gordons believe, as their faith teaches them, that abortion is a sin and they believe that the Holy Spirit speaks to us through our moral conscience to help us pause and seek guidance when we are going astray.

376.    When the Covid-19 vaccine mandate came out, Detective Gordon felt that his moral conscience was nagging at him. Something did not feel right about it.

377.    He and his wife researched and were appalled to find out that the vaccine was developed using fetal cell lines obtained from aborted babies, among other religious concerns.

378.    He and his wife prayed about it and determined that this was absolutely unacceptable to their faith, and that it would be a sin for him or any of the family to take the vaccine due to its use of aborted fetal cell lines.

379.    They take this so seriously that the Gordons also immediately stopped using any other product that is associated with abortion, including Tylenol, which they will not even give to their children.

380.    Detective Gordon timely applied for religious accommodation, explaining the tenants of his faith that support his guidance from prayer that it would be a sin to take a Covid-19 vaccine.

381.    He was denied without any explanation.

382.    Soon after, as a result of a lawsuit, the NYPD sent a checklist of boilerplate "reasons" for the denial. These were: (1) Insufficient or missing religious documentation; (2) Objection appears to be based on verifiable false information, misinformation, fear of unknown origin of vaccine or side effects; (3) Written statement does not set forth how religious tenets conflicts with vaccine requirement; and (4) No demonstrated history of vaccination/medical refusal.

383.    Undue hardship was not listed as a reason for denial and was never a reason for denial.

384.    Detective Gordon timely appealed and was allowed to continue to test weekly in lieu of

vaccination while his appeal pended at the Citywide Panel.

385.    In his appeal, Detective Gordon refuted each point asserted as a basis for denial.

386.    He noted that his request quoted eight Holy Bible quotes and had amply supported documentation about his religious beliefs.

387.    He objected to the characterization of his beliefs as "scientific misinformation" noting this has no relation to his sincerely held religious beliefs and further stating: "if my Religious Accommodation was in fact reviewed on an individual basis, the paperwork I attached would have directly negated the aforementioned listed reason for your denial. I attached a printout from North Dakota Heaalth that clearly details the use of aborted fetal cells, which are derived from an aborted fetus, in the development and testing of the currently available vaccines."

388.    He further objected to the bizarre contention that his statement did not set forth how religious tenets conflict with vaccine requirement. He told the City: "I worship God and do not pray to man, or the Pope, or a Bishop or a priest. I pray to God Almighty and fear his judgment for my actions in my life. Since sincerely held religious beliefs can be unique to an individual, evidence from others is not necessary." After this reminder, he reiterated that his primary religious objections were:

   a.    "The vaccine is immoral. As stated previously, cell lines cultured from aborted fetal tissue are used in the development and testing of the available vaccines. This is morally repugnant and unacceptable to me. Some have argued that the absence of proximity between the abortion (1972) and the development of the vaccine (2020) dilutes this argument. 'Let each man decide with his own conscience,' I have to stand and give my antown account to God. (Rev 20:11)."

   b.    "The vaccine is unnecessary for me. I have Covid-19 antibodies, tested and verified. My immune system has functioned as the Creator intended (Ps 139:14) and I hold that my

immunity as at least equal to that of the vaccinated (citing multiple Bible passages)."

389.    Last, Detective Gordon objected to the claim that he had no demonstrated history of vaccination/medical refusal. First, he said this was irrelevant, as it did not speak to the unique properties of the Covid-19 vaccine. Next, he said that it was untrue. He noted that he could not recall once taking a flu vaccine in the last twenty years, and that once he found out Tylenol was tested using aborted fetal cells, he immediately stopped using the product.

390.    Detective Gordon then stated: "I even went a step further to research acetaminophen, to see if it was developed or tested against aborted fetal cells. Acetaminophen was discovered in 1866, and the earliest known Abortion to provide fetal cells was in 1972. Therefore, there is no longer a need to use Tylenol products and Acetaminophen alone is sufficient enough to provide some pain relief."

391.    A true and accurate copy of Detective Gordon's appeal letter to the Citywide Panel is attached hereto as Exhibit 8.

392.    In or around July 2022, Detective Gordon's application for religious accommodation was denied by the Citywide Panel.

393.    Upon information and belief, the Citywide Panel did not provide any reasoning other than "Does Not Meet Criteria."

394.    However, Mr. Eichenholtz admitted that NYPD did not provide any basis to deny any NYPD on the basis of undue hardship, so undue hardship was not a reason that Detective Gordon was denied.

395.    Rather, Detective Gordon was denied by the Citywide Panel because of their discriminatory policy of denying religious accommodation requests grounded in opposition to abortion in reliance, at least in part, on the instruction of Mr. Eichenholtz and Commissioner Chokshi.

396.    Though he was denied accommodation, NYPD allowed Detective Gordon to continue to work unvaccinated until September 16, 2022.

397.    He put in for early retirement in August, and on September 16, 2022, after it was received, he was forced to leave the NYPD.

398.    By this time, the CDC had already issued unequivocal guidance that vaccinated and unvaccinated employees posed the same or similar risk of spreading Covid-19, and should not be treated any differently in a workplace.

399.    Yet, the City obstinately refused to rescind the mandate until February 2023 and will not rehire Detective Gordon unless he waives his right to sue and is willing to start over as a rookie.

400.    By then, the family had already begun the process of relocating to Florida, since Detective Gordon could not find any comparable work in New York City without being vaccinated.

401.    Experiencing forced retirement due to the denial of a religious accommodation led to profound pain and suffering, both emotionally and financially for the Gordon family.

402.    Throughout the entire pandemic, Detective Gordon demonstrated his commitment and resilience by continuing to work, often under challenging conditions, only to be abruptly denied the accommodation that would allow him to align his work with his religious beliefs.

403.    This denial not only stripped away his professional identity but also created a sense of loss and isolation, especially as he was allowed to work up until the very last day before his forced retirement from the NYPD.

404.    The situation was exacerbated by the strain it placed on his marriage, as the necessity to relocate for work led to ongoing conflicts and a feeling of instability in the relationship.

405.    He and his family had to leave their generational home, their family their friends, the kids had to leave school and the entire life they knew.

406.    Additionally, being passed over for promotion to Detective 2nd grade, which he would have gotten but for the denial of religious accommodation, compounded his distress, as it highlights the

unfairness of his circumstances and the sacrifices he made.

407.    Detective Gordon was also forced to collect a much lower pension than he would have been awarded if he was able to complete a full 20 years of service.

408.    Together, these and other challenges caused by the City's wrongful denial of accommodation resulted in significant emotional turmoil, leaving Detective Gordon to grapple with feelings of frustration, disappointment, and uncertainty.

*Francesco Oddo*

409.    Plaintiff Francesco Oddo ("Officer Oddo") was a police officer who had worked for NYPD for ten years before he was denied accommodation and forced to retire in late October 2022.

410.    At the time the Municipal Mandate was issued he was working in the Bronx Court (criminal courthouse) in an administrative desk job.

411.    He was not allowed to be on the street at that time because of June 2021 injury (dog bite from stray dog). He could not use a taser or pepper spray and so was moved to a job that primarily was done through the computer. He had very little contact with the public.

412.    Officer Oddo promptly submitted a religious accommodation request in October 2021.

413.    He was allowed to test weekly and keep working in his job pending a decision.

414.    A lifelong devout and baptized Catholic, Officer Oddo believes that life is sacred, and that it is sin to benefit from the use of aborted fetal tissue.

415.    Officer Oddo consulted his moral conscience when he learned that the vaccines were derived using aborted fetal cell lines and determined that he could not take the vaccines without violating his sincerely held religious beliefs.

416.    As described more fully in his heartfelt letter, Officer Oddo explained that the Roman Catholic Church taught its members that they had to consult their religious conscience on this issue, and while

some Catholics believed after such consultation that they could take the vaccine, he could not in good conscience follow them.

417.    He explained that to a believer, the conscience is how God communicates to us and guides us to do what is right and steer away from wrongdoing.

418.    As Officer Oddo explained, the Catholic Catechism defines conscience as an inner faculty where a person discerns moral truth and applies it to specific actions in accordance with God's will. It is, according to the Catholic Church, must more than a mental process, but rather is the way that God, the Holy Spirit and Christ guide us, and it is the religious duty of every Catholic to learn to discern the voice of conscience over mere personal preferences.

419.    According to the foundational Catechism on conscience isn't a feeling or opinion; it's a rational process rooted in the human capacity to seek truth, guided by God's voice within.

420.    CCC 1776 frames it as an intimate, sacred space: "Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice, ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment… For man has in his heart a law inscribed by God."

421.    Officer Oddo believes, as is taught in the Catholic Church, that conscience is inviolable. CCC 1782 states: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters."

422.    Catholics are bound to obey a certain conscience—when it's clear and aligned with truth. CCC 1790: "A human being must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself."

423.    The City had a discriminatory policy of rejecting all beliefs rooted in conscience, especially

those that involved an objection to abortion as personally held, based on misinformation, and unsupported.

424.    At no time did NYPD reach out to Officer Oddo to engage in cooperative dialogue or seek further information about his religious objection to the Covid-19 vaccine.

425.    Instead, on or about December 20, 2021, NYPD denied Officer Oddo's application, and then issued boilerplate checkbox "reasons" for the denial after the fact stating: (1) Objection was personal, political or philosophical; (3) insufficient or missing religious documentation; (3) written statement does not set forth how religious tenets conflicts with the vaccine requirements; (4) No history of vaccination/medicine refusal.

426.    Officer Oddo timely appealed and was allowed to keep working in person in his job unvaccinated pending a decision on appeal.

427.    In his appeal, Officer Oddo refuted the pretextual reasons for denial.

428.    The NYPD had never asked about refusal of any other medications or vaccines or explained the basis for why this might be relevant.

429.    But Officer ODDO's records kept by NYPD clearly showed he had consistently refused the flu vaccine.

430.    Prior to the Mandate, Officer Oddo had submitted requests for accommodation related to the flu vaccine. If the Department required a history of vaccination refusal, it was in Officer Oddo's records that he had refused the flu vaccine based on his religious beliefs for several years in his many visits to the district surgeon.

431.    On August 8, 2022, he received a denial from the Citywide Panel stating that his appeal was denied. The only reason provided was: "Does not meet criteria."

432.    At no time did the Citywide Panel reach out to engage in a cooperative dialogue with Officer

Oddo.

433.    The Citywide Panel determination was not based on undue hardship, and the NYPD did not provide any materials to support an undue hardship determination to the Citywide Panel.

434.    Rather, the Citywide Panel rejected Officer Oddo because they had a widespread policy of rejecting religious beliefs that were grounded in the religious conscience and an objection to abortion.

435.    Officer Oddo was allowed to continue working unvaccinated after his denial in August until October 29, 2022, when he was forced to take early retirement.

436.    This shows that NYPD had great discretion whether to follow the Commissioner's Mandate.

437.    He was aware of co-workers that were permitted to return to work unvaccinated several months later after the mandate was no longer strictly enforced but before they were appealed shortly after he was forced to take early retirement. By then it was too late for his return.

438.    The City's discriminatory action caused severe economic, psychological, emotional and mental harm.

439.    No longer able to afford his mortgage after he was forced out of his job at NYPD, Officer Oddo lost his house and had to move out of state.

440.    Officer Oddo was forced to collect far less for a pension than he would have earned had he been allowed to stay twenty years, as he had planned.

441.    Together, these and other challenges caused by the City's wrongful denial of accommodation resulted in significant emotional upset, leaving Officer Oddo to grapple with psychological turmoil, and feelings of frustration, disappointment, and uncertainty.

### John D. Brancaccio, Jr.

442.    Plaintiff John D. Brancaccio, Jr. (Mr. Brancaccio) worked for the sanitation department ("DSNY") for seventeen years and seven months before he was denied religious accommodation and

forced onto leave without pay.

443.    Throughout the pandemic, he was one of the unsung heroes that got society through.

444.    While most people worked from home in the early days, commercial waste subsided, while residential waste rose 30% or more.

445.    Mr. Brancaccio worked tirelessly in person, picking up trash that ballooned in volume as people sat at home and ordered everything online.

446.    Meanwhile, Mr. Brancaccio and his colleagues at DSNY had to give up their days off, their Sundays, their vacations, to keep up.

447.    The DSNY was working with a skeleton crew from March 2020 through 2021, as many employees went on leave and had to be out for a variety of reasons.

448.    Though he had seniority, Mr. Brancaccio was reassigned to work the midnight shift for almost nine months straight and then assigned to another shift that required him to get up at 3am.

449.    Nobody provided any protective equipment to the sanitation team. There was no PPE, no gloves, no hand sanitizer.

450.    Mr. Brancaccio had to approach a foundation online to ask if they could help, and they finally sent a case of hand sanitizer.

451.    But it was too late. By then, Mr. Brancaccio and most of his team already had gotten Covid-19 and had natural immunity.

452.    Mr. Brancaccio worked one of the heaviest shifts in the City, servicing massive apartment buildings in Jackson Heights and Corona.

453.    During the pandemic, these areas turned into war zones. He witnessed knife fights, gang violence, and endured people spitting on him, intentionally driving by to hit him, and telling their children in front of him to work hard in school so they did not end up like him.

454.    He did all of this without complaint, and without missing a day.

455.    But then the vaccine mandate came out, and he was thrown away as if he was trash, by the City that he'd served so faithfully his whole career.

456.    Mr. Brancaccio could not take a Covid-19 vaccine.

457.    He is a devout Catholic, having attended Catholic school all the way through high school, and then attending a Catholic University. He and his Catholic wife send their child to Catholic School.

458.    Mr. Brancaccio believes that abortion is sin, and that it was a sin to take the Covid-19 because of the use of aborted fetal cell lines in the development of the vaccines.

459.    The Catholic Church instructed Catholics to consult their moral conscience to determine whether they could in good faith take the Covid-19 vaccine despite its connection to abortion.

460.    Mr. Brancaccio did so, and confirmed that it would be a sin to take a Covid-19 vaccine.

461.    When the Municipal Mandate came out, he was told by his supervisor that it was going to be impossible to get religious accommodation.

462.    Nonetheless he applied for religious accommodation, pulling sources explaining the religious issue and passages from scripture, and explaining that he could not take the vaccine due to the use of aborted fetal cell lines.

463.    DSNY never had a cooperative dialogue with Mr. Brancaccio about his faith, needs or possible accommodations.

464.    Instead, on November 18, 2021, DSNY denied his application without any explanation other than to say that there was no basis to grant him accommodation.

465.    DSNY, like all other City agencies, had been instructed by Commissioner Chokshi to deny religious accommodation requests based on objection to abortion.

466.    Some DSNY employees were accommodated. There was no rational or lawful reason why some

were granted accommodation while others were denied.

467.    Mr. Brancaccio promptly appealed to the Citywide Panel, including in his appeal a letter from a pastor that he consulted with who shared his beliefs and wrote a letter in support, explaining the basis for religious objection and the need to avoid products tainted by sin, like the use of aborted fetal cell lines in the development of the vaccine.

468.    DSNY did not deny Mr. Brancaccio's application on the basis of undue hardship.

469.    There was no undue hardship claim from DSNY, who could have easily accommodated employees without causing a safety issue or economic hardship.

470.    The Citywide Panel denied Mr. Brancaccio's application on January 7, 2022 without any explanation other than "Does not meet criteria."

471.    Shortly thereafter, Mr. Brancaccio was placed on leave without pay.

472.    Mr. Brancaccio was originally told he would be placed on leave without pay until June 30, 2022.

473.    However, in February 2022, Mr. Brancaccio was given an ultimatum – get vaccinated in violation of your religious beliefs or be terminated.

474.    Mr. Brancaccio has a wife and a child in Catholic school to support.

475.    He also felt that it was a sin to get vaccinated and did not want to violate his sincerely held religious beliefs.

476.    Eventually, Mr. Brancaccio, feeling he had no choice, got vaccinated in violation of his religious beliefs so that he could go back to work.

477.    This was extremely traumatic, and continues to cause great psychological and spiritual distress.

478.    Mr. Brancaccio became very depressed after getting vaccinated.

479.    For much of the last three years, he felt he was dragging through the motions.

480.    His arm is still at times sore and numb from the vaccine, which harmed him and caused him

fatigue.

481.    But more harmful is the psychological damage.

482.    Mr. Brancaccio's friends and family repeatedly remarked that he did not seem like himself.

483.    He was so disgusted with himself for violating his faith to feed his family. But he felt he had no choice.

484.    Last August, Mr. Brancaccio made his twenty years and retired.

485.    Had he not been forced to violate his faith, he might have stayed longer, but he could not stand to stay any longer given what the City put him through.

486.    The six weeks of leave without pay had significant financial consequences as well.

487.    Sanitation workers are paid a premium when it snows. Some of the biggest snowstorms of the year occurred during those six weeks, causing Mr. Brancaccio to lose about fifteen thousand dollars of pay for the period. Since this was a pension year, this translated into several thousand dollars a year less in his yearly pension.

488.    Mr. Brancaccio seeks redress for his financial, spiritual, mental and emotional harms. No one should ever be forced to choose between violating their faith and feeding their family, and there was no justification for the City's imposition of this Hobson's choice on Mr. Brancaccio.

*John Clarke*

489.    John Clarke ("Mr. Clarke") is a seventy-five-year-old gardener who had worked for eighteen years for the City and was on the verge of retirement when he was denied religious accommodation and terminated from his job with the Parks Department in 2022.

490.    At Parks, Mr. Clarke worked almost entirely outside, caring for plants and gardens. He also had an office, where he worked alone, on paperwork for the parks department, and where he kept gardening tools.

491.    Mr. Clarke always went above and beyond at his job. Whenever the City needed him, he was there, without question or complaint. He came in nights, weekends, and any other time the City called on him to beautify or tend to a garden for a special event. For the last two years of his employment, Mr. Clarke worked in Brooklyn, maintaining McCarren Park for those years.

492.    Mr. Clarke was so diligent and so beloved that his extraordinary efforts were profiled in a New York Times article in 2010. Elizabeth A. Harris, Gardener Brings Coffey Park Back From Decay, N.Y. Times, Apr. 25, 2010, at MB3, https://www.nytimes.com/2010/04/25/nyregion/25gardener.html (last visited Mar. 31, 2025).

493.    Mr. Clarke worked unvaccinated in person all throughout the pandemic emergency without issue.

494.    In October 2021, when the Municipal Mandate was announced, Mr. Clarke submitted a religious accommodation request.

495.    He explained that for 42 years, he had been a strict vegan for spiritual and ethical reasons and therefore could not take a Covid-19 vaccine.

496.    He and his wife had raised their children without any vaccines, as per their vegan beliefs.

497.    Mr. Clarke's veganism is not just about diet, but it is part of a comprehensive world view that includes the spiritual understanding about man and his relationship to other sentient beings, and the spiritual consequences of harming sentient beings for personal gain.

498.    Under this world view, Mr. Clarke not only avoids products with animal products in them, but also any product that is tested on animals before being brought to market.

499.    Mr. Clarke cannot take any of the Covid-19 vaccines, because none of them are vegan under his strict definition.

500.    The Pfizer vaccine directly used a component of bovine milk in the vaccines.

501.    And all the Covid-19 vaccines were tested on animals during their development, as is legally required by regulatory bodies like the FDA before human trials can begin.

502.    For many spiritual and ethical vegans, this animal testing alone renders the product non-vegan, and off limits to a strict practitioner like Mr. Clarke.

503.    Mr. Clarke is not alone in this understanding of what is permissible and not. The Vegan Society, for instance, has also noted that because animal testing is currently unavoidable in vaccine development, no Covid-19 vaccine can be considered vegan.

504.    On November 17, 2021, the EEO office asked Mr. Clarke to answer several follow-up questions. In answer to how long he'd held the beliefs, and how he'd developed them, he noted he had been a strict vegan for 42 years, and had never wavered, and that his supervisors were aware of his religious practices in this regard. He also explained that he believes humans are best off spiritually and physically if they follow these practices, and that he raised his children vegan as well.

505.    Mr. Clarke further answered that he had not been vaccinated since he was ten years old in 1960. He stated that he could not take a Covid-19 vaccine because they were all tested on animals, which he believes to be inhumane, abusive and immoral. He said he could not break 42 years of strict adherence to his belief system, which he believes to be the most positive and important choice he has ever made for himself mentally, physically, or spiritually.

506.    Mr. Clarke's application was denied by the EEO office on November 18, 2021, with the following reason: "your supporting evidence was determined to be inadequate as it pertains to religion."

507.    Mr. Clarke was given two options: either appeal through SAMS to have his application reviewed under the Stricken Standards, or appeal to the Citywide Panel.

508.    Mr. Clarke does not qualify under the discriminatory Stricken Standards, so he appealed to the Citywide Panel.

509.    He was allowed to continue testing weekly and working in person while his appeal was pending.

510.    Mr. Clarke stated, in his appeal, that his sincerely held religious belief is veganism, that veganism is his religion, and that he had been a strict vegan for the past 42 years of his life, including the entire 18 years he worked for Parks.

511.    He wrote, "It is not merely a diet, but an all-encompassing belief system, way of living and approach to life, particularly as it pertains to how we as humans should treat all of God's living creatures. Veganism may not be traditional, organized religion such as Christianity, Judaism, Hinduism or Islam, but Title VII protects any employees with sincerely held religious beliefs, even if they are not part of an organized or formal religion." He then pointed out that ethical beliefs held with the strength of religious views also qualify for protection.

512.    His appeal further stated that as a vegan, he does not consume meat, dairy or any animal products, and avoids all products with animal-derived ingredients or materials, or which perform animal testing. "It is my belief that we as humans are at our strongest of mind, body and spirit when we follow a vegan diet and belief system…I refuse to take any Covid-19 vaccines, all of which were created through animal testing that I believe to be abusive, inhumane, and immoral…it would be against my sincerely held religious belief of veganism for me to take any Covid-19 vaccines.

513.    Mr. Clarke offered "I have no problem with continuing to wear a mask and submit a weekly PCR test, as I have been asked to, and as I have fully adhered to."

514.    On or about January 29, 2022, the Citywide Panel denied Mr. Clarke accommodation without any reasoning but "Does not meet criteria" and presented him a choice – violate your sincerely held religious beliefs or be terminated in February 2022.

515.    The Citywide Panel did not deny Mr. Clarke on the basis of undue hardship.

516.    Parks Department did not make an undue hardship claim.

517.    Mr. Clarke had a non-public facing and largely solitary outdoor job.

518.    The Parks Department and/or Citywide Panel also did accommodate at least two lifeguards in person during the time when the Municipal Mandate was in effect.

519.    If lifeguards, who have to give mouth-to-mouth resuscitation, are able to be accommodated without presenting an undue hardship or safety issue, a solitary gardener who did not have to stand near anyone to do his job, and worked mostly alone outside, could certainly be accommodated as well.

520.    Rather, the Citywide Panel denied Mr. Clarke solely on the basis of their official policy of denying "idiosyncratic" or "personally held" religious beliefs, which they assert allows a person to exercise personal choice over what beliefs have merit or not and are therefore invalid.

521.    It is well-settled that all-encompassing and deeply held beliefs, like Mr. Clarke's, are protected under the religious accommodation statutes and the religion clause of the First Amendment.

522.    Mr. Clarke was unwilling to violate his sincerely held religious beliefs, so was terminated on February 15, 2022.

523.    He has suffered enormous financial, emotional, mental and psychological harm as a result. Mr. Clarke has very limited resources. He had dedicated almost two decades to Parks and is now left without his full pension and benefits, and without being able to do the job he loved so well.

*David R. Burgos*

524.    David R. Burgos ("Officer Burgos") worked for the NYPD for sixteen years before he was denied religious accommodation and then terminated in April 2022.

525.    He had worked unvaccinated all throughout the pandemic emergency from 2020 on in person, testing weekly.

526.    Like most of his colleagues, he caught Covid-19 and had natural immunity before the Municipal Mandate ever came out.

527.    When Mandate came out, and for the six year prior, Officer Burgos' job was in fleet services in Queens. His job was to keep track of vehicles, doing intakes, outtakes, paperwork related to loaner vehicles and so forth. It was almost entirely administrative in nature without almost no public contact, and limited contact with co-workers. There was some patrol work around the perimeter of the fence, but this was outside and rarely involved contact or close proximity to anyone else.

528.    Occasionally, Officer Burgos would be sent to fill in on patrol if another unit was short-staffed, but this was not part of his normal job description.

529.    Mr. Burgos has sincerely held religious beliefs that do not allow him to take a Covid-19 vaccine.

530.    He is a devout Catholic, who attends Mass weekly, and believes in the Catholic Church's teaching that the body is a temple.

531.    On this basis, Mr. Burgos does not drink alcohol, fasts on Fridays during Lent, and is careful about any foreign or potentially harmful inputs in his body that could alter God's perfect design or which are tainted by sin or harmful substances. On this basis, especially as his faith grew in later years, he regularly refused flu shots offered yearly by the NYPD.

532.    Officer Burgos also believes that he must consult his religious conscience, that it is the voice of the Holy Spirit and ultimately Christ and God guiding us and helping us to discern how to live in accordance with God's plan.

533.    Early on, Mr. consulted his conscience and received a clear message not to take the Covid-19 vaccines.

534.    Mr. Burgos shared this advice with his parents, but they did not listen.

535.    Both of them took the vaccine and then died from adverse reactions to the vaccine shortly thereafter.

536.    Mr. Burgos took this as a further sign that his guidance from God was correct, and he must not

violate his faith with these vaccines.

537.    Later, Mr. Burgos learned that the vaccines also used aborted fetal cell lines in production and development, which was further evidence that his guidance from conscience was correct, as Mr. Burgos believes abortion is a sin and that he cannot benefit from it.

538.    When the Municipal Mandate came out, Officer Burgos submitted a religious accommodation request.

539.    He received a denial with no reasoning.

540.    On or about February 8, 2022 a result of a lawsuit, and without any cooperative dialogue, the NYPD sent him a follow up letter with checkbox reasons. Two boxes were checked: (1) Objection was personal, political or philosophical; and (2) Objection appears to be based on verifiable false information, misinformation, fear of unknown origin of vaccines or side effects.

541.    Mr. Burgos timely appealed to the Citywide Panel.

542.    As the months dragged on, he noticed that while some colleagues were arbitrarily accepted, and thousands with pending applications were allowed to keep working in person (including him), the Citywide Panel appeared to be finding pretextual reasons to deny most applicants it reviewed, and then gave employees only seven days to be vaccinated.

543.    The City's discovery, in the meantime, showed that the Citywide Panel continued to reject personally held religious beliefs, like those derived from conscience or prayer, or those grounded in an objection to abortion.

544.    In or around April 1, 2022, still without an answer from the Citywide Panel, Mr. Burgos resigned to avoid being fired and losing his pension.

545.    Under the NYPD rules in place at the time, vested employees like Mr. Burgos would lose their pension if they were terminated or resigned with less than thirty days notice.

546.    Mr. Burgos could not risk losing his pension if he only had seven days to get vaccinated or be forced into an involuntary resignation and given the Citywide Panel's arbitrary actions towards colleagues, and widespread discriminatory policies, he knew it was futile to place any hope in that process.

547.    Mr. Burgos suffered enormously as a result of the City's failure to accommodate his religious beliefs.

548.    He was in good standing, had never been in trouble, and had dedicated his career to the NYPD.

549.    When he was denied religious accommodation and forced to leave the job he loved, he felt like he was in the Twilight Zone and his identity and sense of the world was shattered and that everything he believed in was destroyed.

550.    Up until that point, he had never experienced anxiety. He had always been stoic, felt like he could handle anything.

551.    Having to choose between job and faith broke him. He began having panic attacks and developed PTSD. He lost a lot of relationships and became deeply depressed.

552.    Officer Burgos also had severe financial losses as a result of the City's discrimination.

553.    He had to take a prorated pension, which is far below what he would have been entitled to if he had been able to work through as he planned until full retirement. He lost a $10,000 a year supplement for completing twenty years, he had to sell his home and his parents' home at a financial impact and move out of state to try to find work.

554.    Officer Burgos is too old to start over as a rookie cop, so he has to make due with whatever jobs he can find, at far less salary than he was making at NYPD.

555.    His career and future were taken from him for no reason.

556.    NYPD never claimed undue hardship to the Citywide Panel and indeed could not. They openly

violated the Municipal Mandate (with the City's full knowledge and consent) by allowing over five thousand unvaccinated police officers with far more public contact than Officer Burgos to work in person throughout the entire mandate, and these officers still have their jobs.

557.    NYPD did not deny Officer Burgos because of hardship, but instead because of their discriminatory definition of what constitutes a valid religious objection.

*John Kennedy*

558.    Plaintiff John Kennedy (Officer Kennedy) worked for the NYPD for fifteen years before he was denied religious accommodation and forced to resign.

559.    He was assigned to and in charge of the Critical Response Command (CRC) canine unit as a Lead Trainer officer. His job was to make sure dog teams were up to par with training and ready to be deployed as needed. He had no contact with the public unless deployed with the dogs, or on detail to a short-staffed unit, and others could have easily been deployed in his stead if that were an issue.

560.    Throughout the pandemic, Officer Kennedy was in and out of work due to his cancer diagnosis and treatment. When he was working, he was outside and in public during the pandemic, dealing with his dogs and society at large, and the NYPD never had an issue with him working unvaccinated.

561.    Officer Kennedy was working full time and leading the CRC unit when the Covid-19 vaccine mandate went into effect and for many years before.

562.    On September 23, 2021, his Commanding Officer in the CRC had written Officer Kennedy a recommendation letter for his promotion from lead trainer officer to detective specialist. This letter made it clear that Officer Kennedy had "continued to exceed expectations" since he had become a Lead Trainer in December of 2020.

563.    Officer Kennedy had excelled in the position, as demonstrated in his earning over eighteen (18) various high-level certifications and trainings while on the job.

564.    In this recommendation letter, his supervisor described Officer Kennedy's exceptional record. Even when he was ill with cancer and while getting numerous treatments, Officer Kennedy displayed "extraordinary perseverance and battled through adversity to return back to his training duties in the CRC K9 unit."

565.    Officer Kennedy could not take the Covid-19 vaccine due to his religious beliefs and also due to medical reasons as he was undergoing treatment for his recurrent bladder cancer.

566.    On October 26, 2021, Officer Kennedy submitted his first request for religious accommodation.

567.    Officer Kennedy is a practicing Roman Catholic who strongly and faithfully opposes the use of aborted fetal cell lines in the development and creation of vaccines. He was baptized and confirmed in the Catholic Church, and he attended Catholic elementary school and Fordham University, which is a Jesuit institution.

568.    As a Catholic, Officer Kennedy practices his faith daily by adhering to the Ten Commandments of Judaism and Christianity.

569.    As a Catholic, Officer Kennedy believes his body is a temple of the Holy Spirit.

570.    As a Catholic, Officer Kennedy believes abortion is a sin and deriving benefit from a product developed using aborted fetal cell lines is a sin.

571.    The Pope recommended that Catholics consult their own moral conscience, which is what Officer Kennedy did when he had to make his decision: honor his religious upbringing and beliefs or go against them to keep his job.

572.    He received clear guidance from his moral conscience and prayer that he could not violate his faith by taking the vaccines, as he

573.    Due to his beliefs, Officer Kennedy no longer even takes Tylenol, because he learned that Tylenol might have also used aborted fetal cell lines in development.

574.    On February 8, 2022, Officer Kennedy's requests for religious and medical accommodation were both denied by NYPD.

575.    Some NYPD officers were accommodated. These officers put in requests for religious accommodation and never heard back whether they were approved or not. These same officers continued to work and once the NYPD no longer enforced the vaccine mandate, they were able to retain their positions and titles. This was not the case for Officer Kennedy.

576.    Officer Kennedy tried to appeal through the website provided by the Department for Reasonable Accommodation (DCAS, one of the agencies on the Citywide Panel), as he was instructed, however when he clicked on the submit button to upload his documents, nothing happened. He took multiple screenshots of his attempts and sent emails to DCAS and never received a response.

577.    On or about April 29, 2022, Officer Kennedy received an email saying he had until May 4, 2022, to comply to the vaccine mandate or be terminated.

578.    As Officer Kennedy was not able to take the Covid-19 vaccine, he was forced to resign from his position. He was allowed to "burn" his accrued time to stay on payroll until September 2022.

579.    On September 1, 2022, Officer Kennedy was forced to be officially resigned and terminated.

580.    Officer Kennedy's promotion never happened.

581.    Officer Kennedy believes his promotion was halted because he requested religious accommodation.

582.    Others within the department who were also up for promotions, and who also submitted requests for religious accommodation, shared the same experience as Officer Kennedy.

583.    Meanwhile, those that did not submit religious accommodations were upon information and belief promoted without issue.

584.    Officer Kennedy applied for unemployment, which was a timely process. In the meantime, the

mandate was no longer in effect at the NYPD and many officers were encouraged to reapply for their positions.

585.    While on unemployment, Officer Kennedy made a fraction of his usual weekly income.

586.    After reapplying for his job and waiting many months, Officer Kennedy was rehired by the NYPD in March 2023.

587.    Officer Kennedy lost his momentum and opportunity for getting a promotion. He lost his lead position within the CRC K9 unit as someone else had taken the role in his absence. He lost all his overtime, which he had rightfully accrued and hoped to use much later in his career as per his retirement plans.

588.    Officer Kennedy had to get financial help from family in order to keep his home in New York.

589.    Once back at work, Officer Kennedy was no longer the Lead Trainer, and was moved to basic patrol by a new supervisor who didn't have a history working with him. This new supervisor instead promoted officers she knew.

590.    Other officers with less experience and no special training now make up the CRC K9 unit, and Officer Kennedy is back on the streets with basic patrol duties. Officer Kennedy did nothing wrong; he just chose to honor his sincerely held religious beliefs.

591.    He seeks to be made whole.

*Marc Robinson*

592.    Marc Robinson ("Officer Robinson") had almost sixteen years of service credit with the NYPD when he was denied religious accommodation and forced to retire in 2022.

593.    He was a New York City Correction Officer starting in November 2006.

594.    During his time training with the police academy, Officer Robinson refused the Hepatitis C vaccine with no issues.

595.    He worked as a corrections officer throughout the pandemic unvaccinated without issue.

596.    When the Municipal Mandate came out, he timely applied for religious accommodation.

597.    For over twenty years, Officer Robinson has been a devout practicing Old Testament Christian.

598.    He and his congregation believe that Jesus is the Messiah, but they also believe they have to keep the Old Testament law.

599.    As an Old Testament Christian, Officer Robinson believes in the sanctity of the blood. He believes, as is stated in the Bible that our bodies are the "Temple of God", that the Spirit of God dwells within our bodies, and that we should keep our temples pure. He also believes, as the Bible teaches, that our bodies are not our own, but God's.

600.    Officer Robinson's sincere religious belief is that taking chemicals defiles the temple which is God's, and that God directed us to use herbs to heal ourselves (Ecclesiasticus 38:4).

601.    Officer Robinson believes that the Lord has commanded that it is a sin to get vaccinated because it pollutes God's temple but also because it places trust in man rather than the Lord.

602.    Because of his religious beliefs, Officer Robinson does not take any vaccines and has refused the flu shot and the Hepatitis B vaccine at the NYPD. He has similarly refused intravenous pain medication when hospitalized.

603.    He has previously received religious accommodation from the NYPD for his beliefs in the form of a beard accommodation.

604.    The NYPD treated these requests and other types of religious or identity-based requests completely differently than the religious accommodation requests related to the Covid-19 vaccine.

605.    They did not question or harass Officer Robinson or other applicants about their beliefs but instead assume the truth of the belief and engage in good faith analysis of hardship, as required by law.

606.    But when it came to the Covid-19 vaccines, the NYPD changed their policy, aggressively

second-guessing employees' beliefs, and substituting judgment to find reasons to deny them, even when sincere.

607.    Officer Robinson was allowed to test weekly while he waited for a response.

608.    In or around February 2022, NYPD denied his request for religious accommodation, without engaging in any cooperative dialogue whatsoever, on the ground that his religious beliefs were allegedly personal in nature and did not mention any history of vaccine refusal.

609.    In fact, NYPD's own records show that Officer Robinson did refuse other vaccines, even those NYPD asked him to take.

610.    Officer Robinson appealed.

611.    He waited as long as he could for an answer, but then he was forced into a vested retirement in or around April 5, 2022.

612.    The reason that he had to retire was because he was vested, and he was told that he had to give thirty days' notice if he wanted to keep his pension. But the Citywide Panel was denying people and only giving them seven days to get vaccinated or face termination.

613.    Officer Robinson could not risk losing his pension, and his lease was also up. He could not sign another lease without knowing if he would have a job for the coming year.

614.    Officer Robinson also saw how arbitrary the Citywide Panel's decisions were.

615.    They accommodated one person in his unit, but denied others, with no rhyme or reason.

616.    Thousands were allowed to keep working unvaccinated throughout the pandemic, but every day was like Russian Roulette, and you never knew when your number would come up and you would suddenly have seven days to get vaccinated or lose your job and likely your pension too.

617.    Another factor was his family. Officer Robinson had a child with another NYPD employee, who worked for NYPD traffic, who shared his religious beliefs against vaccination, and was also forced out

after NYPD denied her religious accommodation request.

618.    They could not survive in New York City any longer unemployed, and vaccine mandates precluded them from getting work anywhere nearby.

619.    Officer Robinson knew he could not violate his sincerely held religious beliefs and saw that it was futile to hold out hope for the Citywide Panel, who appeared to be engaging in blatant religious discrimination.

620.    He gave his notice, and on or about April 5, 2022, vested out at a fraction of the pension he would have been entitled to if he was not forced out.

621.    Because NYPD denied him religious accommodation, Officer Robinson was forced to leave New York City.

622.    Officer Robinson has gone through severe mental, emotional, and psychological stress.

623.    His partner left him, in large part due to the stress of the situation and moved with their daughter to Florida.

624.    Officer Robinson currently has no home and is couch-surfing and trying to get by on a fraction of the money he made at NYPD working as an armed security guard.

625.    He has fallen into a deep depression and feels he lost everything he had.

626.    He has no health insurance and cannot afford to see a therapist.

627.    His health is deteriorating, and his mouth is in severe pain from cavities he cannot afford to fix.

628.    The good will of others, who have let him stay from time to time, is dissipating.

629.    Officer Robinson tried to return to NYPD, but they refused to rehire him unless he signs a waiver of his right to sue and even then, he will have to start over as a rookie cop.

630.    Officer Robinson has lost everything as a result of the City's refusal to reasonably accommodate him. He will only get a fraction of his pension, and he will always have to live with the indignity and

pain of having to choose between his job and his faith.

***Timothy Rivicci***

631.    Timothy Rivicci ("Mr. Rivicci") is a dedicated civil servant, former NYPD police officer and was an FDNY firefighter from 2016 until he was denied religious accommodation and terminated in 2016.

632.    Rivicci is also a Born Again Christian, and active member of the Calvary Chapen in Staten Island, where he resides and used to work for the City.

633.    His faith prohibits him from receiving all vaccines.

634.    Mr. Rivicci worked throughout the pandemic in person unvaccinated without issue, testing weekly and continuing to serve as a heroic frontline worker.

635.    He got Covid-19 like most of his colleagues and has robust natural immunity.

636.    When the Municipal Mandate came out, he applied for religious accommodation.

637.    The FDNY allowed him to work in person while his request was pending so long as he tested weekly.

638.    He maintained high levels of antibodies throughout against Covid-19.

639.    Mr. Rivicci submitted an eight-page personal statement with his application for accommodation, detailing his Christian faith and his rejection of all vaccines for religious reasons. He explained that he had always been supportive and enthusiastic about vaccines until he learned several years prior to the pandemic that they used aborted fetal cell lines in their production and development. Upon learning this, he knew that he could not take vaccines. As a Christian, he believes abortion is a sin and that he cannot profit from it.

640.    With his application, Mr. Rivicci also submitted a letter from his pastor, attesting that Mr. Rivicci has strongly held faith-filled convictions against receiving the vaccine and explaining that Mr.

Rivicci's religious conscience prevented him from getting the vaccine, and that he sincerely believed that it would damage his soul.

641.    After no discussion with Rivicci, and without engaging in the statutorily required cooperative dialogue, FDNY issued a boilerplate denial stating: "The request for an exemption from the vaccine mandate is denied. The asserted basis for the accommodation is insufficient to grant the requested accommodation, particularly in light of the potential undue hardship to the Department."

642.    Rivicci then submitted his appeal to the Citywide Panel. He included a second personal letter with his application, which stated, among other things: "To take vaccinations would not only shatter my entire relationship with Jesus Christ for the rest of my life, but it would also put my soul in jeopardy for all of eternity. If I were to receive a vaccine knowing what I know now about the foul and impure ingredients, as well as the connections to abortion by using aborted fetal cell lines to test and/or develop the vaccines, it would be a direct violation of my beliefs as a Christian."

643.    Rivicci's appeal included another letter from his Pastor, which explained in pertinent part: "Timothy's objections to the Covid vaccine are based upon his strongly held faith-filled religious convictions. His objections are in line with scripture and this Church's teachings."

644.    The Pastor further stated "I am in agreement with Timothy's interpretation of scripture and his religious objection to receiving the Covid vaccine. He should be granted an accommodation to protect his sincere and genuine religious beliefs. The rejection of his religious exemption when he has valid religious objections to receiving this vaccine is wrong."

645.    Rivicci also submitted a statement summarizing his religious beliefs regarding vaccination.

646.    Additionally, he submitted a letter from his attorney, requesting the reversal of FDNY's denial, citing to his religious beliefs, FDNY's failure to engage in any interactive process, and the lack of proof of undue hardship.

647.    Because Mr. Rivicci's initial application had not been filed by October 27, 2021, he was not allowed to test weekly and remain on payroll (like over a thousand of his colleagues) but instead had to go on leave without pay after his initial denial in November 2021 while he awaited a decision from the Citywide Panel.

648.    Eventually, in or around the end of March 2022, the Citywide Panel issued a denial, noting that the decision was solely on the basis of undue hardship, stating: "The decision classification for your appeal is as follows: Employer undue hardship."

649.    Mr. Eichenholtz admitted in sworn depositions that the FDNY had submitted no materials supporting undue hardship or arguing for it, and that the Citywide Panel did not make any independent assessments of undue hardship.

650.    In fact, it would not have been an undue hardship to accommodate Rivicci.

651.    The City's own FAQ stated that testing weekly was an accommodation that would not cause undue hardship.

652.    At least 1,176 of Mr. Rivicci's colleagues were allowed to test weekly throughout the entire mandate in lieu of vaccination.

653.    And dozens of his colleagues were granted religious accommodation.

654.    Mr. Rivicci timely filed an article 78 petition and won on October 5, 2022. The lower court found that the City made an error of law by failing to engage in a cooperative dialogue, and that the boilerplate assertion of undue hardship, absent anything in the record to support it on an individualized basis was arbitrary and capricious.

655.    Mr. Rivicci was eventually reinstated but has not been made whole yet for all of his harms available under statutory and constitutional claims.

656.    Having to choose between his job and faith caused him severe emotional and psychological

trauma.

### John v. Schaefer

657.    John Schaefer ("Officer Schaefer") worked for NYPD for over sixteen years before he was denied religious accommodation and forced to retire.

658.    He worked throughout the pandemic in person unvaccinated without issue in the Queens fleet services division vehicle allocation office which supplied the police department with vehicles.

659.    His job was primarily administrative, with little to no public contact, and limited contact with co-workers.

660.    He and his co-workers also had natural immunity and their desks were not close to each other.

661.    Officer Schaefer is a devout Christian, and received the sacraments of Baptism, Confirmation, Communion and Reconciliation.

662.    In his five-page single spaced letter, he detailed his faith journey, and the personal relationship he developed with God after his daughter's difficult birth.

663.    He believes that abortion is a sin, and he objects to the vaccines, among other religious reasons, because they used aborted fetal cell lines in pre-licensing testing. He feels that participating in the vaccines would be participating in child sacrifice, which is an abomination.

664.    He also believes that the blood and body are sacred and cannot be contaminated with products tainted by sin and unholy ingredients.

665.    For this reason, he does not take any vaccines, and his three children have had to homeschool since 2019 when New York repealed the religious exemption for childhood vaccines.

666.    Officer Schaefer was denied by NYPD on the ground that his beliefs are "personal" and "the written statement does not set forth how religious tenets conflict with the vaccine requirement" and "no demonstrated history of vaccine refusal."

667.    Upon information and belief, the NYPD reviewer did not even read his application, which sites to many tenets and Bible verses and clearly articulates a history of vaccine refusal, not just for himself but his children.

668.    Officer Schaefer appealed to the Citywide Panel. He included in his materials a ten-page letter from an attorney explaining why his religious beliefs were protected and addressing the deficiencies alleged by NYPD.

669.    He was allowed to work in person and continue testing weekly in lieu of vaccination.

670.    Officer Schaefer attempted to wait as long as he could but credibly felt that appeal to the Citywide Panel was futile, as he saw them deny officer after officer with similar beliefs.

671.    On or about July 22, 2022, still not having received an answer from the Citywide Panel, Officer Schaefer was forced to resign to keep his pension and support his family.

672.    Unable to work anywhere in New York City due to the mandates, he and his family had to move south because of the City's discrimination.

673.    The Schaefers have suffered enormous mental, physical, financial and psychological harm due to the City's denial of accommodation.

*Matthew Pasieka*

674.    Matthew Pasieka (Officer Pasieka) worked with the NYPD as a police officer. During the Covid-19 pandemic, he was assigned by the NYPD to the City's office of Emergency Management. There he worked as a liaison, interacting with other city agencies and representatives.

675.    Once the City determined that there was a pandemic emergency response, Officer Pasieka worked in a very public facing capacity, speaking and meeting with people of all walks of life.

676.    He was allowed to complete his job duties in person unvaccinated throughout the pandemic with no issues, as long as he tested weekly, which he did with no problems.

677.    On October 24, 2021, after the City mandated the Covid-19 vaccine, Officer Pasieka submitted his first request for religious accommodation.

678.    Officer Pasieka is a devout Roman Catholic. He grew up in a religious household. As a child, he was baptized, received Holy Communion, and was confirmed in the Catholic Church. Growing up, his family attended church every week and during all the holy services throughout the year.

679.    As an adult, Officer Pasieka transferred to the Cure of Ars Parish in Merrick, New York, where he continues to practice his faith.

680.    Officer Pasieka objected to taking the Covid-19 vaccine because it went against his beliefs that his body should be a holy temple for Christ.

681.    He made this determination after consulting his moral conscience.

682.    He also sat with and sought counsel from his Monsignor pastor before writing his letter for religious accommodation.

683.    In his request letter, Officer Pasieka states that as a practicing Catholic, taking the Covid-19 vaccine would go against his religious beliefs for multiple reasons.

684.    He objected to the vaccine because he believes human life is sacred. The Bible teaches him that our bodies are temples, and God gives us the free will to make our own decisions on how we care for and preserve our bodies.

685.    He objected to the vaccine because it was developed from aborted fetal cell lines. He stated that it is well known that Catholics are against abortion as it goes against the very sanctity of life. Officer Pasieka believes abortion is murder, and taking a vaccine that profited from such murder would go against his profoundly personal and religious conviction.

686.    Officer Pasieka believes that God has a plan for each and every one of us. Abortion directly goes against God's plan.

687.     In his letter, Officer Pasieka cites passages from the books of Psalm, Proverbs, Job. This demonstrates his sincere study and appreciation for the Holy Bible.

688.     Officer Pasieka also cites the importance of free will as his reasoning for rejecting the Covid-19 vaccine. He believes we all have the right to decided what medical treatment, medication, and vaccination we put into our bodies. Again, he quotes three different scriptures from Genesis to further elaborate and support his point.

689.     His ultimate reason for objecting to the Covid-19 vaccine mandate is that it violates his protected right to religious freedom and expression.

690.     Like most other officers in the NYPD who applied for religious accommodation, Officer Pasieka's request was denied by the NYPD on November 30, 2021, not due to undue hardship, but because of a discriminatory rejection of his religious beliefs.

691.     On December 6, 2021, Officer Pasieka appealed the denial.

692.     He never received an answer from the appeal as he felt pressured to resign before getting fired by the NYPD.

693.     Officer Pasieka was rightfully nervous to be fired with no chance of reinstatement. He saw many of his colleagues with the same beliefs as him continue to face discrimination by the Citywide Panel.

694.     Discovery in related cases also showed that the Citywide Panel was rejecting concerns about abortion.

695.     And so Officer Pasieka made the painful choice to resign on March 25, 2022 so he would not lose his pension. His accrued vacation days and other PTO made it possible for him to receive income until June 2022.

696.     Officer Pasieka had to sell his New York condo in order to afford the costs of moving his entire life to Florida, where he worked from April 2022 through May 2023.

697.    He did not make the same income once in Florida. He spent more on rent than he was previously paying on his NY condo's mortgage.

698.    He is looking to recoup all that he lost during the months he had to relocate just to survive.

699.    Officer Pasieka was reinstated to the NYPD on June 2, 2023. He barely retained his seniority, but because he was within the one-year mark, he made the deadline.

700.    Officer Pasieka had to spend even more money than the first time to move back to New York, this time paying higher rent until he could afford another condo to mortgage. The condos were now three times more expensive than when he left.

701.    Officer Pasieka lost a year's worth of his pension accruing, which now means he has to work an additional year to make up for it.

702.    Officer Pasieka has lost money, time, and faith in his NYPD family to make him whole.

703.    Before his religious accommodation was denied, Officer Pasieka had to complete many hours of sensitivity training to accept others' religious habits, clothing, and beliefs. He feels betrayed that the NYPD and the City he loves and serves couldn't afford him the same consideration and sense of humanity.

### Rommel A. Perez

704.    Rommel A. Perez ("Sergeant Perez") worked for NYPD for over sixteen years, plus additional credits for military service, when he was denied religious accommodation and terminated in 2022.

705.    He worked throughout the pandemic as a Sergeant assigned to Manhattan courts.

706.    Prior to the issuance of the Municipal Mandate, Sergeant Perez was injured by a Defendant and because of a shoulder injury from the altercation, could not operate his weapon.

707.    He was officially placed on limited duty, which was supposed to require that he only did administrative work, with no prisoner contact. Accordingly, the majority of his job was administrative,

and included ensuring compliance with penal code regulations, analyzing financial data, analyzing trends, and developing strategies to improve policing performance.

708.    He worked with officers and the District Attorneys' office to finalize charges and ensure defendants had timely arraignments, implemented new procedures and technologies that improved efficiency and streamlined operations, and generally oversaw operations and managed staff.

709.    Sergeant Perez is devoutly religious. He was raised Catholic, but, inspired by his wife, he converted to become a Messianic Jew in or around 2018.

710.    As a Messianic Jew, he believes in Christ but also observes the Sabbath on Saturday, wears a beard, follows the Old Testament and the Torah, and keeps a very strict diet, with no alcohol.

711.    Sergeant Perez has gotten religious accommodation from NYPD before, including for a beard accommodation which was granted without issue or question about his faith.

712.    When the Municipal Mandate was issued, he timely applied for religious accommodation, with a lengthy, heartfelt letter outlining multiple reasons that the vaccines violate his religious beliefs. Some but not all are set forth here.

713.    Sergeant Perez believes that the blood is sacred and that vaccines, which use animal testing, and aborted fetal cell lines in testing, among other issues, spiritually as well as physically pollute the sacred blood. He also believes the vaccines are not Kosher.

714.    He believes that God wants us to turn to prayer for healing, and that we should not use proactive medical interventions to change a healthy body but only heal the sick body.

715.    Sergeant Perez also believes that the vaccines have the hallmarks of the mark of the beast, and that he must not partake of them.

716.    Sergeant Perez was allowed to test weekly and keep working in person while his religious accommodation request was pending.

717.    The NYPD denied Sergeant Perez with the check boxes stating his beliefs were (1) personal/political/philosophical; (2) written statement does not set forth how tenets conflict with the vaccine requirement; (3) no history of medication/vaccination refusal.

718.    Sergeant Perez wrote a lengthy personal letter refuting each point, delving into even more religious detail about his sincerely held religious beliefs, and pointing out that he did have a history of refusing the flu vaccine.

719.    Sergeant Perez was allowed to continue working in person and testing while awaiting his appeal.

720.    On or about August 31, 2022, the Citywide Panel issued a denial giving no other reason than "Does not meet criteria."

721.    On or about September 6, 2022, Sergeant Perez received a follow up email stating that his appeal had been denied (again with no reason provided) and that if he did not receive at least one dose of the vaccine before September 14, 2022, he would be terminated.

722.    Sergeant Perez went through the darkest period of his life as he contemplated what to do.

723.    He had a family to support and he pleaded with God to let him be the sacrificial lamb, and take the shot, so that he could support them. He knew, though, that he could not. His wife and family all shared his religious beliefs and made it clear that they would disown him if he violated their faith.

724.    Sergeant Perez became desperate. He felt he was worth more dead than alive to those he loved and came very close to taking his own life. In the end, he had an epiphany, and the Lord spoke to him and told him it was not worth it and he had to endure.

725.    That Friday, he was fired for refusing to violate his religious beliefs.

726.    Sergeant Perez was financially harmed by the City's actions. But even worse was the emotional, psychological and spiritual harm of being forced to choose between job and faith, which profoundly harmed Sergeant Perez and stay with him to this day.

727.    He was able somehow to get hired back in or around November 2022 (even though there was still a mandate, and he was not granted a religious accommodation, which showed that NYPD had great discretion to follow the mandate or not as they saw fit).

728.    But the NYPD did not give him his time off back and has treated him poorly, and continued to harass him about not being vaccinated.

729.    He had planned to work for thirty years for the NYPD, but the harassment and deprivation of leave made it so stressful that he retired at seventeen years, forfeiting a substantial amount of pension he would have been entitled to.

### Matthew Demerest

730.    Matthew Demerest (Officer Demerest) was employed by the NYPD for six and a half years as a police officer.

731.    During most of the pandemic, Officer Demerest worked full time as a police officer. He dealt with people on and off the streets, in all manner of situations such as city police officers customarily do.

732.    He was allowed to complete his job duties in person unvaccinated throughout the pandemic with no issues, as long as he tested weekly, which he did with no problems.

733.    On October 26, 2021, after the City mandated the Covid-19 vaccine, Officer Demerest submitted his first request for religious and medical accommodation.

734.    Officer Demerest is a devout Roman Catholic. He grew up in a religious household. As a child, he was baptized, received Holy Communion, and was confirmed in the Catholic Church. Growing up, his family attended church every week.

735.    As members of the Catholic faith, Officer Demerest and his family spent time considering the pros and cons of taking the Covid-19 vaccine, and with guidance from prayer and listening to God, they

decided that it would go against their faith to take such measures.

736.    Officer Demerest believes life begins at conception and that the early stages of human development in the womb do not make human life any less meaningful.

737.    He and his family follow the Ten Commandments, including "thou shalt not murder." Abortion is murder in God's eyes and in the eyes and hearts of those who follow him.

738.    Officer Demerest and his family confirmed that their moral conscience would never allow them to take a vaccine that was created and developed using abortion-derived cell lines. This would go against all that they faithfully practice as a Catholic family. Furthermore, that anyone would benefit by taking such a vaccine is preposterous to a devout Catholic such as Officer Demerest.

739.    Officer Demerest believes in protecting and serving those most defenseless in this world. This belief is what motivated him to join the NYPD and the United States Military in the first place.

740.    His sense of responsibility to always defend and protect those who cannot protect themselves will continue to motivate him in his professional and spiritual life.

741.    Officer Demerest has a personal relationship to God, and he understands that as a child of God he has free will to act on his judgment and moral conscience.

742.    Officer Demerest was troubled to learn that the NYPD was coercing him to receive a vaccine that he was morally and religiously opposed to taking. Conscience is one of the central teachings of his faith, and the NYPD was asking Officer Demerest to ignore this Holy guidance.

743.    Since Officer Demerest had contracted covid and fully recuperated, it was clear he had built natural antibodies and a lasting immunity. He had tested for antibodies, proving his long-lasting immunity.

744.    He prayed that the NYPD, his second family, would honor his sincere request for religious accommodation, but on November 17, 2021, his first request was denied.

745.    Officer Demerest appealed the first denial, writing another letter reinstating his religious beliefs and his medical reasons for not wanting and/or needing the Covid-19 vaccines. He had already contracted covid, and healed, and he did not fall under the category of those who are most susceptible to the virus.

746.    Throughout the entire two years of the pandemic, Officer Demerest worked full time as a police officer.

747.    Prior to the issuance of the Municipal Mandate, and for reasons wholly unrelated to Covid-19, Officer Demerest had been moved to an administrative position that was not public facing. His supervisor asked him to work in a specialized, smaller unit, which was temporary but with an assured opportunity to become permanent. It was an opportunity that he decided to take.

748.    Shortly before the Municipal Mandate was issued, his supervisor began the process of making his administrative job permanent.

749.    Officer Demerest promptly filed a heartfelt religious accommodation request detailing his sincerely held religious objections to the Covid-19 vaccines.

750.    After he submitted the application, Officer Demerest's supervisor admitted to him that the process to be permanently moved to this smaller unit was taking longer than usual, and Officer Demerest believes that the delay was because he was asking for religious accommodation. He heard similar stories from other officers seeking religious accommodation whose paperwork for promotion or transfers was also paused without explanation.

751.    On February 8, 2022, his appeal was denied by NYPD on the basis that his beliefs were allegedly "based on verifiable false information, misinformation, fear of unknown origin of vaccine or side effects", and that he had "no demonstrated history of vaccination/medicine refusal".

752.    On February 8, 2022, Officer Demerest also received an email stating that employees denied

reasonable accommodation could appeal the decision within seven days by applying to the NYPD EEOD and sending all documentation to the City Appeals Panel for review.

753.    Officer Demerest appealed his religious accommodation denial, sending all his documentation as required.

754.    On April 12, 2022, he received his first denial from the Citywide Panel.

755.    On April 13, 2022, Officer Demerest emailed Michael Melocowsky, the Executive Director of EEOD, to follow up on his concerns that he never received an interview or had cooperative dialogue about his situation.

756.    On April 13, 2022, at 12:37 p.m., Mr. Melocowsky emailed Officer Demerest stating that someone would be in touch that same day with information.

757.    And approximately four minutes later, at 12:41 p.m., Officer Demerest received an email from Lieutenant Louis A. Lerebours, confirming that his religious appeal was denied.

758.    On May 18, 2022, Officer Demerest received another denial.

759.    On May 19, 2022, he emailed Mr. Melocowsky again to clarify that he never received an interview or engaged in cooperative dialogue regarding his requests.

760.    Mr. Melocowsky informed Officer Demerest that the EEOD were not in charge of the appeals and directed his questions to DCAS.

761.    Officer Demerest again asked Mr. Melocowsky for help reaching DCAS as no contact information was provided to him in his notification. Mr. Melocowsky simply replied that the link provided would allow him to leave a message.

762.    Officer Demerest sent his questions and concerns through the link provided and never heard anything back from DCAS.

763.    On June 3, 2022, Officer Demerest was terminated from a job he loved.

764.    Officer Demerest suffered financial, spiritual and psychological harm as well as mental anguish.

765.    If he hadn't been terminated by the NYPD in such a manner, all of his time/service credit, contributions to his 457, ITHP, and 50/50, could have been seamlessly transferred to the FDNY, which is where he found employment in 2023.

766.    He would have also retained his Tier 2 status if he was never terminated. Now he has to begin again as a Tier 3 in FDNY. When he was Tier 2, Officer Demerest was set to have the option for service retirement in 2033.

767.    Because of this break in service, he would have had to pay out of pocket or to get his accrued time and service back.

768.    Officer Demerest did nothing wrong and his break in service was not his fault. He should not have to pay to transfer everything from NYPD to FDNY, i.e. service credit, Tier 2 status, etc.

769.    Prior to becoming a police officer, Officer Demerest was in the NYS Teachers Retirement System as a substitute teacher for five years, and he was in the NYS Retirement System because he was a lifeguard, and he was able to bring all that he accrued to the NYPD. He even brought over military time. It was all bought back once, it should not have to be bought over again.

770.    Firefighter Demerest continues to protect and serve those in need, and he seeks to be made whole so that he can continue to provide for himself and move on with his life.

*Aretha Simmons*

771.    Aretha Simmons ("Ms. Simmons") worked for the City for nearly sixteen years before she was denied religious accommodation and terminated, first for other City Departments, and for the last six or seven years prior to termination, for DCAS.

772.    Ms. Simmons' job could easily be done fully remote and had been done remotely for most of the pandemic.

773.   She served as an administrative staff analyst and NYCAP center as a help desk representative, which is the system that handles Citywide employee documentation, passwords and other files. Her primary job duties were to answer calls related to benefits (which calls could be forwarded to her home line as they had been during most of the pandemic), work with online employee documentation, hiring, processing applications to get hired and answer emails.

774.   When the Municipal Mandate came out, Ms. Simmons applied for religious accommodation.

775.   She included with her application a detailed personal letter and a letter from a pastor at her church attesting to her faith and need for accommodation.

776.   Ms. Simmons is a devout Judeo-Christian and also a non-denominational Minister and Christian Counselor.

777.   Among other sincerely held religious beliefs that do not allow her to take the Covid-19 vaccines, a central reason Ms. Simmons set forth in her letter is that as a Christian, Ms. Simmons has religious objections to the use of aborted fetal cell lines used in testing the Covid-19 vaccines. Citing Bible versus, she explained that children are recognized by God at the point of creation and are knit together by God in the womb. Children are blessings from God and killing them or using abortion driven cells in any way, whether in the vaccine or testing, is condemned." She also explained that vaccines in general interfere in her faith in the creator, and in his perfect design, as they seek to change a healthy body proactively, even though God made us perfect in his image, and that she had refused flu shots for this reason.

778.   On November 9, 2021, DCAS denied her application, stating: "In your cooperative dialogue with this Office, you stated that since God is your creator and healer, getting the vaccine means that you are not trusting in God to heal you and protect you. You asserted that based on this principle, you do not get the flu vaccine. You were not able to mention any other vaccine or medical interventions that

are or were derived from abortion… Based on the information provided and after careful consideration, this Office determined that you did not provide sufficient testimony to demonstrate that you have a sincerely held religious observance, belief or practice that would qualify for a religious exemption to the COVID-19 vaccine mandate."

779.    Ms. Simmons was shocked. She was a supervisor and knew that this was not the typical way that religious accommodations were handled by the City or DCAS.

780.    The City and the agency did not typically second guess or try to pick apart an applicant's religious beliefs. Rather, when an employee applied for accommodation, the typical response would be to assume sincerity absent a glaring reason to suspect otherwise and assess in good faith whether accommodation could be granted without undue hardship.

781.    DCAS was unwilling to do that with the vaccine accommodations, however.

782.    DCAS was one of the three agencies overseeing the appeals, and was responsible for training nearly every City agency on how to handle religious accommodation requests from the Municipal Mandate.

783.    In emails that have emerged in discovery in other matters, reviewers routinely note that they were instructed by DCAS to reject beliefs that are grounded in personal prayer or concerns about the use of aborted fetal cell lines.

784.    DCAS reviewers showed tremendous hostility towards these beliefs, and went so far as to say that reviewers should reject concerns about abortion even if the employee was sincere, on the basis that they were factually wrong.

785.    Ms. Simmons was given the choice to appeal to the Citywide Panel or to the SAMS arbitrators using the Stricken Standards.

786.    Ms. Simmons timely appealed to the Citywide Panel, which DCAS oversaw as one of three

reviewing agencies. She submitted an additional letter, refuting the claims made by the DCAS reviewer, and reaffirming the religious nature of her concerns.

787.    The Citywide Panel denied her application without any explanation, and she was terminated on or about April 6, 2022.

788.    Ms. Simmons knows of two other members of her church with substantially similar religious objections who were accommodated – one who worked for the human resources administration and another for the Law Department. Yet, she was denied based solely on an objection to her faith, showing that reviewers had tremendous discretion.

789.    After the Municipal Mandate was repealed in February 2023, Ms. Simmons attempted repeatedly to get rehired by the City.

790.    She was forced to apply for her old job at DCAS, which she did. But she was told that they were not hiring for her position. This was not true – at the time, they were actively advertising online for openings in her position which they did not fill for quite some time.

791.    Ms. Simmons suffered severe spiritual, financial, emotional, and psychological harm and mental anguish as a result of the City's actions.

792.    She had a pension loan at the time she was terminated, which she now owes substantial taxes on, as it was seen as a premature withdrawal when she could not pay it back immediately upon termination.

793.    She could not find work despite diligent efforts. She exhausted her savings, went deeply into debt and fell into serious depression. To this day, Ms. Simmons suffers from depression and post-traumatic stress disorder from having been forced to choose between job and faith, and she struggles financially, emotionally and spiritually.

794.    She hopes that through this lawsuit, she can help make herself whole, but also can help others

who were mistreated by the City the way that she was.

## FIRST CLAIM FOR RELIEF

### (Liability under the Free Exercise Clause by All Plaintiffs Against All Defendants)

795.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

796.    The Mandates are unconstitutional, both facially, including as applied through widespread policies and practices, and as applied to the plaintiffs and others, because they violate their right to religious freedom under the First Amendment.

797.    The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that Congress (and by extension, State and City governments) shall make no law prohibiting the free exercise of religion.

798.    Laws that burden religion are subject to strict scrutiny under the Free Exercise Clause particularly when they are not neutral or generally applicable.

799.    Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature. Indicia of animus need not appear in the text of the regulation but must be examined in context through scrutiny of legislative history, related regulations and policies, implementing policies and commentary by decision-makers, among other sources.

800.    Mayor de Blasio, who was the architect of these Mandates, openly expressed animus towards unorthodox religions, admitting to the press that he is convinced by the Pope that scripture does not support a religious objection to vaccination, and stating that religious objections that do not comport with orthodoxy, as the mayor interprets it, will be denied an exemption from the Mandates.

801.    Official policies subsequently adopted by the various City departments and agencies mirrored the mayor's admission that the City intended to impose a special disability on employees with

unorthodox religious viewpoints.

802.    DCAS, the Law Department and agency heads each adopted an open policy of rejecting and discriminating against beliefs grounded in personal prayer or religious concerns about abortion.

803.    The City also showed open animus to unorthodox religions by not only failing to disavow the Stricken Standards after the Second Circuit held that they were discriminatory and unconstitutional. Instead, they began offering them as an option at most City agencies.

804.    This created two unequal tracks – one, available for Christian Scientists, which had no mechanism for denial based on undue hardship, and the other available for the disfavored religions, revealing further animus.

805.    The Municipal Mandate was not generally applicable, since it allowed agencies to make exceptions for thousands of employees for secular reasons while denying religious accommodation as set forth more fully in the complaint. As one of many examples, the Municipal Mandate provided that the appeals had to conclude in 2021, but most agencies allowed the appeals to pend until 2023, and thousands of employees with pending applications were able to continue to work unvaccinated in person due to this secular reason of administrative delay.

806.    Moreover, neither the Mandate nor the religious accommodation policies were generally applicable.

807.    A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions. As detailed in the individual sections, the government exercised great discretion at the agency and appellate level to deny or grant accommodation requests.

808.    The Municipal Mandate provide for highly individualized determinations by government officials about whether the employees' religious beliefs are valid and whether they seem sincere.

Particularly given the City's adoption of brazenly discriminatory standards to judge these applications, and the widespread pattern of hostility and abuse, such unbridled discretion render the Municipal Mandate invalid as a facial matter.

809.    Alternatively, even if the Mandate was generally applicable, the religious accommodation policy was not. Some were arbitrarily granted while others with the same religious beliefs or level of hardship were denied.

810.    Moreover, a policy is not generally applicable if there are carve outs for secular exemptions when religious exemptions are denied, as occurs in these Mandates.

811.    Strict scrutiny therefore applies.

812.    A government policy can survive strict scrutiny under the Free Exercise Clause only if it advances interests of the highest order and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so.

813.    Here, there is no compelling reason to mandate vaccines, as the COVID-19 vaccines cannot stop the spread of disease.

814.    Moreover, to the extent that stopping the spread of COVID-19 is the interest, far more effective and less intrusive measures exist that could be adopted instead.

815.    All Plaintiffs make this claim within the statute of limitations, because their final determination occurred less than three years ago and/or their time is tolled by the pending class action in the related matter New Yorkers for Religious Liberty, Inc. v. City of New York, 1:22-cv-00752-DG-VMS.

## SECOND CLAIM FOR RELIEF
### (Liability under the Establishment Clause By All Plaintiffs Against All Defendants)

816.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

817.    The Mandates violate the Establishment Clause because the City declared, in implementing them, that they intended to preference orthodox religious beliefs over unorthodox or personally held beliefs, and the City specifically noted that they would preference Christian Scientists. Under the Larson test, this requires strict scrutiny, which the City cannot withstand.

818.    Commissioner of Health further compounded this violation by sending a letter to the Citywide Panel and the arbitrators, as well as City agencies, instructing them to deny religious objections grounded in the use of aborted fetal cell lines in testing the vaccines. In so doing, he took an official position on a disputed religious matter, favoring the views of the Pope and other "religious leaders" that he was persuaded by and imposing special disability on those who did not share the majority viewpoint on this issue.

819.    Other decision-makers openly adopted the same discriminatory positions and instructed reviewers to deny beliefs grounded in personal prayer or objection to abortion unlawfully.

820.    The Mandates also violate the Establishment Clause because they fail the coercion test and are enforced by the City to coerce everyone with minority religious views on vaccines to violate their faith and get vaccinated or lose the ability to earn income anywhere in New York City for the foreseeable future.

### THIRD CLAIM FOR RELIEF
### (Violation of the Equal Protection Clause of the
### Fourteenth Amendment to the United States Constitution
### and the New York State Constitution)

821.        On behalf of themselves and the Class, the Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

822.        By their actions, as described herein, Defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected Plaintiffs to the deprivation of the rights, privileges,

or immunities secured by the United States Constitution and New York Constitution.

823.          The religious accommodation policies adopted by the City violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (and the corresponding provisions of the New York State Constitution and New York City Charter) because they categorically discriminate against most religions, and preference Christian Scientists over those with personally held or idiosyncratic religious views.

824.          There is no rational basis for this discrimination. Christian Scientists pose no greater danger than Catholics and other disfavored religions with religious beliefs derived from a concern about abortion or guidance from prayer. Both groups are equally able to spread COVID-19.

825.          Plaintiffs face the loss of their employment, ability to practice their vocation, contractual rights and violation of civil rights and liberties as a result of the discriminatory regulation.

826.          The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

827.          While performing those duties, Defendants intentionally deprived Plaintiffs of securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and the State of New York by arbitrarily discriminating against them based on their religious beliefs, and creed.

## FOURTH CLAIM FOR RELIEF
### Violations of Title VII – Failure to Accommodate, Discrimination and Retaliation

828.     On behalf of themselves and the Class, the Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

829.     They assert that Defendants violated their rights under Title VII by failing to reasonably accommodate their sincerely held religious beliefs, adopting official policies that were discriminatory

against most religions, and continuing to retaliate against them for seeking religious accommodation.

830.    Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

831.    Plaintiffs were entitled to accommodation but were denied religious accommodation by their agencies and the City, in violation of Title VII.

832.    To the extent that Defendants claim "undue hardship" as a defense, Plaintiffs reserve the right to rebut such allegations in more detail and with further evidence, as undue hardship is an affirmative defense and cannot give rise to dismissal for failure to state a claim.

833.    Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

834.    For a Title VII claim, undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

835.    To prevail on this defense, Defendants must show they considered all options for accommodation in good faith and proved, prior to denial, that such options were untenable according to statutory factors and analysis of objective evidence assessed against each individual's circumstances.

836.    Defendants did not meet their undue hardship burden, and the denials on this basis were pretextual.

837.    They used the de minimis standard, even though that was not the standard governing the state

statutory claims and is the wrong standard under Title VII.

838.    They admit there was no documentation or evidence considered, and no safety or economic analysis undertaken before denying employees based on undue hardship.

839.    To the extent that Defendants truly could not accommodate Plaintiffs in person or remotely without substantial hardship, Defendants could have provided other accommodations, such as allowing Plaintiffs to return without waiving their seniority or tenure, providing leave with health insurance not tied to coercive waivers, allowing them to work at other jobs during the leave, and refraining from attempting to block their efforts to collect unemployment insurance while they waited for the "emergency" to subside so they could return to work.

840.    The DOE did not assess any of these potential accommodations to determine whether they would have posed a substantial hardship.

841.    The City's own written policy stated that weekly testing was not an undue hardship, the great weight of the science, as set forth in the declarations from public health experts attached and incorporated herein showed it was not a safety issue to thus accommodate employees, and thousands of employees were allowed to work unvaccinated in person in public facing jobs throughout the Muncipal Mandate's duration.

842.    The City also violated Title VII by engaging in direct discrimination and imposing a disparate impact on unorthodox or disfavored religious beliefs.

843.    First, the City proposed and then adopted a facially discriminatory policy that favored Christian Scientists and categorically disfavored all other religions. The Mayor publicly supported this policy and announced it was the City's intention to discriminate against personally held religious beliefs and any faiths other than Christian Scientists and Jehovah's Witnesses.

844.    Second, after the Second Circuit held that this policy was unconstitutional, the City not only

failed to disavow it but began offering it in most City departments.

845.    Third, the City Health Commissioner drafted and sent a letter instructing decision-makers to deny all religious beliefs grounded in abortion based on his assessment that the concern did not matter, according to his review of what other religious leaders thought.

846.    Fourth, the Citywide Panel used Chokshi's letter in denying religious beliefs grounded in abortion, and both DCAS and Mr. Eichenholtz, from the Law Department, instructed panelists and agency reviewers to deny beliefs grounded in concerns about religious abortion.

847.    Fifth, DCAS and Mr. Eichenholtz continued to instruct the panelists and agency reviewers to deny beliefs that were "personally" derived, such as from prayer or the moral conscience or review of scripture, rather than militated by a religious leader.

848.    Many more examples are listed in this complaint which collectively far surpass an inference of animus and rise to the level of direct evidence of discrimination.

849.    As a direct and proximate result of Defendants' failure to accommodate them, Plaintiffs suffered, and continue to suffer economic damages, including but not limited to high interest on debt, penalties and fines for measures taken to try to survive after they were wrongfully deprived of income, medical debt, loss of homes and assets, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which they are entitled to an award of monetary damages in an amount to be determined at trial.

850.    Plaintiffs are also entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1),

(k).

851.      Plaintiffs are also entitled to punitive damages in an amount to be determined at trial. Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

852.      And Plaintiffs are entitled to reasonable attorneys' fees and costs.

853.      Pursuant to the single filing rule, Plaintiffs are entitled to join this lawsuit because at least one of the named Plaintiffs in this lawsuit (Ms. Tunnell) timely filed complaints with the EEOC alerting the DOE and the City about class-wide discrimination and failure to accommodate, and this lawsuit was timely commenced within ninety days of these Plaintiffs' receipt of a right to sue letter.

854.      Pursuant to the same rule, all members of the proposed class are entitled to Title VII relief on the same basis without individually exhausting administrative remedies. *See Tolliver v. Xerox Corp.,* 918 F.2d 1052 (2d Cir. 1990).

855.      The claims of the rest of the proposed class and group all arise out of the same circumstances and within the same time frame. This is sufficient to allow the entire class to join in this claim pursuant to the single-filing rule. *Id.* at 1058.

## FIFTH CLAIM FOR RELIEF

### Violation of the New York City Human Rights Law

856.      Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

857.      For the same reasons set forth above, Defendants actions violate the New York City Human Rights Law.

858.      In 2005, the City Council amended the administrative code to emphasize the New York

City Human Rights Law's (NYCHRL) uniquely broad and remedial purposes, and again in 2016 to clarify its intent to foster jurisprudence that maximally protects civil rights in all circumstances. Therefore,  although Title VII's analytical framework is applicable to the NYCHRL, claims under the City law must be reviewed "independently from and more liberally than their federal and state counterparts." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted); *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78, 947 N.E.2d 135, 922 N.Y.S.2d 244 (2011) (requiring the NYCHRL to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); *Makinen v. City of NY*, 857 F3d 491, 495 (2d Cir. 2017).

859.    Defendants have adopted an unlawful discriminatory practice by imposing vaccine mandates upon Plaintiffs and Class Members as a condition of retaining their employment, while denying their religious exemption requests, because complying with the mandates would require Plaintiffs and Class Members to violate their sincerely held religious beliefs and practices.

860.    Plaintiffs and all similarly situated Class Members have sincere religious beliefs against vaccination. They alerted the Defendants that they are unable to be vaccinated because of these beliefs but were nonetheless suspended or segregated or otherwise adversely impacted because Defendants refused to accommodate their sincerely held religious beliefs.

861.    Plaintiffs and Class Members were furthermore then harassed, retaliated against and further discriminated against as a result of their sincerely held religious beliefs and creed.

862.    The New York City Human Rights Law applies to the proceedings of the individual agencies as well as the Citywide Appeals Panel.

863.    "Importantly, in contrast to Title VII which does not define 'undue hardship' in the context

of religious accommodation, the NYCHRL adopts a rigorous definition of an employer's 'undue hardship' as 'an accommodation requiring significant expense or difficulty,' and mandating that '[t]he employer shall have the burden of proof to show such hardship.'" *Litzman v. New York City Police Dep't*, 2013 U.S. Dist. LEXIS 162968, *20 (S.D.N.Y. 2013) (quoting N.Y.C. Admin. Code § 8-107(3)(b)).

864.     As set forth supra, Defendants used the de minimis hardship standard and failed to assess the statutory factors or prove undue hardship before denying relief.

## SIXTH CLAIM FOR RELIEF

### Violation of the New York State Human Rights Law

865.     Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

866.     For the same reasons set forth in counts Four and Five, Defendants actions violate the New York State Human Rights Law, both under a failure to accommodate and disparate impact claim.

867.     The NYSHRL states that an undue hardship exists when the accommodation would cause significant expense or difficulty, not "more than a minimal burden" (which is the standard  the City applied).

868.     As described in the Complaint and supporting exhibits, neither the city agencies nor the Citywide Appeals Panel carried their burdens to demonstrate why the requested accommodations would constitute an undue hardship under Title VII, an undue hardship under the New York State Human Rights Law, and an undue hardship under the New York City Human Rights Law—which is what the law requires.

869.     In fact, neither the FDNY nor the Citywide Appeals Panel even explained why

accommodating FDNY plaintiffs would be more than a "potential for undue hardship"—which does not even satisfy Title VII and the EEOC guidance.

870.     Furthermore, Mr. Eichenholtz—an attorney in the City's Law Department who played a critical role in the formation of the Citywide Appeals Panel, provided consultation regarding the standards to be applied by the Citywide Appeals Panel, and served on the Citywide Appeals Panel himself—appeared to not even know that there is a heightened "undue hardship" standard in the New York State and New York City Human Rights Law and stated that the Citywide Appeals Panel followed only the EEOC guidance and the "more than a de minimus burden" standard when assessing undue hardship.

871.     The Citywide Panel made no independent inquiry of whether accommodating applicants would pose an undue hardship to the various agencies' operations, instead relying on whatever agency description of undue hardship already existed in the record. Such descriptions were either nonexistent or threadbare, failing in each instance to incorporate the factors that EEOC guidance and the state and city human rights laws set forth for assessing whether an employer has demonstrated an undue hardship.

872.     The Citywide Panel also did not seek information regarding whether employees posed a direct threat to others, the number of employees agencies could afford to accommodate, agencies' ability to make payroll, any additional costs of accommodating employees, the degree to which the geographic separateness or administrative or fiscal relationship of the facilities would make accommodations more difficult or expensive, agencies' capacities to work with remote workers, agencies' number of available remote sites, agencies' remote site capacities, as well as whether other alternatives were explored—all factors that the state and city human rights laws set forth for

assessing whether an employer has demonstrated an undue hardship.

873.    Mr. Eichenholtz testified under oath that, "I know of no legal requirement that requires at the appellate phase of a review that that sort of assessment be provided at that level of detail."

874.    Additionally, Defendants have not stated a cost of accommodating Plaintiffs, including the costs of loss of productivity and of retaining or hiring employees. In fact, Defendants' cost of not accommodating Plaintiffs itself constitutes a significant expense or difficulty on the agencies, as each agency was facing a major staffing shortage before and after the Plaintiffs and class members were terminated.

## REQUEST FOR RELIEF

Plaintiffs respectfully ask this Court for the following relief:

1.    Certifying the proposed Class pursuant to Rule 23;

2.    Declaring the City's religious accommodation policies unconstitutional on their face, and annulling the denials of religious accommodation, *nunc pro tunc*.

3.    Reinstating Plaintiffs and others denied religious accommodation with no break in service, and restoring their benefits, status and accrued pension and other rights; and

4.    Awarding front pay to those who can no longer return; and

5.    Awarding nominal, actual consequential and punitive damages in an amount to be determined at trial; and

6.    On all Claims for Relief: awarding relief to the Class equivalent to the relief requested for the individual named Plaintiffs identified herein.

7.    On all Claims for Relief: awarding costs of suit; investigation costs; payment of reasonable attorneys' fees; declaratory relief, injunctive relief, pre-judgment interest

and such other and further relief as the Court may deem just and proper.

DEMAND FOR
JURY TRIAL

Plaintiffs and the Class respectfully demand a trial by jury for all issues so triable in this action.

CONCLUSION

Wherefore, Plaintiffs respectfully ask this Court for the relief set forth above and any other relief that the Court deems just and proper.


Dated:  New York, New York
        March 31, 2025

Respectfully submitted,

GIBSON LAW FIRM, PLLC

*/s/ Sujata S. Gibson*

**Sujata S. Gibson**
*Attorney for Plaintiffs and the Class*
Gibson Law Firm, PLLC
120 E Buffalo St. Suite 2
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law