## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

SHARON TUNNELL, EDISON GBOR, GREGORY GORDON, FRANCESCO ODDO, JOHN CLARKE, DAVID R. BURGOS, JOHN D. BRANCACCIO, JR., JOHN KENNEDY, MARC ROBINSON, TIMOTHY RIVICCI, JOHN V. SCHAEFER, MATTHEW PASIEKA, ROMMEL A. PEREZ, MATTHEW DEMEREST, ARETHA SIMMONS, and BRIAN SMITH, individually and on behalf of all other persons similarly situated,

**SECOND AMENDED PROPOSED CLASS ACTION COMPLAINT**

Case No. 25-cv-01781 (AMD)(MMH)

Plaintiffs,

- against -

THE CITY OF NEW YORK, DAVE CHOKSHI, in his official and individual capacity;NELLIE AFSHAR in her official and individual capacity; STEVEN BANKS, in his official and individual capacity; JACKIE BRAY in her official and individual capacity; JAY VARMA in his official and individual capacity; and ERIC EICHENHOLTZ, in his official and individual capacity.
.

Defendants.

------------------------------------------------------------------------ x

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidencecontemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, <u>A Memorial And Remonstrance, On The Religious Rights Of Man: WrittenIn 1784-85</u>

Plaintiffs, proceeding as individuals and as a proposed class, herein complain of the Defendants as

follows:

1

<u>NATURE OF ACTION</u>

1.     This is a religious discrimination action against the City of New York and its senior policymakers arising from the City's implementation of its COVID-19 vaccine mandate and related religious accommodation processes.

2.     Rather than engaging in the individualized, good-faith assessment required by the Constitution and governing statutes, Defendants adopted and enforced policies designed to limit the number of employees who could obtain religious accommodation. Those policies categorically excluded most religions and all personally held religious beliefs, while automatically accommodating members of a narrow set of favored faiths, such as Christian Scientists.

3.     Prior litigation established that the City's original written policy governing religious accommodation—the so-called "Stricken Standards"—violated the First Amendment.

4.     This action builds on that precedent and alleges that, even after the City's attorneys conceded that the Stricken Standards were "constitutionally suspect," and the Second Circuit confirmed that assessment, the City did not rescind the policy. Instead, it replicated and deployed the same unlawful criteria across nearly every City agency.

5.     Employees who did not belong to the privileged religions recognized under the Stricken Standards were diverted to an alternative review process known as the "Citywide Panel."

6.     Discovery has revealed that the Citywide Panel also continued to apply many of the same unconstitutional criteria. Senior policymakers directed reviewers to categorically reject religious beliefs grounded in objections to abortion, prayer, conscience, or any source other than official denominational doctrine.

7.     Consistent with those directives, the City's Law Department—tasked with overseeing the Citywide Panel—has continued to assert, including in recent litigation, that Catholic employees are

2

categorically ineligible for accommodation because Pope Francis received the COVID-19 vaccine, underscoring the persistence of the discriminatory policy.

8. Emails from September 2021, recently produced by court order, which were long improperly withheld by the City's Law Department despite mandated disclosure obligations, show that from the start, even at the DOE, Commissioner Chokshi and high level City policy makers participated in directing decision-makers to reject whole categories of sincere religious beliefs and improperly used their authority to favor certain religious positions over others.

9. The Citywide Panel also imposed an unequal and unlawful undue-hardship framework, creating a two-tier system. Employees affiliated with favored religions were accommodated automatically without any hardship analysis, while Catholics and all others deemed ineligible under the Stricken Standards were subjected to an additional and arbitrary undue-hardship inquiry based on an impermissible "de minimis" standard rather than the governing statutory standards.

10. Through this scheme, the City attempted to retroactively justify concededly unlawful denials by inventing new rationales to reach the same predetermined outcomes.

11. Plaintiffs are longtime City employees with sincerely held religious beliefs opposing vaccination who were denied accommodation pursuant to these policies.

12. Plaintiffs faithfully served the City until they were terminated, forced into retirement, or otherwise stripped of their livelihoods as a result of Defendants' unlawful conduct. The constitutional and statutory violations alleged here were identified early, persisted despite judicial intervention, and were knowing and deliberate.

13. Proceeding individually and on behalf of a class of similarly situated employees, Plaintiffs seek declaratory and injunctive relief, reinstatement, nominal, compensatory, actual, and punitive damages, attorneys' fees, and all other relief to which they are entitled.

## THE PARTIES

### *Plaintiffs*

14.     Plaintiff **Sharon Tunnell** is a resident of Brooklyn. She was employed by the Fire Department of the City of New York ("FDNY") as a Fire Protection Inspector when she was denied religious accommodation and terminated on or about July 27, 2022.

15.     Plaintiff **Edison Gbor** is currently homeless. He was employed by the FDNY as a firefighter in the Bronx when he was denied religious accommodation and terminated in 2022.

16.     Plaintiff **Gregory J. Gordon** no longer lives in New York State. He was a resident of Staten Island and employed by the New York City Police Department ("NYPD") as a detective in Richmond County when he was denied religious accommodation and forced to retire in or around September 2022.

17.     Plaintiff **Francesco Oddo** no longer lives in New York State. He was employed by the NYPD as a police officer in the Bronx when he was denied religious accommodation and forced to retire in or around October 2022.

18.     Plaintiff **John Clarke** is a resident of Brooklyn. He was employed by the New York City Department of Parks & Recreation ("Parks") as a gardener in Kings County when he was denied religious accommodation and terminated in 2022.

19.     Plaintiff **David R. Burgos** was employed by the NYPD as a police officer in Queens working in fleet services when he was denied religious accommodation and forced to retire in or around April 2022.

20.     Plaintiff **John D. Brancaccio, Jr**., lives in Queens and was employed by the Department of Sanitation ("DSNY") New York as a sanitation worker in Queens County when he was denied religious accommodation and forced to violate his sincerely held religious convictions to keep his job.

21.     Plaintiff **John Kennedy** is a resident of Rockland County. He was employed by the NYPD as a police officer in charge of the CRC canine unit when he was denied religious accommodation and forced to retire in or around September 2022.

22.     Plaintiff **Marc Robinson** is currently homeless. He was employed by the NYPD as a police officer when he was denied religious accommodation and forced to retire in or around April 2022.

23.     Plaintiff **Timothy Rivicci** ("Mr. Rivicci") lives in Staten Island. He was employed by the FDNY as a firefighter in Richmond County until he was denied religious accommodation and terminated in or around March 2022.

24.     Plaintiff **John V. Schaefer** was employed by the NYPD as a detective working in Queens until he was denied religious accommodation and forced to retire in or around August 2022.

25.     Plaintiff **Matthew Pasieka** was employed by the New York City Police Department ("NYPD") as a police officer until he was denied religious accommodation and forced to retire in or around June 2022.

26.     Plaintiff **Rommel A. Perez** was employed by the NYPD as a Sergeant working in Manhattan when he was denied religious accommodation and forced to retire in or around September 2022.

27.     Plaintiff **Matthew Demerest** was employed by the NYPD as a police officer working in an administrative job when he was denied religious accommodation and terminated in or around June 2022.

28.     Plaintiff **Aretha Simmons** was employed by the Department of Citywide Administrative Services ("DCAS") in an administrative job that could be fully remote when she was denied religious accommodation and terminated in 2022.

29.    Plaintiff **Brian Smith** was employed by the New York City Fire Department as a seated chauffer (driver) when he was denied religious accommodation and was forced to retire around August of 2022.

### *Defendants*

30.    Defendant **City of New York** (the "City") is a municipal corporation constituting the local municipal government of the population residing in New York, Bronx, Queens, Kings and Richmond Counties in New York State. The First Amendment of the United States Constitution applies to this defendant by virtue of the Fourteenth Amendment.  The City operates and employs people through its' agencies, including the agencies that employed Plaintiffs, among others. The City is liable under 42 U.S.C. § 1983 for constitutional violations caused by its policies, customs, and the decisions of final municipal policymakers, including those challenged in this action.

31.    Defendant **DAVE CHOKSHI** is sued in his official and individual capacity. At all times relevant to this Complaint, Defendant Chokshi served as the Commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH"). In that capacity, Chokshi exercised final policymaking authority over the mandates and decisions thereunder, as well as public health guidance issued by him or DOHMH, including guidance directed at officials adjudicating employee religious accommodation requests.

32.    Defendant **NELLIE AFSHAR** was, at all times relevant herein, the Chief of Staff of the DOHMH. In that capacity, Afshar was responsible for overseeing the DOHMH operations and participated in the development and approval of guidance directed at officials adjudicating employee religious requests under the mandate. She is sued in her individual and official capacities.

33.    Defendant **JACKIE BRAY** was at all times relevant herein, the Deputy Executive Director of the NYC COVID-19 Test & Trace Corps, operating from the Office of the Mayor of the

6

City of New York. In that capacity, Bray coordinated City Hall's involvement in developing and approving guidance directed at officials adjudicating employee religious accommodation requests under mandate. She is sued in her individual and official capacities.

34.     **Defendant STEVEN BANKS** was, at all times relevant herein, the First Deputy Commissioner and General Counsel of the New York City Office of Labor Relations ("OLR"). In that capacity, Banks exercised authority on behalf of the City over the negotiation and administration of the accommodation process applicable to employees under the mandate, including coordinating with various high level City policy makers, arranging policy and strategy with the unions and arbitrators, advising on criteria used at all phases of the religious exemption process, and directing the development of guidance used by officials adjudicating religious accommodation requests. He is sued in his individual and official capacities.

35.     Defendant JAY VARMA was, at all relevant times, a senior public health official for the City of New York, including serving as Senior Advisor for Public Health in the Office of the Mayor. In that role, Dr. Varma was a key architect of the City's COVID-19 response and played a central role in the development, implementation, and oversight of the vaccination mandate and related policies governing religious exemption requests. Acting under color of state law, Dr. Varma participated in, coordinated, and/or approved policies and practices that directed how such requests were evaluated and denied, including the standardized framework challenged in this action.

36.     **Defendant ERIC EICHENHOLTZ** was, at all times relevant herein, a senior attorney at the New York City Law Department exercising policymaking authority over employment policy and litigation and religious accommodation policies related to the COVID-19 vaccine mandates. In that capacity, Eichenholtz directed and advised on the criteria proposed to arbitrators for adjudicating DOE employee religious accommodation requests, provided advice and oversight over the initial religious

accommodation process at DOE and created and supervised the Citywide Appeal Panel. He also personally participated in and directed policies for religious accommodation at the municipal level. Eichenholtz is sued in his individual and official capacities.

## JURISDICTION AND VENUE

37. **Federal Jurisdiction.** This Court has subject-matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983, as this action arises under the Constitution and laws of the United States and alleges deprivations of federally secured rights under color of state law.

38. **Supplemental Jurisdiction.** This Court has supplemental jurisdiction over Plaintiffs' related state and local law claims, including claims under the New York State Human Rights Law and New York City Human Rights Law, pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative facts as the federal claims.

39. **Venue.** Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside or operate here and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## GENERAL FACTS

I.   **Overview of Claims and Fact Roadmap**

40. This action challenges the City of New York's religious accommodation policies as implemented under its COVID-19 vaccine mandates and also presents a developed factual record bearing on the facial neutrality and general applicability of the Municipal Mandate itself.

41. Prior litigation, including decisions of the Second Circuit, addressed early challenges to religious accommodation processes on a more limited factual record and in the context of

different mandates. Those cases did not consider the full scope of facts alleged here concerning the role of City actors in developing, directing, and enforcing the religious accommodation criteria used to implement the Municipal Mandate.

42. This Complaint pleads materially different facts. It concerns the Municipal Mandate—issued and administered by the same City actors responsible for the accommodation policies at issue—and alleges centralized development, instruction, and enforcement of those policies by City officials who also exercised broad discretion in administering the mandate.

43. The factual allegations are organized to assist the Court in evaluating both sets of claims. First, the Complaint describes the City's adoption of religious accommodation criteria that disfavored certain beliefs, including objections based on abortion and conscience, while privileging others. Second, it alleges centralized guidance, training, and oversight by DCAS, the Law Department, and the Citywide Panel, including direct participation by senior officials in resolving religious and theological questions. Third, it pleads agency-level implementation demonstrating the uniform application of these standards across departments, alongside extensive discretionary carveouts and exemptions relevant to neutrality and general applicability. Finally, it alleges the resulting harms to Plaintiffs and the proposed class. Agency-specific examples are pleaded as representative illustrations of a single Citywide scheme, not as isolated incidents.

44. Plaintiffs assert individual claims for the statutory and constitutional harms they experienced and also seek to address the widespread and systemic religious discrimination alleged to have affected employees seeking accommodation from the Municipal Mandate.

## II.    General Facts Related to the Pandemic and the City's Response

### A. The Covid-19 Pandemic

45. In early March 2020, ex-Governor Cuomo declared a statewide disaster emergency due to the emergence of the COVID-19 pandemic.

46. On March 12, 2020, Mayor de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City posed by COVID-19.

47. On March 25, 2020, Commissioner Chokshi declared the existence of a public health emergency within the City to address COVID-19.

48. Throughout New York City and elsewhere, businesses and public authorities transitioned to remote work and tele-commuting wherever possible for much of the rest of the spring of 2020.

49. Most Plaintiffs and proposed class members, however, were required to continue working in person, even throughout these early and most serious days of the pandemic.

50. They were called heroes for keeping the city running during this fraught time.

51. They were all exposed repeatedly to the most virulent strains of Covid, and most got Covid and acquired robust natural immunity.

52. On June 8, 2020, New York City began reopening public spaces. By the fall of 2020, the City was substantially reopened. New York City public schools even began offering in person instruction again.

53. In December 2020, the Covid-19 vaccines became available to the public, but City workers were not required to take them to work in person. Weekly testing was implemented as a reasonable alternative for those who could not or would not be vaccinated.

54. On June 23, 2021, ex-Governor Cuomo issued a declaration that the state of emergency due to COVID-19 was officially over in New York.

55. On July 1, 2021, ex-Mayor de Blasio re-opened New York City without restriction.

56. At all relevant times during the pandemic emergency, and until and after it was declared over, Plaintiffs worked, typically in person, unvaccinated without issue.

**B.** **Scientific Evidence Regarding Vaccine Effectiveness Prior to Mandate Enactment**

57. By the summer and fall of 2021, prior to when the City began issuing vaccine mandates, the City had already seen a substantial reduction in Covid-19 related hospitalizations and deaths compared to earlier in the pandemic. For instance, on June 2, 2021, NYC reported zero new Covid-19 deaths and a test positivity rate of 0.83%, the lowest since testing began.

58. By August 2021, even with the Delta variant, hospitalizations did not surge. A December 2021 statement from NYC Health Commissioner Dr. Dave Chokshi noted that while cases and test positivity had increased, "we have not seen the same thing with respect to the markers of severe disease, particularly hospitalizations."

59. When the Mandates were issued, it was at that point clear that vaccination could not meaningfully stop transmission or community spread.

60. By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread Covid-19 and were equally as infectious as unvaccinated people when they did; (2) herd immunity could not be achieved with Covid-19 vaccines; (3) vaccine protection wanes significantly after a short period of time.

61. On August 5, 2021, Wolf Blitzer interviewed CDC Director Rochelle Walensky ("Dr. Walensky") on CNN. Dr. Walensky clarified that the data on vaccine effectiveness against the then-dominant delta variant are conclusive: "what they can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."

11

C. **The City's Vaccine Mandates and Chokshi and Mayoral Discretion Over Same**

62. Notwithstanding the science or the fact that the pandemic emergency had been declared over, Commissioner Chokshi began issuing a series of vaccine mandates in August 2021.

63. Defendant Chokshi, acting in coordination with the Mayor's office and at his own discretion, issued most of the "emergency" vaccine mandates. The relevant ones here are: (1) the DOE Mandate, the first version of which was issued in August 2021, with an effective date of September 27, 2021 (later changed to October 1, 2021 due to a federal court restraining order); (2) the Municipal Mandate, issued October 20, 2021 with an effective date of October 29, 2021; and (3) a private sector mandate effective in December 2021.

64. The Mayor's office and Commissioner of Health's office made multiple statements to the press explaining that all these Mandates were part of one comprehensive scheme.

65. The mandates were partially contingent on the Mayor's renewal of temporary declarations of a "state of emergency" in New York City, which he renewed every thirty days through "Emergency Executive Orders" ("EEOs") even as he and Chokshi made statements to the press confirming the emergency was over.

66. In addition, the Mayor had full discretion to repeal, amend, carve-out or pause any aspect of the Mandates or repeal them altogether as did Commissioner Chokshi.

D. **The DOE Mandate**

67. The DOE Mandate, one of the first, was announced in August 2021 with an effective date of September 27, 2021.

68. Initially, it did not include a provision for religious accommodation. However, in September 2021, the DOE mandate was specifically amended to allow for accommodation in order to lift a state-court TRO, and impact litigation resulted in an arbitration order requiring both

the City and DOE to provide and oversee religious accommodation for DOE employees.

69. The impact arbitration award, referred to here and in other litigation as the "Stricken Standards," was facially unconstitutional. On its face, it allowed accommodation for Christian Scientists as of right but required that Catholics and others whose religious "leaders" were vaccinated be denied, even if they held sincere religious objections. It also allowed state actors to decide whether a person's religion was "established" enough or "recognized" enough to merit relief. And it required submission of a clergy letter confirming membership in an acceptable faith.

70. The November 28, 2021, merits panel decision of the Second Circuit Court of Appeals found that the DOE Mandate, as applied through the Stricken Standards, was likely unconstitutional. *Kane v De Blasio*, 19 F4th 152, 167-169 (2d Cir. 2021) *(Kane I).* Finding that it was not neutral nor generally applicable, and that the City and DOE could not meet strict scrutiny, the Court vacated the denial of a preliminary injunction and ordered the City to provide fresh review through it's new "Citywide Panel" appeals process. The Court ordered the Citywide Panel to adhere to "standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law."

E. **The City was Involved in the Discrimination at DOE**

71. The *Kane* decision assessed allegations from an early complaint, and while it found sufficient allegations to find plaintiffs likely to succeed on their free exercise claims as applied, it did not find enough facts to show the City was involved in the religious accommodation process implemented at DOE to defeat neutrality of the mandate as a whole.

72. This case is different, in that it is addressing a different Municipal Mandate, and the religious

13

discrimination complained of here was directly administered by the City not the DOE.

73. And this complaint also incorporates significant allegations uncovered in related matters that show the City was involved in the DOE process as well.

74. What was not before the Second Circuit in *Kane* or *NYFRL* was that *both* the City and DOE were ordered to oversee the accommodation process at DOE. And the arbitration award did not require the City or DOE to use the Stricken Standards. Rather, it ordered the City to provide DOE employees religious accommodation using the Stricken Standards, *or* a lawful statutory accommodation process.

75. The City chose and endorsed the Stricken Standards, the discriminatory criteria therein having been largely drafted and proposed by agents and high-level City policymakers.

76. As set forth in more detail below, in addition to failing to train or intervene, the City actively endorsed a maximally discriminatory approach in the DOE process – even beyond what the Stricken Standards required.

77. In light of the information that the City was jointly directed to implement a religious accommodation process at the DOE, the Mayor's comments to the press on the eve of the arbitrations cannot be deemed "personal opinions" as inferred by the Second Circuit in the interlocutory decision in *Kane*, but rather are revealed as an endorsement by the City's highest policy maker.

78. The full remarks were not before the Second Circuit. The press statements responded to the question of how the City would decide who to accommodate at the DOE. The Mayor did not say that it was up to the DOE. He said that the process and criteria were "100%" set by the City and unions and were extremely limited. Then he noted that "We are saying very clearly" that a person cannot have a personally held religious practice but must instead be a Christian

Scientist or Jehovah's Witness to qualify.

79. Moreover, City agencies and high-level policy makers sent articles to DOE decision-makers, encouraging them to reject most faiths on the basis of alleged "religious leaders" having been vaccinated. Arbitrators and DOE decision makers cited these letters and articles in the hearings as a basis for denial.

**The Chokshi Letter**

80. A significant fact that contributed to the discrimination (which was also not before the Second Circuit in the *Kane* or NYFRL litigation), was that Commissioner Chokshi himself wrote and disseminated a letter instructing DOE decision makers and arbitrators to deny religious whole categories of sincere religious objection to the vaccines.

81. In the letter, Commissioner Chokshi particularly instructed decision-makers to deny religious beliefs based on an objection to the vaccines' connection to abortion.

82. Though he stated it in a manner that was intentionally confusing, and led many decision-makers to beliefs there was no connection between abortion and the vaccines, Commissioner Chokshi admitted in the letter that cell lines from aborted fetuses were technically used in the development of the vaccines, either directly (for example to make tissues to grow the adenovirus used in one of the vaccines) or for safety and efficacy testing required pre-licensure.

83. Nonetheless, Chokshi asserted in his letter that religious objection was still unwarranted because "[a]n array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development."

84. Commissioner Chokshi also claimed that other products, like Tylenol, used aborted fetal cell lines the same way and suggested that no one could therefore have sincerely held objections to the vaccines because these products were so widespread.

85. The government is prohibited from taking sides in religious disputes or lending their power to resolve such disputes, favor one side or punish another. Commissioner Chokshi's letter did all three.

86. Commissioner Chokshi sent this letter to the DOE and also to the arbitrators hearing the appeals. The same letter was then later sent to the Citywide Panel, which also relied on it, as evidenced by the denial of Sarah Buzaglo, who was denied by the Citywide Panel on the ground that her concerns about abortion conflicted with guidance from Commissioner Chokshi.

87. DOE representatives and arbitrators cited Commissioner Chokshi's letter as authority for denying accommodation to employees who had concerns about the use of aborted fetal cell lines in production or development of the vaccines, even in cases where they found the employee's religious objections sincere.

**Emails Confirm the Discriminatory Intent of the Letter**

88. In March 2026, the City finally produced an email chain discussing the creation of the Chokshi letter after an appellate court ordered them to underact them.

89. Upon information and belief, Defendant Eichenholtz, who was managing attorney at the Law Department and in charge of the Covid-19 mandate litigation, participated in the decision to unlawfully withhold these emails.

90. The emails are attached hereto not for the truth of what they say, but for the fact that these statements were made. Exhibit 1.

16

91. These emails show that Chokshi's letter was concocted by high level City policy makers and intentionally disseminated to advise and assist arbitrators in discriminating against sincerely held religious beliefs, particularly those involving abortion or tainted blood.

92. Steven Banks, First Deputy Commissioner & General Counsel for the NYC Office of Labor Relations ("OLR") represented the Mayor and the City in all labor relations with unions.

93. Banks has expressed open disdain for religious objections to vaccination and actively worked to try to suppress accommodation.

94. On September 20, 2021, right before the start of the DOE religious accommodation arbitrations, Banks wrote an email to a number of high-level policy makers at City Hall, and the DOHMH.

95. In Banks' September 20, 2021 email, he noted that 2/3 of appeals from the initial DOE blanket denials were religious, and many cited religious objections to abortion or certain animal products. He said "since many of these claims are going to labor arbitrators" for appeal **"it would be very very helpful if we could get a document signed off on by a City Doctor that essentially makes the argument as to why this is BS."**

96. In case there was any confusion about what this letter was to be used for, Banks concluded that the purpose would be to give the arbitrators something they could use to justify denying religious accommodation requests, which leads to a reasonable inference that the arbitration firm shared Banks' goal of denying accommodation requests and looking for ways to shield those decisions from later challenges.

97. Jackie Bray, the Deputy Executive Director of the City's NYC Covid-19 Test & Trace Corps, and a high-level policy maker at the time for the City's Covid Policy and interagency coordination, agreed to try to pull together a letter by the next day.

17

98. Ms. Bray found a North Dakota Department of Health handout claiming religious objections were invalid (which was, on its face, clearly unconstitutional for a government to weigh in on) and an unverified blog that was hostile to religion and falsely asserted that aborted fetal cell lines were also used to bring Tylenol and a host of other common over the counter medications to market so objectors could not be sincere. She said these would be great resources and they could use them to create something similar to provide to arbitrators from the City.

99. Bray stated "the MD's were also batting around the idea of making someone attest to rejecting all the medications on this list and look for proof that they have rejected all of these 'sincerely' for some time."

100. Bray asked Banks to send her some of the DOE employee religious accommodation letters so she could craft a response that would be tailored to deny them, stating "we clearly have very good material here (citing the blog) and we also want to give you the best product we can because this will absolutely be subject to litigation and will go far."

101. Banks then brought in other high level policy makers and administrators from the DOE, OLR, and City Hall, asking them for help to provide some examples of DOE employee applications objecting to fetal cell lines used in the development of Covid-19 vaccines with the unmistakable message that these were to be used as models for arguments to proactively categorically refute.

102. He admitted, "The first page of the North Dakota document is a little bit more neutral than I was thinking…We can go further and make an argument about how even if someone is concerned about fetal cells it should not prevent them from being vaccinated."

103. Banks approved Bray's idea of creating a sincerity test that resulted in disqualification

18

if an employee did not also state that they avoided Tylenol and other products listed in the blog, stating, "Yes, the list is good. Because to the extent that there are hearings in these cases, the employees can be asked about whether they use or have used those medications."

104. Banks admitted he was coordinating with the UFT teachers union on this plan to endorse denial of certain disfavored beliefs and promised to get them the document before the arbitration hearings started later that week.

105. Once a draft was created, Dave Chokshi and Jay Varma were cc'd. Bray stated – "Attached is a memo Annie drafted. Obviously need Dave [Chokshi], Jane and Jay [Varma] to review and then need to know from OLR if this works."

106. Jay Varma said the memo was "okay with me."

107. Bray noted that she added a line to the draft "about pork, beef and animal products" which she needed DOHMH to confirm. She suggested that DOHMH should sign off and send to OLR, stating "We are moving fast here on negotiations and hearings on exemptions so wanting to wrap this up today." She noted that OLR also had a draft circulating.

108. Nellie Afshar, then Chief of Staff at DOHMH said she had edits. She sent a draft to Dave Chokshi, asserting that it was okay "on our side" and asking if he had "any issues with this coming from you."

109. On September 21, 2021, Defendant Chokshi wrote that he had no issues with it coming from him. His primary question was "We had to remove the section about pork and animal products? Seemed they wanted it specifically." Ms. Ashfar agreed to add those back in and also said she went further by "adding a line about Tylenol, advil etc" even though she knew this list was not accurate. She said, "For awareness, we have not been able to verify the list of meds, I asked Jack if she could track it down with Jay."

110. Dave Chokshi thanked her with several exclamation points. Chokshi then signed off and the letter was sent to the arbitrators and DOE representatives despite the fact that the list was never verified.

111. Chokshi's letter was repeatedly cited for the line in the letter stating "the Pfizer and Moderna vaccines do not use any fetal cell lines for vaccine production." However, in the same letter, Defendant Chokshi buried the admission that all three vaccines did use aborted fetal cell lines to bring the products to market. Many arbitrators and decision-makers misunderstood the letter as saying that there was no connection.

112. As advised by Banks, the letter then takes the position that even if fetal cell lines were used, this is not a religious problem because an "array" of religious leaders advise taking the vaccine. Chokshi claimed the Catholic Church had clearly taken the position that Roman Catholics were able to take the vaccine without issue though this was not true. Even the facially unconstitutional North Dakota public health handout itself did not go that far, acknowledging that the Church advised that some Catholics would not be able to take it due to guidance from their religious conscience.

113. The letter also falsely stated that Tylenol and certain other over the counter medications used aborted fetal cells to bring their products to market in a similar way.

114. The statements about Tylenol and other drugs is false and as the emails show, was knowingly unverifiable at the time.

115. Neither Bray nor Varma nor Chokshi nor Afshar ever managed to verify the list.

116. Assuming arguendo that there was any truth to Chokshi's assertion that Tylenol and other listed over the counter medications used aborted fetal cell lines the same way the Covid-19 vaccines did, it was not common knowledge that any alleged connection existed

sufficient to put most religious people on notice to look into it. By contrast, it was widely discussed that the Covid-19 vaccines all made use of aborted fetal cell lines to bring the products to market.

117.   In fact, Tylenol, Advil and other products on the list were not brought to market using aborted fetal cell lines and Chokshi and the others on the email participating in the drafting of the letter had no good-faith basis to assert they did.

118.   Because of Chokshi's misinformation about Tylenol, and the City's use of it, thousands of employees at DOE and the City level were denied for failing to state that they avoided Tylenol as part of their religious practice.

**The Citywide Panel**

119.   As stated above, the Second Circuit did not have any information about the City's involvement in the DOE process at the time.

120.   At all relevant times, the City – particularly the Mayor's office, exercised control over and responsibility for the Citywide Panel.

121.   At all relevant times, Defendant Eichenholtz was given final decision-making authority by the City to oversee and implement the Citywide Panel process.

122.   As set forth in more detail below, it is now apparent that the City defied the Second Circuit's order, continuing to apply many of the same discriminatory policies struck down in *Kane I,* and violating equal protection laws by imposing a more difficult undue hardship burden on those seeking remedial review than those who had been impermissibly favored under the old policy.

123.   Additionally, after the Second Circuit issued its decision in *Kane I,* the City not only failed to remediate or repudiate the harm done to DOE employees through the Stricken

Standards, but instead expanded the harm by offering the Stricken Standards as an appeal option for employees denied religious accommodation at most City agencies and departments.

## III.    The Municipal Mandate and Citywide Discrimination

### A.  Municipal Mandate Expands to Cover City Workers

124.    On October 20, 2021, while immersed in the litigation over the religious discrimination at DOE, Commissioner Chokshi issued a mandate covering all municipal employees (the "Municipal Mandate") rescinding the option of testing weekly and requiring each employee to get two doses of the Covid-19 vaccine unless provided with religious or medical accommodation. A true and accurate copy of the Municipal Mandate is attached hereto as Exhibit 2, not for the truth of anything therein but rather for a record of what it stated.

125.    The Municipal Mandate required all covered employees to be vaccinated by October 29, 2021, with some carve outs for categories of employees covered by other mandates, working per diem or working in certain positions where there were staffing shortages.

126.    The Municipal Mandate also allowed employees to work in person while awaiting a decision on appeal, stating "For reasonable accommodation requests filed on or before October 27, 2021, employees will be permitted to continue to submit weekly negative PCR test results while their accommodation request is under consideration or on appeal", and "Any employee who requests a reasonable accommodation from their agency on or before October 27, 2021 and is awaiting a reasonable accommodation determination from their agency or on any appeal must continue to submit a negative PCR test result within every seven-day period, as previously required."

127.    Because of administrative constraints, backlog, and enormous agency discretion,

thousands of City employees, in every City Department and agency, continued working unvaccinated for months and often longer after the Vaccine Mandate was implemented.

128.    Some of these unvaccinated employees were never placed on leave without pay ("LWOP") or terminated and instead continued to submit to weekly testing until the Vaccine Mandate was eventually lifted.

129.    The Municipal Mandate provided explicitly for permanent religious accommodation in person or otherwise.

130.    Official guidance issued by the City to each agency stated that "the primary accommodation from the vaccination mandate **that will not cause an undue hardship** and/or disruption is weekly testing and submission of negative PCR results.

131.    The guidance acknowledged that weekly testing was a feasible accommodation for the vast majority of City employees.

132.    At the time that the Municipal Mandate was adopted, the City already had sworn declarations from the nation's top public health experts, including Dr. Marty Makary, who was at the time at Johns Hopkins and now serves as Commissioner of the FDA, and Dr. Jay Bhattacharya, then at Stanford and now the Director of the CDC.

133.    These declarations (Exhibit 3 and Exhibit 4) are attached hereto and incorporated herein, and explain in detail why City workers could be safely accommodated from any vaccine mandates, citing the best available science at the time to show that natural immunity provided more durable and long-lasting immunity, that vaccinated employees could also get and spread Covid-19 at similar rates, and that a plethora of accommodations were available short of termination.

134.    The City's own databases themselves showed the vaccine mandates were not working.

23

For example, at DOE, the case numbers were far higher among the fully vaccinated staff than they had ever been when unvaccinated staff were allowed to work in person. Their daily report was publicly available and showed an average of about 30 total covid-19 cases on any given day prior to the date all unvaccinated staff were put on leave without pay or accommodated remotely in October 2021. After that date, cases rose to 50-60 and sometimes as high as 5,000 in a day among the fully vaccinated staff.

135. Delta and Omicron shattered any illusion that the vaccines could meaningfully stop a person from getting and spreading Covid-19. Instead, as public health experts around the world acknowledged back in July, everyone, vaccinated or not, was getting Covid-19 and there was nothing the vaccines could do to prevent that.

136. The City routinely granted in person accommodation from the Municipal Mandate to employees with significant public contact, including frontline firefighters, police officers, and even lifeguards who gave mouth-to-mouth resuscitation.

137. Notwithstanding the great weight of the science, and the City's own policies and practices which expressly recognized that accommodation was not a hardship, the City arbitrarily used its discretion to reject other applicants based on alleged "undue hardship" without explaining any material difference between them and those accommodated, or analyzing any of the required statutory factors, engaging in cooperative dialogue to consider alternatives, or engaging with data or objective evidence.

138. The pretextual undue hardship policy was based on an unlawful "de minimis" standard, and the City's instruction to agencies and reviewers that any inconvenience likely met that standard.

139. It was also another mechanism to discriminate against disfavored religious beliefs, as a

hedge in case a court later found the belief sincere.

140.    But undue hardship was not the primary reason given in most City appeals.

141.    Given the FAQ, stating that it was presumptively *not* an undue hardship, most agencies did not even deny any employee on this basis, and solely focused on whether the employee's religious beliefs were valid under the City's standard.

**B. The City Instructed Agencies to Engage in Rampant Religious Discrimination**

142.    Pursuant to the Municipal Mandate, each agency of the City was to inform its employees that they could request religious exemptions from the vaccine mandate by submitting accommodation requests within a very short time frame in late October 2021 to committees run by the agencies but directed by City policymakers.

143.    In an effort to deny most applications, the City changed its usual EEO policies for the Covid-19 vaccine accommodation requests dramatically.

144.    Prior policies required the City to assume that an employee's beliefs were sincere and only ask for follow-up or act with suspicion where it was clearly warranted.

145.    When it came to evaluating mandate accommodation requests, however, agency employees tasked with making such determinations were instructed to deny as many accommodation requests as possible, assume beliefs were insincere, and use follow up questions to try to find further reasons to deny relief.

*1.   The City Directed Agencies to Categorically Reject Some Faiths and all Personal Beliefs*

146.    The City implemented standards, policies and procedures for the City agencies to use while evaluating and deciding requests for religious accommodations to the Municipal Mandate.

147.    Initial agency determinations of religious exemption requests were adjudicated under the

same or materially similar standards codified in the Stricken Standards, which meant that most religions were categorically ineligible for accommodation.

148.    Mayor de Blasio told the press in October 2021 that he relied on Pope Francis' statement that nothing in scripture precludes vaccination and asserted that the City's official policy was that only Christian Scientists and Jehovah's Witnesses could be accommodated, and that *no* personally held beliefs would be accommodated. He confirmed that the DOE criteria in the Stricken Standards was "100%" derived from a process involving the City.

149.    This official policy was not only applied at DOE but also during the initial reviews at the City departments under the Municipal Mandate.

150.    On October 28, 2021, the City issued guidance for applying for reasonable religious and medical accommodation from the Municipal Mandate, stating that accommodation could *only* be granted for "documented" religious reasons (policy referred to as "October Guidance").

151.    According to October Guidance, "A request based solely on a personal, political, or philosophical preference does not qualify for a religious accommodation."

152.    Defendants implemented these policies so that idiosyncratic or personal religious beliefs did not qualify as a valid basis for religious accommodation.

153.    Pursuant to Defendant's standards, policies and procedures, any belief that did not conform to the stereotypical official tenets or recognized doctrine of an organized religion was automatically deemed "personal," "philosophical," or "political" in nature—even where the belief was sincerely held and religious in character.

154.    The City also promulgated and implemented discriminatory standards, policies and procedures regarding the Municipal Mandate through the Department of Citywide

26

Administrative Services ("DCAS").

155.   DCAS instructed the various city agencies on the standards, policies and procedures regarding religious accommodations to the Municipal Mandate.

156.   It was the policy and practice of the Defendant to deny requests if the applicant's opposition to vaccination was not "required" by his or her religion, or where other members of the faith did not oppose the vaccine.

157.   It was the Defendant's policy and procedure to deny applicant's where the Defendant decided that the applicant's opposition was not required by his faith because other members of the faith did not oppose the vaccine.

158.   Accordingly, under the City's policies, Catholics were initially categorically disqualified from receiving a religious accommodation because their beliefs diverged from the Pope's official position. Many other religions were similarly categorically excluded from access to accommodation, even if the employee who belonged to that religion had sincere religious objections.

159.   DCAS provided agencies with articles supporting their official policy to categorically exclude all Catholics, Jews, Buddhists, Seventh Day Adventists, Muslims, most Christians and many others regardless of their specific objection, asserting that the "leaders" of these faiths were all in support of vaccination or the viewpoint that religious opposition to Covid-19 vaccines was not real.

160.   Defendants particularly routinely refused to recognize conscience-based objections as religious in nature, treating appeals to conscience as merely general moral or ethical concerns rather than protected expressions of religious belief.

161.   DCAS also repeatedly instructed City agencies to deny or impose special disabilities on

religious beliefs that were "personally held" (including those derived from prayer and guidance from the moral conscience) and especially those that were grounded in objections about abortion or held by Catholics.

## 2. *The City Directed Agencies to Unequally Burden Abortion-Related Concerns*

162. Emails between head EEO officer Melissa O'Neill and reviewers reveal particular animus towards beliefs grounded in a religious objection to abortion. As one of many examples, Ms. O'Neill instructed reviewers that they could deny sincere religious objections related to the use of aborted fetal cells if religious adherents if evaluators felt they were "wrong" about any facts associated with this concern, even if the supposed errors were immaterial to the overall religious concern.

163. This advice was based in part on a letter circulated by Commissioner of Health, Defendant Dave Chokshi, who issued the municipal mandate (the "Chokshi letter").

164. In the letter, Commissioner Chokshi instructed decision-makers at the City or agency level as well as DOE and arbitration panels to deny religious beliefs based on an objection to the vaccines' connection to abortion.

165. Commissioner Chokshi admitted in his letter that cell lines from aborted fetuses were used in the development of the vaccines, either directly (for example to make tissues to grow the adenovirus used in one of the vaccines) or for safety and efficacy testing required pre-licensure.

166. But he stressed that applicants might make a mistake and say that the vaccines "contain" aborted fetal cell lines, and if they did, they should be denied. To many, this distinction does not matter, as the concern is partaking of a product that was brought to market only because it used the fruits of an abortion.

167.    Nonetheless, the Chokshi letter asserted that religious objection was still unwarranted because "[a]n array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development."

168.    The Chokshi letter also asserted in sum and substance that other products, like Tylenol, used aborted fetal cell lines the same way as the Covid-19 vaccines and anyone willing to take Tylenol thus had a defective religious belief.

169.    Commissioner Chokshi's letter was factually and doctrinally wrong on many points.

170.    First, he was wrong that the Catholic Church demanded vaccination. There was at the time a split in the Catholic Church about whether it was permissible to take the Covid-19 vaccines given the connection to abortion, and a whole conference of Catholic Bishops took the position that vaccination likely violates the Catholic faith because of the use of aborted fetal cells. Others, like Pope Francis, acknowledged that the vaccines were tainted by abortion, but decided that for them, the possibility of saving others by getting vaccinated overrode this sin. Neither Pope Francis nor the Bishops demanded all Catholics follow them – rather, they advised Catholics that they had to consult their moral conscience (which is the voice of the Holy Spirit and God in Catholicism) to decide whether to take it.

171.    Second, Defendant Chokshi was wrong about Tylenol and other over-the-counter products mentioned in the letter. Tylenol and other products mentioned by Defendant Chokshi did not use fetal cell lines for testing pre-licensure. Many of these products came to market before fetal cell lines were ever first used, and the corporations confirm they do not use fetal cell lines for any aspect of their product development.

172. To the extent that third parties later ran experiments on Tylenol using aborted fetal cell lines, this was not necessary to bring the product to market, and many Catholics and others with religious beliefs against abortion draw that line.

173. Third, even if Tylenol and other products were tainted by use of aborted fetal cell lines in a similar fashion to Covid-19 vaccines, this alleged fact (which is wrong) was not well-known whereas it was very well known and discussed that the Covid-19 vaccines were tainted by the use of aborted fetal cell lines. Thus, the fact that a person took Tylenol in the past was not dispositive in assessing sincerity, especially if they were unaware of any supposed connection to abortion.

174. Fourth, the government is prohibited from taking sides in religious disputes or lending their power to resolve such disputes, favor one side or punish another. Commissioner Chokshi's letter did all three.

175. Plaintiffs were all denied accommodation pursuant to these unlawful policies.

### 3. *The City Failed to Rescind, Renounce or Remediate Policies After Kane*

176. After the Second Circuit held that the Stricken Standards were likely unconstitutional, and the City likely violated the free exercise clause by discriminating against personally held religious beliefs, the City failed to remediate the problem or even renounce those policies.

177. Instead, after the Second Circuit held they were unconstitutional (and the City's attorneys admitted in Court they were at least "constitutionally suspect") the City *expanded the use* of the Stricken Standards beyond DOE and began offering the Stricken Standards policy as an appeal option in nearly every City Department.

178. Alternatively, if employees were not Christian Scientists or others lucky enough to meet the discriminatory criteria of the Stricken Standards, they could appeal to a new "Citywide

Panel" appeal process.

179.   The continued offer of these two policies created a separate and unequal track for Christian Scientists, who were eligible for the automatic accommodation allowed under the Stricken Standards (which had no undue hardship provision) and adherents of other religions, who had to go before the Citywide Panel, which applied an unlawful "de minimis" hardship standard.

180.   The Citywide Panel consisted of a panel of three decision-makers, one from Law Department, one from DCAS and one from the Commissioner of Human Rights.

181.   A final disposition on an appeal required votes from all three members with a 2-1 majority prevailing in the event of a disagreement.

182.   Defendant Eric Eichenholtz had authority to change or override any votes in his sole discretion.

183.   The Citywide Panel process was created by Defendant Eichenholtz and his colleague at the Law Department, Georgia Pestana, who each participated intimately in defending the City against the discrimination claims in the *Kane* and related lawsuits and had motive and a job responsibility to try to uphold determinations made under the discriminatory policies implemented at the DOE and all the City agencies prior to the *Kane* decision.

184.   As might be expected given the conflicts of interest, the Citywide Panel did not provide adequate safeguards to meet the basic constitutional or statutory standards or to remediate the harm done at the agency level.

185.   Eichenholtz admitted in sworn testimony that he instructed reviewers to apply a "de minimis" hardship standard, even though city, state and local accommodation laws all require substantial or significant hardship showing.

186. He further admitted that the City did not assess undue hardship independently at all, either for safety or economic factors, but rather was instructed to assume that under the "de minimis" standard, any agency claim of hardship must necessarily be sufficient to meet that low standard.

187. Discovery revealed that the Panelists were also instructed to continue denying any beliefs based on abortion or that were "personally held." Emails from Panelists to Eichenholtz support this claim, specifically stating that he'd instructed them to deny personally held and abortion related beliefs.

188. Eichenholtz himself admitted under oath repeatedly that the Citywide Panel's policy was to deny abortion related and personally held religious beliefs, even if they were found to be sincere, on the ground that the applicant was "wrong" about what their faith required of them.

189. The Citywide Panel did not provide reasons to applicants for upholding their denials.

190. However, Citywide Panelists kept internal notes on decisions in a spreadsheet. These notes reveal systematic rejection of beliefs as "sincere" but ineligible because the applicant was allegedly wrong about what their faith required of them, according to the reviewer.

191. Beliefs derived from prayer and moral conscience were similarly systematically rejected by most Citywide Panels because such beliefs, "while sincere" allegedly allowed the applicant to make religious choices rather than follow wrote dictates from their religious leaders.

192. Under city policies, such beliefs did not merit protection, even if sincere.

193. For example, four *Kane* plaintiffs were found sincere in their beliefs, yet their applications were denied because the City and DOE improperly equated individualized

religious guidance from prayer or discernment—particularly where it diverged from institutional orthodoxy—with "personal," "philosophical," or "idiosyncratic" beliefs unworthy of protection.

194.    *Kane* plaintiff Heather Clark, a DOE administrator, is a devout Christian who returned to Christ after a faith-healing experience and has since maintained a deeply spiritual life guided by the Holy Spirit and faith healing. She objects to vaccines due to guidance from the Holy Spirit and because of her religious objections to the use of aborted fetal cell lines.

195.    Based on policies dictated and endorsed by the City, DOE originally denied her based on "undue hardship, even though she worked remotely and did not interact with students. Although she had been working remotely since 2020 and her position did not involve contact with students or require entry into school buildings, she was denied accommodation on the implausible ground of undue hardship and subsequently denied an appeal hearing without explanation.

196.    The Citywide Panel acknowledged the sincerity of Clark's beliefs but decided she was wrong about what her faith required of her regarding her abortion concerns, and that her beliefs derived from the Holy Spirit could not be honored because they were too personal, allowing her to pick and choose based on what guidance she got rather than official church doctrine. In *New Yorkers for Religious liberty, Inc.,* ("*NYFRL*"), the Second Circuit struck down the Citywide Panel's reasoning as violating the most basic commands of the First Amendment clause and reinstated Clark's case.

197.    Many other *Kane* plaintiffs received the same or similar reasoning from the Panel. Sarah Buzaglo's Citywide Panel decisions even referenced the Chokshi letter for the rule that pro-life religious concerns were not eligible for relief. By the same token, a few *Kane* plaintiff's

33

religious objections to abortion were credited, though they were materially identical to Buzaglo's.

198. The same type of discriminatory reasoning can be seen in spreadsheets from the Citywide Panel involving municipal employees.

199. Take for example, detective Furno, a Catholic who applied for a religious accommodation to the Vaccine Mandate based upon the use of aborted fetal cell lines and his religious opposition to abortions. Based upon his Catholic faith, the City rejected Furno's religious objection, stating that his "claims, including that taking the currently available vaccines would violate principles of his Catholic faith, are not based in the very religion to which he allegedly maintains a sincerely held religious belief." *Furno v. New York City Police Dep't*, Index No.: 85021/2023, NYSCEF Doc. No. 31, March 2, 2023, at p. 16.

200. The City attempted to justify this blatantly unlawful basis for denial as late as 2023, in a memorandum of law submitted by the City's then-lead supervising attorney handling these accommodation cases, Kathleen Linnane, who acted under the direction of Eric Eichenholtz, then Managing Attorney of the Law Department, wrote as follows:

Petitioner claims he is a "conscientious and devout Catholic" and that he "cannot in good conscience accept a vaccine, which employs cell lines derived from aborted fetuses as it violates fundamental aspects of his Catholic faith." Yet Petitioner ignores the reality that the Catholic faith, as attested to by the Sovereign Pontiff Francis ("Pope Francis") advocates for vaccination against Covid-19. Pope Francis has explicitly stated that the Covid-19 vaccine is "authorized by respective authorities" and is an "act of love." Indeed Pope Francis himself, arguably Catholicism's most prominent physical embodiment of the "Holy Spirit" foo concern to Petitioner herein, has been vaccinated against Covid-19. Moreover, the Vatican's Congregation for the Doctrine of the Faith stated, "It is morally acceptable to receive Covid-19 vaccines that have used cell lines from aborted fetuses in their research and production process," and further, "all vaccinations recognized as clinically safe and effective can be used in good conscience with the certain knowledge that the use of such vaccines does not constitute formal cooperation with the abortion from approved by Pope Francis."
*Id.* at p. 15-16.

201. Similarly, as discussed in *Farrell v. New York City Fire Department* (Index No.

34

532029/2022, NYSCEF No. 42), the petitioner, a Catholic, objected to the COVID-19 vaccine based on its connection to fetal cell lines, aligning his objection with his understanding of Catholic doctrine. Despite this, Defendant denied the request. Eichenholtz stated that the objection to abortion failed to meet the threshold of a "comprehensive religious belief system." Eichenholtz further stated that abortion-based concerns are "inapplicable to Covid-19 vaccines because they do not contain cells from aborted fetuses" and there is "also no conflict between the vaccine mandate" and Farrow's beliefs. Rather, Eichenholtz asserted that "to qualify as a religious belief, the cited belief should be 'part of a comprehensive religious belief system and is not simply an isolated teaching'."

202.    Essentially, Eichenholtz took the position (and passed it on to the panel as policy) that if the Catholic faith did not require abstention from vaccination due to the link with abortion, it was not then part of a "comprehensive religious belief" even if in Plaintiffs' demonstrated practices and life, it was.

203.    In other words, Eichenholtz continued the same practice struck down in *Kane* of rejecting personally held religious beliefs or those not supported by church orthodoxy.

204.    In *Chinchilla v. City of New York*, the Citywide Panel considered a Born Again Christian NYPD officer's request for a religious accommodation based on her sincerely held belief that the COVID-19 vaccines were developed using fetal cell lines. The New York City Commission on Human Rights voted to approve the request while DCAS and the Law Department voted to deny it on the ground that the employee's objection was "based on inaccurate scientific information." Notably, Eichenholtz—serving as both a voting member and the Panel's "final reviewer"—initially voted to approve the request, citing the officer's "consistent practice of refusing vaccination." After DCAS voted to deny, Eichenholtz

reversed his vote and joined the denial creating a 2-1 majority in favor of denial.

205.    The City's argument that some employees with personally held or abortion-related beliefs were accommodated does not change the fact that these beliefs were subjected to unequal burdens.

206.    Eichenholtz admitted under oath that ultimately, Citywide Panel reviewers exercised enormous discretion to grant or deny beliefs.

207.    Sometimes they accommodated abortion related concerns, or beliefs derived from conscience, or Catholics whose beliefs differed from the Pope, but ultimately, such beliefs were treated differently and unequally when compared to Christian Scientists and Jehovah's Witnesses.

## IV.    Agency Implementation Shows Systematic Widespread Discrimination

208.    The agencies implementation of the mandate show that the City's instructions resulted in widespread discrimination. Below follow a few examples of how some of the City's agencies interpreted the City policy makers' instructions.

### A.    Implementation at the Comptroller's Office

209.    The Comptroller's Office did not assess undue hardship for any employee or assert the defense. All denials were based on the alleged validity of the religious beliefs of employees.

210.    The Comptroller's Office denials provide a stark illustration of how DCAS's centralized guidance was implemented verbatim at the agency level. Despite having no public-health function and no independent authority to adjudicate religious doctrine or medical science, the Comptroller's Office applied DCAS guidance to categorically deny religious accommodation requests based on (a) objections to abortion and the use of aborted fetal cell lines, and (b) religious beliefs deemed "personal," including beliefs derived through prayer,

conscience, or individual religious discernment, and (c) membership in a religion that DCAS instructed have "no prohibition against vaccines."

211. Denial letters issued by the Comptroller's Equal Employment Opportunity Office expressly invoked DCAS's redefinition of protected religion, stating that "Title VII does not protect…personal preferences," and equating "personal" religious practices and conscience-based beliefs with nonreligious preferences, notwithstanding that such beliefs are protected under federal, state, and city law.

212. The Comptroller's denial letters further demonstrate wholesale adoption of DCAS's centralized talking points and materials. The letters did not engage in any individualized analysis of the employee's job duties or possible accommodations, but instead resolved theological, moral, and scientific questions on behalf of applicants, stating in relevant part:

"Please note that unsubstantiated or inaccurate facts regarding your sincere beliefs – no matter how well-intentioned – are not a valid basis for a Reasonable Accommodation. Many religions, including Roman Catholicism, Judaism, Islam, Pentecostal, and Seventh-Day Adventists, have no prohibition against vaccination. Some people object to the use of a vaccine that was developed or tested using fetal cell lines, but almost all of the medical products we use today have, in some way, been touched by research that's been done on fetal cell lines – including over-the-counter medicines like aspirin, Tylenol and many others. Many faith institutions, including the Catholic Church, have said that in the absence of an alternative vaccine not derived by using the cells, it is morally acceptable to get the vaccine developed or tested using cell lines originating from aborted fetuses. Some express concerns about the safety of the vaccine. The CDC states that Pfizer, Moderna and J&J COVID-19 vaccine ingredients are safe. Nearly all of the ingredients in COVID-19 vaccines are ingredients found in many foods – fats, sugars and salts. The three vaccines have no tissues like aborted fetal cells, gelatin or any materials from any animal… While I understand and respect your strongly-held beliefs, this office cannot grant a religious exemption. Accordingly, your Reasonable Accommodation request for vaccine exemption based on religious beliefs is denied."

213. These denials mirror, nearly verbatim, the guidance, memoranda, and instructional materials disseminated by DCAS and the Law Department and Commissioner Chokshi citywide, including the same misstatements regarding fetal cell lines, the same invocation of unrelated consumer products such as Tylenol, the same selective citation to religious

37

institutions purportedly endorsing vaccination, and the same rejection of sincerely held religious beliefs as factually or theologically "incorrect."

214.    The Comptroller's Office's reliance on this templated reasoning—despite lacking any institutional expertise or policymaking authority in public health, theology, or vaccine development—demonstrates that the discrimination was not the result of an errant policy at one agency, but rather the widespread application of centrally supplied DCAS standards intended to foreclose accommodation for disfavored religious beliefs at all agencies.

**B. *Implementation at Department of Buildings* ("DOB")**

215.    DOB also never assessed undue hardship and did not submit any argument or evidence to the Citywide Panel on undue hardship. Rather, all denials at DOB were solely based on alleged defects with the applicant's religion.

216.    DOB, like all other agencies, initially made decisions in accordance with the City's discriminatory instruction to categorically excluding most faiths while allowing other faiths to receive accommodation automatically.

217.    On or shortly after October 20, 2021, DOB created a form for submission of administrative requests for religious exemption from COVID-19 immunization. The form asked applicants to attach a clergy letter.

218.    Employees whose exemption applications mentioned the use of fetal cell lines in the manufacture or testing of vaccines received a request from the DOB's EEO Office misinforming them that "[i]t does not appear that the mRNA COVID-19 vaccines produced by Pfizer and Moderna require the use of any fetal cell cultures in order to manufacture (produce) the vaccine" and demanding that they explain whether they took Tylenol and other medications wrongly characterized in the Chokshi letter.

219.    Initial denial determinations often revealed that DOB was substituting judgment for what an applicant's faith required of them, typically stating (especially for abortion-related concerns): "the sincerely held religious beliefs that you identified do not prohibit you from taking the COVID vaccine."

220.    Applicants were able to keep working while they appealed the initial denial to the Citywide Panel or to a SAMS panel which applied the very Stricken Standards found unconstitutional in *Kane.*

221.    *NYFRL* plaintiff Frank Schimenti, a devout Catholic whose pro-life religious beliefs precluded vaccination, worked for DOB and was denied by the agency.

222.    Ineligible for relief under the Stricken Standards due to his Catholic faith, he appealed to the Citywide Panel, submitting an eight-page letter detailing his sincerely held religious objections, including those related to abortion.

223.    Citywide Panelists asserted on their spreadsheet that these beliefs were too personal to merit protection, and that Schimenti was wrong that his Catholic faith required him to abstain from vaccines just because aborted fetal cell lines were used to bring them to market.

224.    Eichenholtz, who was one of the reviewers on Schimenti's case (it was subjudice at the time) wrote: "[r]equest based on personal preference against vaccination rather than the religious belief. Articulated religious belief does not prohibit vaccination."

225.    Eichenholtz typically wrote this on applications involving abortion concerns. When asked why in other cases, he has indicated that he believed that the City had to not only determine if religious beliefs were sincere, but also whether the applicants' religion really did preclude vaccination as believed.

226.    Panelists also rejected Schimenti's beliefs because he used Tylenol in the past, even

39

though he told DOB reviewers that he had no idea about the connection, but would never Tylenol again if it was true that it was linked to abortion.

227.    Schimenti recently won a determination in New York State Court, affirmed by the Second Department after the City appealed that the City's denial was arbitrary and capricious, and that he should have been accommodated.

228.    Schimenti's unlawful and discriminatory denial was not an outlier at DOB or the Citywide Panel level, but the norm.

## C. *Implementation at Department of Corrections ("DOC")*

229.    On October 27, 2021, the DOC sent an email to its staff requiring most, but not all, of its staff to submit proof of receiving at least one shot of COVID-19 vaccine by the close of business on October 29, 2021.

230.    Due to staffing shortages, not all DOC employees were required to get vaccinated.

231.    DOC employees who were subject to the October 29 vaccination deadline who wished to submit requests for reasonable accommodation were required to submit their requests by email by 5 p.m. on October 27, 2021 – giving at least some DOC employees less than five hours' notice of their need to do so.

232.    Employees were allowed to test weekly and keep working in person while their accommodation requests and appeals were pending.

233.    Some employees were granted religious accommodation, others denied, without any basis provided for the difference in hardship between those accepted or denied.

234.    If an employee was denied, employees could choose to appeal to the SAMS panel, which applied the Stricken Standards. Instructions to employees stated:

SAMS will only grant appeals based on religious exemptions if it is in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has

spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations ( e.g., Christian Scientists).

235.    Alternatively, employees who did not fit the discriminatory criteria in the Stricken Standards were given the option of a Citywide Panel appeal, which was separate and not equal as it applied an uneven undue hardship policy far harder to surmount than that applied by SAMS, who had to accommodate an employee if they qualified under the Stricken Standards criteria.

236.    Decisions were slow at the Citywide Panel. Some denied DOC employees were allowed to keep testing and working in person unvaccinated throughout the entire mandate until it was lifted in February 2023 without ever losing their jobs.

237.    Others, who were unlucky enough to have had their request arbitrarily decided earlier, or who weren't allowed to indefinitely pend due to favoritism, were dismissed or forced to vaccinate in violation of their sincerely held religious beliefs.

238.    Eichenholtz asserted in sworn testimony that DOC was the only agency that ever submitted anything to the Citywide Panel on the topic of undue hardship.

239.    DOC's submission to the Citywide Panel consisted of a generalized and non-individualized statement that employees should be vaccinated to avoid staffing shortages.

240.    DOC did not articulate why it was safe to have employees whose applications were pending work in person unvaccinated until the Mandate was lifted, but somehow not safe for those whose appeals were decided earlier.

241.    DOC did not articulate how terminating unvaccinated employees assisted with avoiding staffing shortages.

242.    DOC also did not articulate why prisoners, visitors, uniformed employees and a host of

41

other persons in the prisons could safely enter and remain in person unvaccinated, while those with religious objections could not.

243.    Neither DOC nor the Citywide Panel ever engaged in individualized undue hardship analysis for any employee denied religious accommodation.

244.    Eichenholtz admitted that the Panel simply took any assertion by the agency at face value, assuming that any asserted inconvenience met the "more than a minimal burden" standard that he erroneously instructed reviewers to apply.

D.  *Implementation at Department of Investigations (DOI)*

245.    DOI employees were informed in late October 2021 that they had only a few days to apply for religious accommodation to the City Employee Mandate if they wanted to stay on LWOP while they awaited a decision.

246.    Upon receipt of timely-filed exemption application forms, DOI staff sent emails to religious exemption applicants containing the following statement: "Your request has been received. Please continue to submit a negative test result within every seven-day period while you await the reasonable accommodation determination."

247.    DOI exemption applicants whose requests for exemption were denied received emails that provided no reason for denial.

248.    DOI initially implemented the same discriminatory policies recommended and implemented at other agencies, categorically excluding most faiths, denying personally held beliefs and beliefs grounded in religious objection to abortion.

249.    DOI employees denied accommodation under these policies could appeal to SAMS using the Stricken Standards or through the Citywide Panel, which applied more difficult undue hardship standards than SAMS.

250.    DOI employees could continue to test weekly while awaiting a decision on appeal.

251.    Many DOI employees who applied for religious accommodation but did not receive a decision were able to work in person unvaccinated throughout the entire pandemic in person and never lost their jobs despite being unvaccinated.

252.    DOI never engaged in any individualized undue hardship analysis and never provided SAMS or the Citywide Panel with any undue hardship analysis or data.

253.    Some DOI appellants whose appeals were denied by the Citywide Panel received no notices directly from the panel, and those who received direct denials from the Panel were not informed of any reasons for their denials. Other applicants were informed by the DOI of the denials, again, with no explanation for the denials.

### E. *Implementation at Department of Parks and Recreation ("Parks")*

254.    On or about October 26, 2021, Parks notified some of its personnel by email that the deadline to submit applications for reasonable accommodation from the City Mandate's vaccination requirement was 5 p.m. on October 27, 2021 (the next day).

255.    The Parks' notices attached application forms, which stated the following: "[r]eligious accommodation requests should be submitted with documentation from clergy, identifying religion or describing the religious belief\practice\observances and identify the accommodation required."

256.    Parks did not notify every employee of the deadline. Those who learned of it in time and applied by October 27, 2021 were allowed to keep working in person unvaccinated but those who applied after the deadline were placed on LWOP while they waited for a decision (though the City allowed discretion to make exceptions, and some people who applied late were given exceptions while others were not).

43

257. Most applicants were denied without explanation including at least one pastor and many employees with unassailable religious objections, showing the vast discretion given to reviewers.

258. pon denying an application, Parks emailed notices to applicants with information about their options to appeal. Two options were made available: either the Citywide Panel or review under the Stricken Standards by the same "SAMS" (Sheinman Arbitration) arbitrators who decided the unconstitutional arbitration appeals struck down in *Kane I*.

259. Employees were informed that the SAMS option was governed by the exact same policy struck down by the Second Circuit, stating:

> - ***SAMS will only grant your Religious Exemption*** if: 1) your exemption is in writing by a religious official (e.g., clergy); and 2) your religious organization is recognized and established.
>
> - ***SAMS will deny your religious exemption if***: 1) the leader of your religious organization has spoken publicly in favor of vaccines; 2) the documentation you provide appears to be copy-pasted from a readily available source (e.g., from the internet); or 3) your objection to vaccination is personal, political, or philosophical in nature.

260. The denials also informed appellants that if they qualified under the Stricken Standards criteria, there was no undue hardship basis for denial, rather: "you shall be allowed to continue working and remain on payroll; you must submit to weekly COVID-19 testing; and if you have been placed on unpaid leave, you will retroactively be granted paid leave."

261. On information and belief, the Citywide Panel denied the vast majority of the accommodation applications submitted by Parks employees, typically informing denied applicants by emails stating that "[t]he decision classification for your appeal is as follows: Does Not Meet Criteria."

262. Eichenholtz admitted that Parks never submitted any documentation to the Citywide

44

Panel regarding undue hardship, and the Citywide Panel never reviewed whether it would be an undue hardship to accommodate any Parks employee.

263.   Nonetheless, some reviewers exercised discretion to deny on the basis that they assumed it might be a de minimis burden to allow accommodation even if an employee was sincere.

264.   Applicants who replied to Citywide Panel denials asking which criteria they had failed to meet received no response.

265.   Parks employees who failed to submit proof of vaccination after denial of their appeals by the Citywide Panel received an email giving them a short deadline to choose either to separate voluntarily from Parks and maintain health insurance through June 30, 2022 (while waiving any right to challenge this separation), remain on LWOP through June 30 and maintain health insurance until that time (while waiving any right to challenge separation after June 30), or be terminated on the deadline.

266.   Parks employees who agreed to accept either of the LWOP or voluntary separation options were required to return a signed waiver of their right to sue over religious discrimination to Parks within ten days, in violation of federal and state employee protection laws.

267.   Two lifeguards were given religious accommodations to work in person by Parks, and were allowed to engage in all their duties, including mouth to mouth resuscitation, without being vaccinated.

268.   Yet others, like Plaintiff Clarke, a gardener, and many of his colleagues who had jobs that were not public facing, were denied religious accommodation because they did not belong to the correct religion, like Christian Science or another religion the City could understand

### F. Department of Sanitation ("DSNY")

269.    DSNY employees were required to submit accommodation applications by October 29, 2021, if they wanted to remain working while their appeal was pending if denied by the agency.

270.    But the agency failed to notify many employees of this policy.

271.    Those that were aware were given no instructions about what kinds of information their employers wanted. Some sanitation workers expressly asked for guidance but were stonewalled.

272.    DSNY had attorneys review the requests, not EEO officers, and left it "open-ended" as far as what employees could submit in the initial request, giving great discretion to reviewers to decide whether the employee had asserted good religious cause for accommodation or whether to follow up.

273.    Cursory denials were issued to all applicants in or around early November, prior to the Second Circuit's decision in *Kane.*

274.    DSNY denials contained no other information than a short boilerplate statement: "Because the information you provided in support of your request has not sufficiently demonstrated to DSNY that there is a basis for granting you an exemption to the above Order, DSNY is denying your request for an accommodation."

275.    Employees were given only a few days to decide between a SAMS appeal, governed by the discriminatory Stricken Standards, or a Citywide Panel review, and submit any additional materials in support of their appeal.

276.    But despite frequent attempts, by many employees, to find out why their beliefs were deemed insufficient so that they could correct the record on appeal, DSNY refused to provide

any insight or guidance.

277. Importantly, DSNY had an official policy that it was NOT an undue hardship to accommodate employees with sincerely held religious beliefs. Thus, all denials were based on purported defects in the religious beliefs of the applicants.

278. Rather than assessing sincerity, DSNY relied on a generalized interpretation of what various religious leaders required to summarily categorically reject applicants based on their religion.

279. Ryan David, DSNY's Equal Employment Opportunity ("EEO") Officer, testified at a 30(b)(6) deposition in *Rizzo v. New York City Dep't of Sanitation*, Case No. 1:23-cv-07190, that Catholics were subjected to a more onerous burden than other religions, stating this was because: "I don't understand because you identify as Catholic. Your faith leader is telling you that it's okay to get the vaccine. I would like to think that the majority of Catholics probably ended up agreeing and getting the vaccine."

280. David repeatedly testified that when he decided requests in his sole discretion, he considered "the Pope saying you can get the vaccine" and that "a large majority of Catholics" had done so.

281. He justified this, saying that he was Catholic, and that the Pope was vaccinated and that he believed the majority of Catholics got the vaccine. Even where Catholics had beliefs based on conscience, he intimated that he remained suspicious "because again, he is not part of a religion of one."

282. DSNY reviewers also typically followed the City's guidance to reject religious objections related to abortion, especially where the applicant did not know to mention the irrelevant fact of whether they took Tylenol or not. They also categorically denied beliefs

derived from conscience.

283.   DSNY also improperly required applicants to submit a clergy letter in support of their religious position and typically denied those who did not.

284.   However, some reviewers used their discretion to waive the requirement, showing the lack of general applicability at the agency as well as City level.

285.   DSNY supplied its denied employee applicants with information about a two-option appeal process that was similar to the outline that Parks sent to its employees.

286.   When Citywide Appeals Panel panels denied religious exemption appeals, typically the only information they provided to DSNY applicants was "Does Not Meet Criteria."

287.   While DSNY claims the power to terminate the employment of unvaccinated employees, as a practical matter, many unvaccinated employees remained in its workforce through the exercise of discretion by their supervisors. Some of them were never terminated by DSNY despite failing to be vaccinated or receive an accommodation.

288.   Yet others, like Plaintiffs named herein, were forced to choose between faith and career.

## G.  *Implementation at the Fire Department ("FDNY")*

289.   FDNY sent out forms for its employees to submit religious exemption applications. The FDNY's EEO Office sent an email to each applicant requiring "[a] Statement in Support from the applicant's Religious or Spiritual Leader that is specific to the applicant setting forth: (a) that the applicant is known to the religious or spiritual leader, (b) the applicant is in good standing with the faith and (c) the tenet of faith that prohibits the applicant from receiving the vaccine." The FDNY's email stated that an applicant "must include" this Statement in Support to be "considered complete".

290.   FDNY adjudicators did not typically contact applicants to conduct individual

48

conversations with them, or, if they did, it was a hasty phone call with no good faith discussion of potential accommodations.

291.    Most religious accommodation applications were denied at the administrative level. All denial notices provided the same boilerplate reason: "The asserted basis for the accommodation is insufficient to grant the requested accommodation, particularly in light of the potential undue hardship to the Department."

292.    These notices were not individualized or based on any assessment of an individual's actual job duties or other statutory factors on hardship.

293.    This same notice was sent to employees who already worked remotely or had non-public-facing jobs.

294.    FDNY did not engage in individualized cooperative dialogue with employees about any potential hardship if they were accommodated, even if they worked in person with extensive contact with the public, revealing that the concern about hardship was only invoked when the agency wanted to deny someone.

295.    FDNY employees who received denials of exemption requests appealed to the Citywide Panel.

296.    Any applicant, regardless of their job and level of public contact, could test weekly and keep working in person until they were issued a final determination after appeal by the Citywide Panel.

297.    FDNY conceded in related litigation that it allowed at least 1,176 employees with pending appeals to work unvaccinated in person throughout the Mandate.

298.    Most of these employees who were allowed to continue working unvaccinated were in fire operations (firefighters, EMT's, paramedics) and had close and significant public

49

contact.

299. Some of these unvaccinated employees with pending religious accommodation requests were never suspended or terminated, and still work at FDNY today, with no break in service.

300. FDNY also officially granted over a hundred religious accommodations, including to many firefighters and other personnel with public facing job duties and who worked in close contact with other employees.

301. The City also had mutual aid agreements with outside municipalities that did not have vaccination requirements allowed first responders working through these agreements to work unvaccinated without any claim of undue hardship.

302. The City also had volunteer Fire Departments who were not subject to the Vaccine Mandate or any vaccination requirement. The volunteer firefighters and personnel were permitted to work unvaccinated.

303. In December 2021, FDNY sent a memo to employees explaining that blood donors do not have to be vaccinated. This was an exception for secular reasons for personnel that posed no different level of danger than those who were not blood donors.

304. Some FDNY employees who were denied religious accommodation by the Citywide Panel were also nonetheless allowed to keep working unvaccinated or were reinstated without vaccination based on the discretion of their supervisors.

305. FDNY's "potential for undue hardship" add on was wholly unsupported by any individualized analysis or conclusions about any particular employee.

306. FDNY officials admit that their own internal policies provided that weekly testing was not an undue hardship.

307. They also admit that the City prohibited them from assessing whether any other

accommodations including job reassignment, paid or unpaid leave, symptom checks, masking or other mechanisms to reduce any perceived risk could mitigate the so-called "potential for undue hardship" and that they did not assess any of these possible accommodation.

308. FDNY also failed to ever assess whether and why any applicant was more or less dangerous or more expensive to accommodate than the 1176 that remained accommodated.

309. FDNY never assessed any economic or safety data to determine undue hardship for any employee.

310. Nor did FDNY ever submit any documentation or analysis to the Citywide Panel regarding undue hardship.

311. Eichenholtz admitted in depositions that FDNY never submitted any undue hardship analysis to the Citywide Panel for any employee and that the Citywide Panel never independently assessed any of the statutory factors for undue hardship for any employee.

312. Nonetheless, the Citywide Panel sometimes denied employees on the grounds that the words "potential for undue hardship" should be a basis of denial under Eichenholtze's instructions and the de minimis standard, even though no individualized assessment had ever been made or submitted.

## H. *Implementation by the Police Department*

313. The NYPD supplied accommodation request forms to its employees along with notices that informed them of the City Employee Mandate and procedures to apply for religious exemption. The form informed applicants that "Supporting documentation from you and/or your religious official explaining your religious exemption from the COVID-19 vaccine is strongly suggested."

314.   The initial agency denials from NYPD did not state reasons for the denial.

315.   On or about February 8, 2022, because of a lawsuit, NYPD employees who had received cursory denial letters received a second, amended denial letter that contained a checklist of boilerplate reasons for the denial.

316.   On every application, NYPD checked off that the belief was "personal" as a reason to deny the applicant, even though personal religious beliefs are protected under the law.

317.   But pursuant to DCAS and other official policy communications, NYPD's official policy was that any beliefs derived from prayer or personal religious practice was ineligible for accommodation.

318.   NYPD employees who were denied were given a choice between a SAMS appeal, governed by the Stricken Standards, which had no provision for undue hardship denial, or a Citywide Panel appeal.

319.   NYPD employees were also informed as follows: "Employees with pending appeals will remain on active duty status and continue to work while providing proof of negative COVID-19 testing through CPRS while awaiting final decision of their appeal based upon the applicable agreement with their collective bargaining unit (CBU)."

320.   Tanya Meisenholder, then Deputy Commissioner, Equity and Inclusion at the NYPD, emailed the NYPD accommodation reviewers, including the NYPD EEO director, an article by a "former pastor" instructing that there was no valid basis for religious exemption in any sect of Christianity.

321.   The NYPD EEO director told trainees at the NYPD who were to evaluate religious exemption requests at the agency level that they could deny people's applications without making any contact with them, in violation of the cooperative dialogue requirements in all

three governing statutes.

322.  No dialogue took place between NYPD and any employee regarding hardship or potential accommodations.

323.  NYPD never assessed undue hardship for any applicant, and undue hardship was not the basis for any agency level denial. Rather, like most other City agencies, NYPD denied applicants solely based on alleged defects with their religious beliefs.

324.  These denials were governed by the same policies that were struck down in *Kane* and *NYFRL* as unconstitutional.

325.  The EEO director told those reviewing applications at the NYPD that if an applicant objects to the vaccine based on its connection to aborted fetal cells but does not mention that the applicant also avoids Tylenol and Pepto Bismol on this basis, then the request should be rejected.

326.  Employees were not told about this arbitrary requirement so did not know to mention whether they took Tylenol or Pepto Bismol.

327.  Tylenol and Pepto Bismol did not use aborted fetal cell lines in the development of the product and have asserted that there is no connection between their products and abortion.

328.  Some people allege that these products may have been tested against cell lines in experiments that were not conducted by the companies and/or had nothing to do with getting the product to market, unlike Covid-19 vaccines, which depended on the use of aborted fetal cells for licensure. To the extent this allegation is true, many religious people draw a line between pre and post licensure activities, reasoning that if a product did not depend on abortion to come to market, they can take it without participating indirectly in the sin.

329.  Moreover, there was widespread public discussion of the use of aborted fetal cell lines

used in the development of the Covid-19 vaccines, so many religious people were aware of that connection, but it was relatively unknown that Tylenol and Pepto Bismol were tested in experiments that used aborted fetal cell lines, to the extent this is true.

330. The EEO director also told trainees at the NYPD that the question of whether to grant a religious exemption request was "subjective."

331. Similarly, the decision about whether to make any final determination at all was also subjective. Because of a staffing shortage, the City intentionally slowed the review process down for NYPD religious exemption applications so that thousands of NYPD employees remained in "pending" status and were able to continue to work throughout the entire pandemic and mandate.

332. This policy of pausing the reviews was an intentional mechanism for de facto secular exemptions that was communicated to management and officers, as documented by the press. https://nypost.com/2022/05/21/nypd-puts-4650-vaccine-firings-on-hold-insiders/

333. Under this discretionary policy, five thousand or more unvaccinated NYPD employees, most with public facing jobs involving significant public contact, were allowed to keep working in person without meeting the vaccine requirement and without receiving any religious accommodation throughout the entire mandate.

334. The City was aware that NYPD was not requiring vaccination for thousands of employees, and that NYPD had paused review of applications to avoid denials for thousands of employees due to secular concerns about staffing shortages. The City failed to correct this policy or request that the reviews speed up.

335. Much of this pause appeared to be City directed. The Citywide Panel also paused review of thousands of NYPD applications.

336. It also appeared political as Mayor Adams came under fire for the staffing crisis his vaccine mandates have caused on the force, and the simultaneous unchecked horrific crime wave that the City was experiencing.

337. The NYPD also officially granted over 500 religious accommodation requests, including for employees who worked in person in public facing jobs.

338. Reviewers exercised wide discretion in this process.

339. The NYPD granted religious accommodations to detectives and police officers who had close contact with other employees and the public.

340. Yet, hundreds of other NYPD officers, including many Plaintiffs in this case, were denied religious accommodation and terminated or forced to resign or retire early, though they pose no greater danger than those allowed to continue working while their applications indefinitely pend.

341. Even after an employee was denied religious accommodation, NYPD exercised enormous discretion over whether to enforce the denial. Several NYPD employees with significant public contact were allowed to quietly come back without getting vaccinated even after being issued a final denial by the Citywide Panel. Others were allowed to just keep working after the Citywide Panel denied them, even though they remained unvaccinated.

342. Neither the Citywide Panel nor NYPD offered any explanation for why employees are not a direct threat to others while their application pends for months or years on end but somehow cannot be safely accommodated once the agency reviews an application.

343. The NYPD's decision to pause the reviews highlights that in the NYPD, just as in all the other departments, there is no public health necessity to refuse to accommodate religious objectors.

344. The NYPD never provided any evidence or analysis to the Citywide Panel related to undue hardship.

345. The Citywide Panel continued the NYPD's arbitrary practice of denying employees when the employee had not thought to mention whether they use Tylenol, which is irrelevant.

## V. The City's Mandate Policies were Arbitrary and Riddled with Discretion

346. Notwithstanding that thousands of religious objectors were temporarily saved from termination through arbitrary carve outs and pauses, thousands of other employees were terminated because they could not get vaccinated due to their sincerely held religious beliefs.

347. This was especially unfair, in that the City had admitted, before any of the Plaintiffs and other municipal employees were terminated, that there was no longer a public health emergency.

348. Mayor Eric Adams announced he was lifting the "Key to NYC" requirements on February 27, 2022, stating that, provided COVID-19 indicators continued to show a low level of risk and no unexpected spikes occurred, the mandate would end on March 7, 2022.

349. On March 7, 2022, there having been no spikes and risk remaining low, the Key to NYC mandate was lifted. The rollback was part of a broader effort to ease restrictions as case numbers dropped significantly following the Omicron wave, reflecting a shift toward "economic recovery and normalcy."

350. At the very least, this rollback should have alerted the Citywide Panel and each City agency that the Mandates were temporary in nature, and likely ending soon, so short term accommodations should have been considered.

351. Instead, the agencies began firing employees in February 2022, just as the Mayor was announcing that the emergency had abated and was likely at an end.

352.    Later in March, Mayor Adams issued Emergency Executive Order ("EEO") 62, carving out athletes, entertainers, assistants of athletes and entertainers, and other arbitrary categories of employee in an effort to improve economic conditions for his large donors and lobbyists. So, while ballplayers and their entourages could circulate freely in the stands, hot dog venders and janitors and municipal workers had to keep getting vaccinated.

353.    EEO 62 acknowledged that the basis for the carve-out was secular, not scientific. The Mayor asserted that "public health" also included economic and social factors and thus he was exercising his vast discretion to roll back the City's vaccine requirements as he saw fit.

354.    On March 7, 2022, Mayor Adams and Commissioner Chokshi held a press conference, each noting how low the transmission rate was in the City. Commissioner Chokshi said: "According to our data, we are currently at a low alert level" and Mayor Adams clarified the City was experiencing historically low infection rates. The Mayor stated "I'm glad to say that the rates are low enough that the mandatory program is no longer needed." On this basis, he removed a "Key to NYC" Mandate that had required patrons to show they were vaccinated at restaurants and certain other facilities. He also stated: "As of this week, the schools' positivity rate is 0.18 percent. So I'm announcing today that we are lifting the indoor mask requirements for DOE schools between K-12 starting Monday, March 7."

355.    Mayor Adams refused to drop the employee Mandates, despite this progress, but did announce that he intended to lift all restrictions over parades, festivals and parties, stating: "We have become so boring as a city. I want all my parades back. Every one of them. It is time for us to enjoy our city again. All of these noes, noes, noes [sic]. We've become a city of noes. I want to become a city of excitement. We're going to look to reinstate every parade, every festival, every block party…So if you received a no that we're not doing a parade, I

need to find out why.

356.    When asked by a reporter to explain how it was fair that "an unvaccinated tourist from Indiana" could go to whatever restaurant they wanted or participate in parades, but an unvaccinated firefighter or EMS worker who lost their job could not, Mayor Adams did not state any public health reason, but instead said "you know, this went to court, this was the rule. How we determined fair and unfairness is in the court of law."

357.    When asked at the March 2022 press conference if he would repeal the employee mandates and reinstate those who were denied religious accommodation and lost their jobs now that the emergency was over, Mayor Adams again admitted the reason was not about public health, but rather animus to those who refused to comply:

"The overwhelming number of New Yorkers, city employees did the right thing – the overwhelming number. It sends the wrong message to those New Yorkers who stated, even if i was reluctant, I'm going to follow the rules. That is what we are doing. We can't send the wrong message that when we say something, we're going to change and vacillate. That is what was stated people understood, particularly those who took the job with that understanding, we are people who took the job with the understanding and refused to comply. And so the information was clear. People have to follow the rules." https://www.nyc.gov/office-of-themayor/news/110-22/transcript-mayor-eric-adams-makes-announcement-covidmandates (last accessed June 20, 2025).

358.    On March 24, 2022, Mayor Adams issued "Executive Order No. 62" (EEO 62). It amended the employee mandates with blanket exemptions for professional athletes, performers and other artists along with their make-up artists and entourages.

359.    EEO 62 was entirely justified on economic rather than public health goals. The order states that these workers benefit the "City's economic recovery from the pandemic, often attracting large numbers of visitors to the City." He stated that it put athletic teams at a competitive disadvantage to bar unvaccinated players which in turn hurt the City's morale as well as economy.

360. Furthermore, the Mayor knowingly allowed various City agencies to let thousands of unvaccinated employees work in person due to staffing shortages, administrative backlog, and mutual aid agreements until the Mandates were repealed in 2023, while their similarly situated colleagues were being denied religious accommodation and fired without any explanation of why they were possibly more dangerous than those allowed to keep working in person.

361. In *DePaola v. City of New York*, Index No. 85265/2022 (Sup. Ct. Richmond County), which is a related litigation on behalf of a New York City municipal worker who was denied religious accommodation in November 2021, but was granted medical accommodation in May 2022, NYPD submitted a sworn affirmation from Don Nguyen, the Assistant Commissioner of the Equal Employment Opportunity ("EEO") Office admitting that by May of 2022, Covid-19 cases and deaths were extremely low, there were less applications, and there was no safety issue preventing accommodation (in person for municipal employees with weekly testing.

362. Yet, many others with the same or materially similar jobs and public exposure levels as De Paola were denied religious accommodation and fired on the ground of "potential for undue hardship" in or after May 2022.

363. In August 2022, the CDC issued written guidance stating that workplaces should not differentiate between vaccinated and unvaccinated employees, and that receipt of the primary series (all that was required by any of the Mandates) "provides minimal protection against infection and transmission."

364. On September 20, 2022, the City announced the private sector employee mandate would be repealed.

365.    When asked at that time why the Municipal and DOE mandates would not also be repealed despite CDC guidance to treat all workers the same, Mayor Adams told the press, "I don't think anything in general with COVID makes sense and there's no logical pathway one can do." [sic]. Shortly thereafter, the Mayor admitted the City had never enforced the private sector Mandate for most (but not all) employers.

366.    The Municipal and DOE Mandates were not repealed until February 2023.

367.    Most municipal and DOE employees who were denied religious accommodation are still barred from returning to work due to coercive and retaliatory problem codes attached to their files, hostility and refusal to rehire, or the imposition of coercive "waivers" that they are required which would waive their right to seek redress for religious discrimination or back pay.

VI.    **June 2022 Reinstatement Offer Constituted Fresh Statutory and Constitutional Harm**

368.    As set forth above, the City admitted in related litigation that it no longer had a safety justification for the Municipal Mandate by May 2022.

369.    Yet, in June 2022, Defendants offered employees who were previously denied accommodation, suspended and terminated under the vaccine mandate the opportunity to be reinstated with no break in service but ONLY if they show proof that they have received at least one dose of the vaccine by June 30, 2022.

370.    The City refused to accommodate known religious need in making this offer, even though they were on notice that Plaintiffs and others needed religious accommodation and even though their own internal policies and representations to the Courts show they could have easily accommodated them.

VII.    **Named Plaintiffs**

371. Detailed facts concerning the individual Plaintiffs are set forth below. Each Plaintiffs' individual section incorporates by reference all paragraphs of this complaint, which are relevant in assessing the claims on an individual and class wide basis. Likewise, Plaintiffs' individual facts contribute to the evidence of widespread religious discrimination occurring against municipal employees.

*Sharon Tunnell*

372. Plaintiff Sharon Tunnell (Ms. Tunnell) began working as a fire inspector at FDNY in 2019.

373. She was well-respected at her job and had even been approached by her supervisor to see if she would like to be nominated as "employee of the year." She appreciated the compliment but said that she did not want the added mental stress of maintaining that status.

374. Ms. Tunnell is a Christian and has a deep and abiding personal relationship with God, especially around issues of health and healing.

375. Her spiritual and cultural traditions, passed down from her mother, an African American woman who came from the south, was to use God's healing herbs and tonics for most illness, like castor oil, soups, and especially prayer.

376. When she was just five years old, as her mother lay dying, Ms. Tunnell prayed to God with all her might to heal her mother, and she believes her prayers were answered. Her mother was healed, lived a long life and passed away last year from what Ms. Tunnell believes was an adverse reaction to a vaccine.

377. When Ms. Tunnell was only eight years old, her mother went blind. Ms. Tunnell prayed and prayed, and her mother's sight returned.

378. Since those early and formative miracles, Ms. Tunnell routinely turns to God and prayer

61

when she encounters illness and generally avoids medications and other pharmaceutical interventions.

379.   She has not taken a single vaccine as an adult, and she routinely rejects medications, even for things like a tooth abscess or other conditions, turning instead to God to heal her.

380.   Ms. Tunnell worked in person throughout the entire pandemic.

381.   Even in March 2020, when much of the City was shut down, she still had to go out in person and conduct inspections and she continued to do so throughout the entire pandemic emergency, until she was placed on leave without pay in 2022.

382.   Ms. Tunnell declined the Covid-19 vaccine in December 2020 when it became available, instead relying on God to keep her healthy.

383.   Despite working in person all throughout the pandemic unvaccinated, and testing weekly, to this day, Ms. Tunnell never once tested positive for Covid-19.

384.   When she was informed that the testing option would no longer be available, Ms. Tunnell prayed to God to give her an answer about what to do. She heard a voice giving her a clear and unequivocal answer that she must not get vaccinated against Covid-19.

385.   Ms. Tunnell prepared a religious accommodation request on or about October 23, 2021 explaining that her sincerely held religious beliefs precluded vaccination and offering to test weekly, wear an N-95 mask, social distance, sanitize, and continue to make the Most High her dwelling place so that "no evil shall befall me and no plague shall come near my dwelling place" (quoting Psalm 91).

386.   Ms. Tunnell explained the basic tenants that she believes support her guidance from prayer, including foundational passages of the Bible commanding that the body is a temple, and the Christian obligation to keep it clean, as well as passages commanding Christians to

62

place their faith in God for healing.

387.    Ms. Tunnell asserted that it was her personal religious belief that mankind is incapable of healing and sustaining health better than God, and that participating in the Covid-19 vaccine scheme prevents her from worshipping the Creator in the way she sees fit.

388.    Ms. Tunnell also articulated her sincerely held religious concerns that the vaccine appeared to have all the hallmarks of the mark of the beast, and she believed it was the mark of the beast, which she was forbidden from participating in. She noted that the Covid-19 vaccines used genetic coding instructions, which change God's design, and expressed concern about the fact that they used aborted fetal cell lines and a substance called "Luciferase" in their development, which to her were more clear signs that they were tainted by sin and not appropriate under her Christian beliefs.

389.    Ms. Tunnell emailed her request on October 23, 2021, but did not hear back. She then mailed it and also delivered it through an online system on or around October 27, 2021.

390.    While she was waiting for confirmation that her application was received, Ms. Tunnell also put in a request for a thirty-day unpaid personal leave on October 26, 2021. She explained that the Covid-19 vaccine mandate was extremely stressful and that she needed time to clear her mind and make potentially life-changing decisions about her future with FDNY considering the conflicts it brought up. She hoped to use this time to continue to pray to God and seek affirmation of her understanding of what was required of her.

391.    FDNY denied Ms. Tunnell's request for a thirty-day unpaid leave of absence on the same day, with the "Main reason being our current and predicted manpower shortage" (that was anticipated due to the entirely preventable vaccine mandate terminations).

392.    On or about December 30, 2021, FDNY denied Ms. Tunnell's religious accommodation

request with a generic letter stating:

> The request for a religious exemption from the vaccine mandate is denied. The asserted religious basis for the accommodation is insufficient to grant the requested accommodation in light of the potential undue hardship to the Department. Given the state of the public health emergency, the nature of the Department's life-saving mission, and the threat to the safety and health of the Department members and the members of the public that the Department members regularly interact with, the requested accommodation cannot be granted.

393. Importantly, FDNY did not say it *would* be an undue hardship to accommodate Ms. Tunnell, which they are required to prove before denying any request, but rather, that there was a "potential" for undue hardship, which was unspecified and unsupported by any documentation as required by statute.

394. Nor did the agency every consider whether Ms. Tunnell could have been accommodated without "undue hardship."

395. In fact, it would not have been an undue hardship to accommodate Ms. Tunnell. The City's and agency's own guidance provided that weekly testing was the preferred accommodation and would not present an undue hardship in most cases other than in a "few" instances.

396. Ms. Tunnell's job did not involve extraordinarily close public contact to rise to this level. Though she did typically do walk -throughs of commercial buildings with an escort. A large portion of the inspections would take place outdoors, and the escort or others could easily stand six feet away from Ms. Tunnell during any inside portion of the inspection.

397. Moreover, though the FDNY issued this denial in December 2021, they continued to allow Ms. Tunnell to work in person unvaccinated so long as she tested weekly through February 6, 2022, showing that she was not in fact a direct threat.

398. The only reason that they placed Ms. Tunnell on leave without pay (LWOP) on February

7, 2022 was that they realized her appeal to the Citywide Panel, while under consideration, had been submitted late so they determined that they would not allow her to test weekly while she awaited a decision, as some of her colleagues were allowed to do.

399.    This determination had nothing to do with safety, or a determination that it would not have been safe to allow Ms. Tunnell to continue to test weekly and work in person while she awaited a decision.

400.    FDNY also allowed over a thousand other employees, many of whom had jobs with far more contact with the public, to continue to test weekly in lieu of vaccination throughout the pandemic while they awaited a decision on their religious accommodation requests.

401.    FDNY also granted permanent religious accommodation requests to firefighters and others who had much closer contact with colleagues and the public than Ms. Tunnell did in their daily job duties.

402.    FDNY also had a policy, effective December 2021, that blood donors did not need to comply with the Covid-19 vaccine mandate, showing discretion to grant secular reasons for exemption while claiming "potential for undue hardship" on religious accommodations.

403.    On or about July 11, 2022, Ms. Tunnell received a generic denial from a no reply email vaxappeal@dcas.nyc.gov stating that the Citywide Panel denied the appeal, and that "This determination represents the final decision with respect to your reasonable accommodation request."

404.    The only reason provided was "The decision classification for your appeal is as follows: Does not Meet Criteria."

405.    Mr. Eichenholtz admitted in depositions that nothing supported any undue hardship reason for affirming denial of FDNY employees.

406.    He stated that the FDNY did not provide the panel with any materials to justify or argue for undue hardship, either economic or safety related, that the panel did not independently assess undue hardship, and that neither the panel nor the agency assessed whether any FDNY employee was a direct threat or assess the economic or safety impact of any reasonable accommodation request.

407.    Rather, Ms. Tunnell was denied pursuant to the Citywide Panel's default policy of denying those with personally held religious beliefs, such as hers, and any applicant that mentioned aborted fetal cell lines, as she had.

408.    On July 27, 2022, Ms. Tunnell was terminated for failing to violate her sincerely held religious beliefs by getting vaccinated.

409.    Ms. Tunnell timely filed a complaint with the EEOC explaining that the City and FDNY were failing to accommodate her sincerely held religious beliefs were being burdened by widespread discriminatory policies that did not comport with the requirements of Title VII to accommodate employees in good faith, and that she was not being accommodated in good faith as required by Title VII. Ms. Tunnell pointed out that the mandates were discretionary, and exceptions were being made for things like "blood donors" while she and her colleagues were being denied based on the potential for undue hardship and other discriminatory reasons.

410.    On or after December 30, 2024, Ms. Tunnell received a right to sue letter from the EEOC.

411.    She timely files this lawsuit within 90 days of receipt of this letter.

412.    Ms. Tunnell also faced retaliation after the Mandate was lifted in February 2023 and has further state and local statutory claims arising out of that.

413.    Though her unit is still very short staffed, she was told she could not come back without

signing a waiver of her right to sue over the civil rights violations she reported.

414. FDNY also stated that even then she would also have to waive her seniority and start over, with a drastically reduced salary.

415. Unable to accept such terms, Ms. Tunnell is effectively shut out of her career.

416. She has lost everything and is just trying to hold on to her life in New York City by a thread through babysitting and odd jobs.

417. Her emotional, mental and physical health have been significantly impacted by the City's arbitrary and discriminatory policies.

418. She lost all her savings, which totaled $15,000. In order to survive, she used her savings to pay her rent and other expenses. She had to go to the food pantry in order to get enough to eat on a tight budget.

419. More profound and troubling was the psychological toll this loss had on Ms. Tunnell. She was told numerous times that securing a civil service job was supposed to mean a lifelong job.

420. She had spent years healing from the untimely death of her son, finally getting her life together, holding down a great job that she loved, only to have it taken away from her.

421. In August of 2022, she went in for a promotion exam with the FDNY. She inquired whether the vaccine was required, and she was told it was.

422. She passed the exam but could not move forward as she was already placed on leave without pay.

423. Once the mandate was lifted in 2023, Ms. Tunnell decided to be proactive and reapply for the same position. Only this time, she was told that because of her educational background she was no longer qualified for the job. This was obviously untrue, as the City

knew she had qualified before when she initially took the exam in 2022.

424.    Ms. Tunnell feels robbed of her dream job, and of the possibility to move up within the ranks. She had dreams and goals to accomplish, which now seem impossible for her to attain. This has taken a heavy emotional toll on Ms. Tunnell's psychological wellbeing.

425.    Ms. Tunnell seeks relief for herself and all the other hard-working City employees who were forced to work through the worst of the pandemic, then thrown away without a thought due to the City's disdain for their religious practices.

### Edison Gbor

426.    Plaintiff Edison Gbor ("Mr. Gbor") worked for the FDNY for ten years before he was denied religious accommodation, placed on leave without pay and eventually terminated in 2022.

427.    Mr. Gbor was an EMT for seven years and for the three years prior to his termination, he was employed by FDNY as a firefighter at Engine 92 in the Bronx.

428.    Mr. Gbor was a hero during the pandemic. Early on in the pandemic, the FDNY asked him to go into a fully Covid-19 infected unit in Coney Island to work in person with the sick and ailing staff.

429.    He went without complaint, and when he caught Covid-19, he bore it through meditation and faith and reliance on healing herbs, and then quickly returned to work.

430.    He then continued to go wherever he was needed and tend to New Yorkers in need however he could help and without a thought for his own safety and well-being.

431.    What anchored him through this difficult time was his sincerely held religious practices.

432.    Mr. Gbor grew up in Liberia, and his religious beliefs are deeply rooted in the indigenous nature-based spiritual practices reflecting a worldview in which everything – land, trees,

rivers, stones, animals, people and even illnesses, have a spiritual component and humans must maintain harmony with their energies. In his spiritual tradition, natural remedies are used which address not just the physical but also the spiritual aspect of disease.

433.    In or around 2019, Mr. Gbor recommitted to living his life in alignment with the faith of his people and his childhood. Since then, has practiced nature-based religion, maintains strict dietary and lifestyle practices, and believes that healing comes from connecting with the spiritual energy of the earth and humanity and using spiritual energies and faith to grow when challenged with illness. To stay in alignment with the correct energetic flow, he practices Capoera and other energy-based practices, and he avoids vaccines or anything that will interfere with his spiritual and energetic body.

434.    Mr. Gbor used these practices to get through Covid-19 when he was exposed during the early days of the pandemic.

435.    FDNY had no issue continuing to send Mr. Gbor unvaccinated into the most dangerous areas through the height of the pandemic, and they called him a hero for his work during that time.

436.    When the mandate came out, Mr. Gbor timely applied for accommodation, explaining that he had sincerely held religious beliefs that precluded vaccination and the basis for this belief.

437.    While he waited for a decision, he tested weekly and was allowed to keep doing his same job.

438.    As the weeks dragged on with no answer on his religious accommodation request with no answer, Mr. Gbor's mental health was extremely impacted. He started to have what felt like a nervous breakdown, uncertain how to live with the uncertainty and the constant

pressure to violate his faith to keep his job.

439.    Mr. Gbor attempted to seek help from the FDNY's counseling unit. But the unit denied access to him and all his unvaccinated colleagues so he was unable to get the help he was entitled to.

440.    In or around February 2022, FDNY gave Mr. Gbor an ultimatum – get vaccinated or placed on leave without pay (even though he still did not have a final answer on his religious accommodation request).

441.    He could not afford to live in New York City and wait for a decision unpaid, so he was forced to resign and move out of state with his wife.

442.    He felt it was futile to keep trying to get accommodation, given the stories he heard from others being denied without reason, and the hostility that FDNY and the City were showing towards religious beliefs like his, grounded in personal belief and practice.

443.    The stress of living without money, and the emotional and mental consequences of the City's requirement that he choose between faith and a job took a huge toll on Mr. Gbor.

444.    He and his wife separated because of the economic and emotional toll that the City's actions caused.

445.    He tried to get work but could not find comparable work starting over in Florida.

446.    Eventually, Mr. Gbor lost everything – his wife, a home. He became homeless and had to live in his car, and eventually in the forest.

447.    After some time, he found someone who would rent him space in a barn to sleep for $250 a month and he saved up to be able to come back to New York City area after the Municipal Mandate was rescinded in February 2023.

448.    But this proved futile. Despite repeated efforts, FDNY refuses to hire him back.

449.   Mr. Gbor is still homeless and is in a desperate situation.

450.   He has four children to support, who live in the New York City area, and so he must remain here.

451.   Without a home, or a job, it is very difficult to get back on any kind of career track.

**Gregory Gordon**

452.   Plaintiff Gregory Gordon ("Detective Gordon") worked at the NYPD for sixteen years before they denied him religious accommodation in late 2022 and forced him to choose between his job and faith.

453.   For approximately nine years prior to his denial of religious accommodation, Detective Gordon worked as a squad detective in numerous NYPD detective squads throughout the city.

454.   At the time the Municipal Mandate was enacted, he was working in the 121st Precinct Detective squad in Richmond County, New York.

455.   Detective Gordon and his wife are devout Catholics.

456.   They resided at the time in Richmond County, where Detective Gordon had grown up, and been baptized, christened and confirmed under the rites of the Roman Catholic Church, and where he and his wife were members in good standing.

457.   Detective Gordon has been a sponsor two times over for young Catholics receiving Confirmation and is a Godfather to his nieces.

458.   The Gordons believe, as their faith teaches them, that abortion is a sin and they believe that the Holy Spirit speaks to us through our moral conscience to help us pause and seek guidance when we are going astray.

459.   When the Covid-19 vaccine mandate came out, Detective Gordon felt that his moral

conscience was nagging at him. Something did not feel right about it.

460. He and his wife researched and were appalled to find out that the vaccine was developed using fetal cell lines obtained from aborted babies, among other religious concerns.

461. He and his wife prayed about it and determined that this was absolutely unacceptable to their faith, and that it would be a sin for him or any of the family to take the vaccine due to its use of aborted fetal cell lines.

462. They take this so seriously that the Gordons also immediately stopped using any other product that they heard might be associated with abortion, including Tylenol, which they will not even give to their children.

463. Detective Gordon timely applied for religious accommodation, explaining the tenants of his faith that support his guidance from prayer that it would be a sin to take a Covid-19 vaccine.

464. He was denied without any explanation.

465. Soon after, as a result of a lawsuit, the NYPD sent a checklist of boilerplate "reasons" for the denial. These were: (1) Insufficient or missing religious documentation; (2) Objection appears to be based on verifiable false information, misinformation, fear of unknown origin of vaccine or side effects; (3) Written statement does not set forth how religious tenets conflicts with vaccine requirement; and (4) No demonstrated history of vaccination/medical refusal.

466. Undue hardship was not listed as a reason for denial and was never a reason for denial.

467. Detective Gordon timely appealed and was allowed to continue to test weekly in lieu of vaccination while his appeal pended at the Citywide Panel.

468. In his appeal, Detective Gordon refuted each point asserted as a basis for denial.

469.  He noted that his request quoted eight Holy Bible quotes and had amply supported documentation about his religious beliefs.

470.  He objected to the characterization of his beliefs as "scientific misinformation" noting this has no relation to his sincerely held religious beliefs and further stating: "if my Religious Accommodation was in fact reviewed on an individual basis, the paperwork I attached would have directly negated the aforementioned listed reason for your denial. I attached a printout from North Dakota Health that clearly details the use of aborted fetal cells, which are derived from an aborted fetus, in the development and testing of the currently available vaccines."

471.  He further objected to the bizarre contention that his statement did not set forth how religious tenets conflict with vaccine requirement. He told the City: "I worship God and do not pray to man, or the Pope, or a Bishop or a priest. I pray to God Almighty and fear his judgment for my actions in my life. Since sincerely held religious beliefs can be unique to an individual, evidence from others is not necessary." After this reminder, he reiterated that his primary religious objections were:

a.  "The vaccine is immoral. As stated previously, cell lines cultured from aborted fetal tissue are used in the development and testing of the available vaccines. This is morally repugnant and unacceptable to me. Some have argued that the absence of proximity between the abortion (1972) and the development of the vaccine (2020) dilutes this argument. 'Let each man decide with his own conscience,' I have to stand and give my antown account to God. (Rev 20:11)."

b.  "The vaccine is unnecessary for me. I have Covid-19 antibodies, tested and verified. My immune system has functioned as the Creator intended (Ps 139:14) and I hold that my immunity as at least equal to that of the vaccinated (citing multiple Bible passages)."

472.    Last, Detective Gordon objected to the claim that he had no demonstrated history of vaccination/medical refusal. First, he said this was irrelevant, as it did not speak to the unique properties of the Covid-19 vaccine. Next, he said that it was untrue. He noted that he could not recall once taking a flu vaccine in the last twenty years, and that once he found out Tylenol was tested using aborted fetal cells, he immediately stopped using the product.

473.    Detective Gordon then stated: "I even went a step further to research acetaminophen, to see if it was developed or tested against aborted fetal cells. Acetaminophen was discovered in 1866, and the earliest known Abortion to provide fetal cells was in 1972. Therefore, there is no longer a need to use Tylenol products and Acetaminophen alone is sufficient enough to provide some pain relief."

474.    In or around July 2022, Detective Gordon's application for religious accommodation was denied by the Citywide Panel.

475.    Upon information and belief, the Citywide Panel did not provide any reasoning other than "Does Not Meet Criteria."

476.    However, Mr. Eichenholtz admitted that NYPD did not provide any basis to deny any NYPD on the basis of undue hardship, so undue hardship was not a reason that Detective Gordon was denied.

477.    Rather, Detective Gordon was denied by the Citywide Panel because of their discriminatory policy of denying religious accommodation requests grounded in opposition to abortion in reliance, at least in part, on the instruction of Mr. Eichenholtz and Commissioner Chokshi.

478.    Though he was denied accommodation, NYPD allowed Detective Gordon to continue to work unvaccinated until September 16, 2022 due to NYPD's enormous discretion to deviate

from the vaccine mandate when convenient.

479.   But as his time was coming to an end, he put in for early retirement in August, and on September 16, 2022, after it was received, he was forced to leave the NYPD.

480.   By this time, the CDC had already issued unequivocal guidance that vaccinated and unvaccinated employees posed the same or similar risk of spreading Covid-19, and should not be treated any differently in a workplace.

481.   Yet, the City obstinately refused to rescind the mandate until February 2023 and would not rehire Detective Gordon unless he waived his right to sue and is willing to start over as a rookie.

482.   The family relocated to Florida, since Detective Gordon could not find any comparable work in New York City without being vaccinated.

483.   Experiencing forced retirement due to the denial of a religious accommodation led to profound pain and suffering, both emotionally and financially for the Gordon family.

484.   NYPD's denial not only stripped away his professional identity but also created a sense of loss and isolation, especially as he was allowed to work up until the very last day before his forced retirement from the NYPD.

485.   The situation was exacerbated by the strain it placed on his marriage, as the necessity to relocate for work led to ongoing conflicts and a feeling of instability in the relationship.

486.   He and his family had to leave their generational home, their family their friends, the kids had to leave school and the entire life they knew.

487.   Additionally, being passed over for promotion to Detective 2nd grade, which he would have gotten but for the denial of religious accommodation, compounded his distress, as it highlights the unfairness of his circumstances and the sacrifices he made.

488. Detective Gordon was also forced to collect a much lower pension than he would have been awarded if he was able to complete a full 20 years of service.

489. Together, these and other challenges caused by the City's wrongful denial of accommodation resulted in significant emotional turmoil, leaving Detective Gordon to grapple with feelings of frustration, disappointment, and uncertainty.

*Francesco Oddo*

490. Plaintiff Francesco Oddo ("Officer Oddo") was a police officer who had worked for NYPD for ten years before he was denied accommodation and forced to retire in late October 2022.

491. At the time the Municipal Mandate was issued he was working in the Bronx Court (criminal courthouse) in an administrative desk job.

492. He was not allowed to be on the street at that time because of June 2021 injury (dog bite from stray dog). He could not use a taser or pepper spray and so was moved to a job that primarily was done through the computer. He had very little contact with the public.

493. Officer Oddo promptly submitted a religious accommodation request in October 2021.

494. He was allowed to test weekly and keep working in his job pending a decision.

495. A lifelong devout and baptized Catholic, Officer Oddo believes that life is sacred, and that it is sin to benefit from the use of aborted fetal tissue.

496. Officer Oddo consulted his moral conscience when he learned that the vaccines were derived using aborted fetal cell lines and determined that he could not take the vaccines without violating his sincerely held religious beliefs.

497. As described more fully in his heartfelt letter, Officer Oddo explained that the Roman Catholic Church taught its members that they had to consult their religious conscience on

this issue, and while some Catholics believed after such consultation that they could take the vaccine, he could not in good conscience follow them.

498. He explained that to a believer, the conscience is how God communicates to us and guides us to do what is right and steer away from wrongdoing.

499. As Officer Oddo explained, the Catholic Catechism defines conscience as an inner faculty where a person discerns moral truth and applies it to specific actions in accordance with God's will. It is, according to the Catholic Church, must more than a mental process, but rather is the way that God, the Holy Spirit and Christ guide us, and it is the religious duty of every Catholic to learn to discern the voice of conscience over mere personal preferences.

500. According to the foundational Catechism on conscience isn't a feeling or opinion; it's a rational process rooted in the human capacity to seek truth, guided by God's voice within.

501. CCC 1776 frames it as an intimate, sacred space: "Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice, ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment… For man has in his heart a law inscribed by God."

502. Officer Oddo believes, as is taught in the Catholic Church, that conscience is inviolable. CCC 1782 states: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters."

503. Catholics are bound to obey a certain conscience—when it's clear and aligned with truth. CCC 1790: "A human being must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself."

504. The City had a discriminatory policy of rejecting all beliefs rooted in conscience,

especially those that involved an objection to abortion as personally held, based on misinformation, and unsupported.

505.    At no time did NYPD reach out to Officer Oddo to engage in cooperative dialogue or seek further information about his religious objection to the Covid-19 vaccine.

506.    Instead, on or about December 20, 2021, NYPD denied Officer Oddo's application, and then issued boilerplate checkbox "reasons" for the denial after the fact stating: (1) Objection was personal, political or philosophical; (3) insufficient or missing religious documentation; (3) written statement does not set forth how religious tenets conflicts with the vaccine requirements; (4) No history of vaccination/medicine refusal.

507.    Officer Oddo timely appealed and was allowed to keep working in person in his job unvaccinated pending a decision on appeal.

508.    In his appeal, Officer Oddo refuted the pretextual reasons for denial.

509.    The NYPD had never asked about refusal of any other medications or vaccines or explained the basis for why this might be relevant.

510.    But Officer ODDO's records kept by NYPD clearly showed he had consistently refused the flu vaccine.

511.    Prior to the Mandate, Officer Oddo had submitted requests for accommodation related to the flu vaccine. If the Department required a history of vaccination refusal, it was in Officer Oddo's records that he had refused the flu vaccine based on his religious beliefs for several years in his many visits to the district surgeon.

512.    On August 8, 2022, he received a denial from the Citywide Panel stating that his appeal was denied. The only reason provided was: "Does not meet criteria."

513.    At no time did the Citywide Panel reach out to engage in a cooperative dialogue with

78

Officer Oddo.

514.   The Citywide Panel determination was not based on undue hardship, and the NYPD did not provide any materials to support an undue hardship determination to the Citywide Panel.

515.   Rather, the Citywide Panel rejected Officer Oddo because they had a widespread policy of rejecting religious beliefs that were grounded in the religious conscience and an objection to abortion.

516.   Officer Oddo was allowed to continue working unvaccinated after his denial in August until October 29, 2022, when he was forced to take early retirement.

517.   This shows that NYPD had great discretion whether to follow the Commissioner's Mandate.

518.   He was aware of co-workers that were permitted to return to work unvaccinated several months later after the mandate was no longer strictly enforced but before they were appealed shortly after he was forced to take early retirement. By then it was too late for his return.

519.   The City's discriminatory action caused severe economic, psychological, emotional and mental harm.

520.   No longer able to afford his mortgage after he was forced out of his job at NYPD, Officer Oddo lost his house and had to move out of state.

521.   Officer Oddo was forced to collect far less for a pension than he would have earned had he been allowed to stay twenty years, as he had planned.

522.   Together, these and other challenges caused by the City's wrongful denial of accommodation resulted in significant emotional upset, leaving Officer Oddo to grapple with psychological turmoil, and feelings of frustration, disappointment, and uncertainty.

*John D. Brancaccio, Jr.*

523.   Plaintiff John D. Brancaccio, Jr. (Mr. Brancaccio) worked for the sanitation department ("DSNY") for seventeen years and seven months before he was denied religious accommodation and forced onto leave without pay.

524.   Throughout the pandemic, he was one of the unsung heroes that got society through.

525.   While most people worked from home in the early days, commercial waste subsided, while residential waste rose 30% or more.

526.   Mr. Brancaccio worked tirelessly in person, picking up trash that ballooned in volume as people sat at home and ordered everything online.

527.   Meanwhile, Mr. Brancaccio and his colleagues at DSNY had to give up their days off, their Sundays, their vacations, to keep up.

528.   The DSNY was working with a skeleton crew from March 2020 through 2021, as many employees went on leave and had to be out for a variety of reasons.

529.   Though he had seniority, Mr. Brancaccio was reassigned to work the midnight shift for almost nine months straight and then assigned to another shift that required him to get up at 3am.

530.   Nobody provided any protective equipment to the sanitation team. There was no PPE, no gloves, no hand sanitizer.

531.   Mr. Brancaccio had to approach a foundation online to ask if they could help, and they finally sent a case of hand sanitizer.

532.   But it was too late. By then, Mr. Brancaccio and most of his team already had gotten Covid-19 and had natural immunity.

533.   Mr. Brancaccio worked one of the heaviest shifts in the City, servicing massive apartment buildings in Jackson Heights and Corona.

534. During the pandemic, these areas turned into war zones. He witnessed knife fights, gang violence, and endured people spitting on him, intentionally driving by to hit him, and telling their children in front of him to work hard in school so they did not end up like him.

535. He did all of this without complaint, and without missing a day.

536. But then the vaccine mandate came out, and he was thrown away as if he was trash, by the City that he'd served so faithfully his whole career.

537. Mr. Brancaccio could not take a Covid-19 vaccine.

538. He is a devout Catholic, having attended Catholic school all the way through high school, and then attending a Catholic University. He and his Catholic wife send their child to Catholic School.

539. Mr. Brancaccio believes that abortion is sin, and that it was a sin to take the Covid-19 because of the use of aborted fetal cell lines in the development of the vaccines.

540. The Catholic Church instructed Catholics to consult their moral conscience to determine whether they could in good faith take the Covid-19 vaccine despite its connection to abortion.

541. Mr. Brancaccio did so, and confirmed that it would be a sin to take a Covid-19 vaccine.

542. When the Municipal Mandate came out, he was told by his supervisor that it was going to be impossible to get religious accommodation.

543. Nonetheless he applied for religious accommodation, pulling sources explaining the religious issue and passages from scripture, and explaining that he could not take the vaccine due to the use of aborted fetal cell lines.

544. DSNY never had a cooperative dialogue with Mr. Brancaccio about his faith, needs or possible accommodations.

545.   Instead, on November 18, 2021, DSNY denied his application without any explanation other than to say that there was no basis to grant him accommodation.

546.   DSNY, like all other City agencies, had been instructed by Commissioner Chokshi to deny religious accommodation requests based on objection to abortion.

547.   Some DSNY employees were accommodated. There was no rational or lawful reason why some were granted accommodation while others were denied.

548.   Mr. Brancaccio promptly appealed to the Citywide Panel, including in his appeal a letter from a pastor that he consulted with who shared his beliefs and wrote a letter in support, explaining the basis for religious objection and the need to avoid products tainted by sin, like the use of aborted fetal cell lines in the development of the vaccine.

549.   DSNY did not deny Mr. Brancaccio's application on the basis of undue hardship.

550.   There was no undue hardship claim from DSNY, who could have easily accommodated employees without causing a safety issue or economic hardship.

551.   The Citywide Panel denied Mr. Brancaccio's application on January 7, 2022 without any explanation other than "Does not meet criteria."

552.   Shortly thereafter, Mr. Brancaccio was placed on leave without pay.

553.   Mr. Brancaccio was originally told he would be placed on leave without pay until June 30, 2022.

554.   However, in February 2022, Mr. Brancaccio was given an ultimatum – get vaccinated in violation of your religious beliefs or be terminated.

555.   Mr. Brancaccio has a wife and a child in Catholic school to support.

556.   He also felt that it was a sin to get vaccinated and did not want to violate his sincerely held religious beliefs.

557. Eventually, Mr. Brancaccio, feeling he had no choice, got vaccinated in violation of his religious beliefs so that he could go back to work.

558. This was extremely traumatic and continues to cause great psychological and spiritual distress.

559. Mr. Brancaccio became very depressed after getting vaccinated.

560. For much of the last three years, he felt he was dragging through the motions.

561. His arm is still at times sore and numb from the vaccine, which harmed him and caused him fatigue.

562. But more harmful is the psychological damage.

563. Mr. Brancaccio's friends and family repeatedly remarked that he did not seem like himself.

564. He was so disgusted with himself for violating his faith to feed his family. But he felt he had no choice.

565. Last August, Mr. Brancaccio made his twenty years and retired.

566. Had he not been forced to violate his faith, he might have stayed longer, but he could not stand to stay any longer given what the City put him through.

567. The six weeks of leave without pay had significant financial consequences as well.

568. Sanitation workers are paid a premium when it snows. Some of the biggest snowstorms of the year occurred during those six weeks, causing Mr. Brancaccio to lose about fifteen thousand dollars of pay for the period. Since this was a pension year, this translated into several thousand dollars a year less in his yearly pension.

569. Mr. Brancaccio seeks redress for his financial, spiritual, mental and emotional harms. No one should ever be forced to choose between violating their faith and feeding their

family, and there was no justification for the City's imposition of this Hobson's choice on Mr. Brancaccio.

### John Clarke

570. John Clarke ("Mr. Clarke") is a seventy-five-year-old gardener who had worked for eighteen years for the City and was on the verge of retirement when he was denied religious accommodation and terminated from his job with the Parks Department in 2022.

571. At Parks, Mr. Clarke worked almost entirely outside, caring for plants and gardens. He also had an office, where he worked alone, on paperwork for the parks department, and where he kept gardening tools.

572. Mr. Clarke always went above and beyond at his job. Whenever the City needed him, he was there, without question or complaint. He came in nights, weekends, and any other time the City called on him to beautify or tend to a garden for a special event. For the last two years of his employment, Mr. Clarke worked in Brooklyn, maintaining McCarren Park for those years.

573. Mr. Clarke was so diligent and so beloved that his extraordinary efforts were profiled in a New York Times article in 2010. Elizabeth A. Harris, Gardener Brings Coffey Park Back From Decay, N.Y. Times, Apr. 25, 2010, at MB3, https://www.nytimes.com/2010/04/25/nyregion/25gardener.html (last visited Mar. 31, 2025).

574. Mr. Clarke worked unvaccinated in person all throughout the pandemic emergency without issue.

575. In October 2021, when the Municipal Mandate was announced, Mr. Clarke submitted a religious accommodation request.

576.    He explained that for 42 years, he had been a strict vegan for spiritual and ethical reasons and could not take a Covid-19 vaccine because it violated his spiritual beliefs.

577.    He and his wife had raised their children without any vaccines, as per their vegan beliefs.

578.    Mr. Clarke's veganism is not just about diet, but it is part of a comprehensive world view that includes the spiritual understanding about man and his relationship to other sentient beings, and the spiritual consequences of harming sentient beings for personal gain.

579.    Under this world view, Mr. Clarke not only avoids products with animal products in them, but also any product that is tested on animals before being brought to market.

580.    Mr. Clarke cannot take any of the Covid-19 vaccines, because none of them are vegan under his strict definition.

581.    The Pfizer vaccine directly used a component of bovine milk in the vaccines.

582.    And all the Covid-19 vaccines were tested on animals during their development, as is legally required by regulatory bodies like the FDA before human trials can begin.

583.    For many spiritual and ethical vegans, this animal testing alone renders the product non-vegan, and off limits to a strict practitioner like Mr. Clarke.

584.    Mr. Clarke is not alone in this understanding of what is permissible and not. The Vegan Society, for instance, has also noted that because animal testing is currently unavoidable in vaccine development, no Covid-19 vaccine can be considered vegan.

585.    On November 17, 2021, the EEO office asked Mr. Clarke to answer several follow-up questions. In answer to how long he'd held the beliefs, and how he'd developed them, he noted he had been a strict vegan for 42 years, and had never wavered, and that his supervisors were aware of his religious practices in this regard. He also explained that he believes humans are best off spiritually and physically if they follow these practices, and that he

raised his children vegan as well.

586.    Mr. Clarke further answered that he had not been vaccinated since he was ten years old in 1960. He stated that he could not take a Covid-19 vaccine because they were all tested on animals, which he believes to be inhumane, abusive and immoral as well as sinful. He said he could not break 42 years of strict adherence to his belief system, which he believes to be the most positive and important choice he has ever made for himself mentally, physically, or spiritually.

587.    Mr. Clarke's application was denied by the EEO office on November 18, 2021, with the following reason: "your supporting evidence was determined to be inadequate as it pertains to religion."

588.    Mr. Clarke was given two options: either appeal through SAMS to have his application reviewed under the Stricken Standards, or appeal to the Citywide Panel.

589.    Mr. Clarke does not qualify under the discriminatory Stricken Standards, so he appealed to the Citywide Panel.

590.    He was allowed to continue testing weekly and working in person while his appeal was pending.

591.    Mr. Clarke stated, in his appeal, that his sincerely held religious belief is veganism, that veganism is his religion, and that he had been a strict vegan for the past 42 years of his life, including the entire 18 years he worked for Parks.

592.    He wrote, "It is not merely a diet, but an all-encompassing belief system, way of living and approach to life, particularly as it pertains to how we as humans should treat all of God's living creatures. Veganism may not be traditional, organized religion such as Christianity, Judaism, Hinduism or Islam, but Title VII protects any employees with sincerely held

religious beliefs, even if they are not part of an organized or formal religion." He then pointed out that ethical beliefs held with the strength of religious views also qualify for protection.

593. His appeal further stated that as a vegan, he does not consume meat, dairy or any animal products, and avoids all products with animal-derived ingredients or materials, or which perform animal testing. "It is my belief that we as humans are at our strongest of mind, body and spirit when we follow a vegan diet and belief system…I refuse to take any Covid-19 vaccines, all of which were created through animal testing that I believe to be abusive, inhumane, and immoral…it would be against my sincerely held religious belief of veganism for me to take any Covid-19 vaccines.

594. Mr. Clarke offered "I have no problem with continuing to wear a mask and submit a weekly PCR test, as I have been asked to, and as I have fully adhered to."

595. On or about January 29, 2022, the Citywide Panel denied Mr. Clarke accommodation without any reasoning but "Does not meet criteria" and presented him a choice – violate your sincerely held religious beliefs or be terminated in February 2022.

596. The Citywide Panel did not deny Mr. Clarke on the basis of undue hardship.

597. Parks Department did not make an undue hardship claim.

598. Mr. Clarke had a non-public facing and largely solitary outdoor job.

599. The Parks Department and/or Citywide Panel also did accommodate at least two lifeguards in person during the time when the Municipal Mandate was in effect.

600. If lifeguards, who have to give mouth-to-mouth resuscitation, are able to be accommodated without presenting an undue hardship or safety issue, a solitary gardener who did not have to stand near anyone to do his job, and worked mostly alone outside, could

certainly be accommodated as well.

601.   Rather, the Citywide Panel denied Mr. Clarke solely on the basis of their official policy of denying "idiosyncratic" or "personally held" religious beliefs, which they assert allows a person to exercise personal choice over what beliefs have merit or not and are therefore invalid.

602.   It is well-settled that all-encompassing and deeply held beliefs, like Mr. Clarke's, are protected under the religious accommodation statutes and the religion clause of the First Amendment.

603.   Mr. Clarke was unwilling to violate his sincerely held religious beliefs, so was terminated on February 15, 2022.

604.   He has suffered enormous financial, emotional, mental and psychological harm as a result. Mr. Clarke has very limited resources. He had dedicated almost two decades to Parks and is now left without his full pension and benefits, and without being able to do the job he loved so well.

### David R. Burgos

605.   David R. Burgos ("Officer Burgos") worked for the NYPD for sixteen years before he was denied religious accommodation and then forced to retire in April 2022.

606.   He had worked unvaccinated all throughout the pandemic emergency from 2020 on in person, testing weekly.

607.   Like most of his colleagues, he caught Covid-19 and had natural immunity before the Municipal Mandate ever came out.

608.   When Mandate came out, and for the six year prior, Officer Burgos' job was in fleet services in Queens. His job was to keep track of vehicles, doing intakes, outtakes, paperwork

related to loaner vehicles and so forth. It was almost entirely administrative in nature without almost no public contact, and limited contact with co-workers. There was some patrol work around the perimeter of the fence, but this was outside and rarely involved contact or close proximity to anyone else.

609.    Occasionally, Officer Burgos would be sent to fill in on patrol if another unit was short-staffed, but this was not part of his normal job description.

610.    Mr. Burgos has sincerely held religious beliefs that do not allow him to take a Covid-19 vaccine.

611.    He is a devout Catholic, who attends Mass weekly, and believes in the Catholic Church's teaching that the body is a temple.

612.    On this basis, Mr. Burgos does not drink alcohol, fasts on Fridays during Lent, and is careful about any foreign or potentially harmful inputs in his body that could alter God's perfect design or which are tainted by sin or harmful substances. On this basis, especially as his faith grew in later years, he regularly refused flu shots offered yearly by the NYPD.

613.    Officer Burgos also believes that he must consult his religious conscience, that it is the voice of the Holy Spirit and ultimately Christ and God guiding us and helping us to discern how to live in accordance with God's plan.

614.    Early on, Mr. consulted his conscience and received a clear message not to take the Covid-19 vaccines.

615.    Mr. Burgos shared this advice with his parents, but they did not listen.

616.    Both of them took the vaccine and then died from adverse reactions to the vaccine shortly thereafter.

617.    Mr. Burgos took this as a further sign that his guidance from God was correct, and he

must not violate his faith with these vaccines.

618.  Later, Mr. Burgos learned that the vaccines also used aborted fetal cell lines in production and development, which was further evidence that his guidance from conscience was correct, as Mr. Burgos believes abortion is a sin and that he cannot benefit from it.

619.  When the Municipal Mandate came out, Officer Burgos submitted a religious accommodation request.

620.  He received a denial with no reasoning.

621.  On or about February 8, 2022 a result of a lawsuit, and without any cooperative dialogue, the NYPD sent him a follow up letter with checkbox reasons. Two boxes were checked: (1) Objection was personal, political or philosophical; and (2) Objection appears to be based on verifiable false information, misinformation, fear of unknown origin of vaccines or side effects.

622.   Mr. Burgos timely appealed to the Citywide Panel.

623.  As the months dragged on, he noticed that while some colleagues were arbitrarily accepted, and thousands with pending applications were allowed to keep working in person (including him), the Citywide Panel appeared to be finding pretextual reasons to deny most applicants it reviewed, and then gave employees only seven days to be vaccinated.

624.  The City's discovery, in the meantime, showed that the Citywide Panel continued to reject personally held religious beliefs, like those derived from conscience or prayer, or those grounded in an objection to abortion.

625.  In or around April 1, 2022, still without an answer from the Citywide Panel, Mr. Burgos resigned to avoid being fired and losing his pension.

626.  Under the NYPD rules in place at the time, vested employees like Mr. Burgos would

lose their pension if they were terminated or resigned with less than thirty days' notice.

627.    Mr. Burgos could not risk losing his pension if he only had seven days to get vaccinated or be forced into an involuntary resignation and given the Citywide Panel's arbitrary actions towards colleagues, and widespread discriminatory policies, he knew it was futile to place any hope in that process.

628.    Mr. Burgos suffered enormously as a result of the City's failure to accommodate his religious beliefs.

629.    He was in good standing, had never been in trouble, and had dedicated his career to the NYPD.

630.    When he was denied religious accommodation and forced to leave the job he loved, he felt like he was in the Twilight Zone and his identity and sense of the world was shattered and that everything he believed in was destroyed.

631.    Up until that point, he had never experienced anxiety. He had always been stoic, felt like he could handle anything.

632.    Having to choose between job and faith broke him. He began having panic attacks and developed PTSD. He lost a lot of relationships and became deeply depressed.

633.    Officer Burgos also had severe financial losses as a result of the City's discrimination.

634.    He had to take a prorated pension, which is far below what he would have been entitled to if he had been able to work through as he planned until full retirement. He lost a $10,000 a year supplement for completing twenty years, he had to sell his home and his parents' home at a financial impact and move out of state to try to find work.

635.    Officer Burgos is too old to start over as a rookie cop, so he has to make due with whatever jobs he can find, at far less salary than he was making at NYPD.

636. His career and future were taken from him for no reason.

637. NYPD never claimed undue hardship to the Citywide Panel and indeed could not. They openly violated the Municipal Mandate (with the City's full knowledge and consent) by allowing over five thousand unvaccinated police officers with far more public contact than Officer Burgos to work in person throughout the entire mandate, and these officers still have their jobs.

638. NYPD did not deny Officer Burgos because of hardship, but instead because of their discriminatory definition of what constitutes a valid religious objection.

*John Kennedy*

639. Plaintiff John Kennedy (Officer Kennedy) worked for the NYPD for fifteen years before he was denied religious accommodation and forced to resign.

640. He was assigned to and in charge of the Critical Response Command (CRC) canine unit as a Lead Trainer officer. His job was to make sure dog teams were up to par with training and ready to be deployed as needed. He had no contact with the public unless deployed with the dogs, or on detail to a short-staffed unit, and others could have easily been deployed in his stead if that were an issue.

641. Throughout the pandemic, Officer Kennedy was in and out of work due to his cancer diagnosis and treatment. When he was working, he was outside and in public during the pandemic, dealing with his dogs and society at large, and the NYPD never had an issue with him working unvaccinated.

642. Officer Kennedy was working full time and leading the CRC unit when the Covid-19 vaccine mandate went into effect and for many years before.

643. On September 23, 2021, his Commanding Officer in the CRC had written Officer

Kennedy a recommendation letter for his promotion from lead trainer officer to detective specialist. This letter made it clear that Officer Kennedy had "continued to exceed expectations" since he had become a Lead Trainer in December of 2020.

644.     Officer Kennedy had excelled in the position, as demonstrated in his earning over eighteen (18) various high-level certifications and trainings while on the job.

645.     In this recommendation letter, his supervisor described Officer Kennedy's exceptional record. Even when he was ill with cancer and while getting numerous treatments, Officer Kennedy displayed "extraordinary perseverance and battled through adversity to return back to his training duties in the CRC K9 unit."

646.     Officer Kennedy could not take the Covid-19 vaccine due to his religious beliefs and also due to medical reasons as he was undergoing treatment for his recurrent bladder cancer.

647.     On October 26, 2021, Officer Kennedy submitted his first request for religious accommodation.

648.     Officer Kennedy is a practicing Roman Catholic who strongly and faithfully opposes the use of aborted fetal cell lines in the development and creation of vaccines. He was baptized and confirmed in the Catholic Church, and he attended Catholic elementary school and Fordham University, which is a Jesuit institution.

649.     As a Catholic, Officer Kennedy practices his faith daily by adhering to the Ten Commandments of Judaism and Christianity.

650.     As a Catholic, Officer Kennedy believes his body is a temple of the Holy Spirit.

651.     As a Catholic, Officer Kennedy believes abortion is a sin and deriving benefit from a product developed using aborted fetal cell lines is a sin.

652.     The Pope recommended that Catholics consult their own moral conscience, which is

93

what Officer Kennedy did when he had to make his decision: honor his religious upbringing and beliefs or go against them to keep his job.

653.    He received clear guidance from his moral conscience and prayer that he could not violate his faith by taking the vaccines, as he

654.    Due to his beliefs, Officer Kennedy no longer even takes Tylenol, because he learned that Tylenol might have also used aborted fetal cell lines in development.

655.    On February 8, 2022, Officer Kennedy's requests for religious and medical accommodation were both denied by NYPD.

656.    Some NYPD officers were accommodated. These officers put in requests for religious accommodation and never heard back whether they were approved or not. These same officers continued to work and once the NYPD no longer enforced the vaccine mandate, they were able to retain their positions and titles. This was not the case for Officer Kennedy.

657.     Officer Kennedy tried to appeal through the website provided by the Department for Reasonable Accommodation (DCAS, one of the agencies on the Citywide Panel), as he was instructed, however when he clicked on the submit button to upload his documents, nothing happened. He took multiple screenshots of his attempts and sent emails to DCAS and never received a response.

658.    On or about April 29, 2022, Officer Kennedy received an email saying he had until May 4, 2022, to comply to the vaccine mandate or be terminated.

659.    As Officer Kennedy was not able to take the Covid-19 vaccine, he was forced to resign from his position. He was allowed to "burn" his accrued time to stay on payroll until September 2022.

660.    On September 1, 2022, Officer Kennedy was forced to be officially resigned and

terminated.

661. Officer Kennedy's promotion never happened.

662. Officer Kennedy believes his promotion was halted because he requested religious accommodation.

663. Others within the department who were also up for promotions, and who also submitted requests for religious accommodation, shared the same experience as Officer Kennedy.

664. Meanwhile, those that did not submit religious accommodations were upon information and belief promoted without issue.

665. Officer Kennedy applied for unemployment, which was a timely process. In the meantime, the mandate was no longer in effect at the NYPD and many officers were encouraged to reapply for their positions.

666. While on unemployment, Officer Kennedy made a fraction of his usual weekly income.

667. After reapplying for his job and waiting many months, Officer Kennedy was rehired by the NYPD in March 2023.

668. Officer Kennedy lost his momentum and opportunity for getting a promotion. He lost his lead position within the CRC K9 unit as someone else had taken the role in his absence. He lost all his overtime, which he had rightfully accrued and hoped to use much later in his career as per his retirement plans.

669. Officer Kennedy had to get financial help from family in order to keep his home in New York.

670. Once back at work, Officer Kennedy was no longer the Lead Trainer, and was moved to basic patrol by a new supervisor who didn't have a history working with him. This new supervisor instead promoted officers she knew.

671. Other officers with less experience and no special training now make up the CRC K9 unit, and Officer Kennedy is back on the streets with basic patrol duties. Officer Kennedy did nothing wrong; he just chose to honor his sincerely held religious beliefs.

672. He seeks to be made whole.

*Marc Robinson*

673. Marc Robinson ("Officer Robinson") had almost sixteen years of service credit with the NYPD when he was denied religious accommodation and forced to retire in 2022.

674. He was a New York City Correction Officer from November 9, 2006 to July 2007. In the Correction Academy, Mr. Robinson refused the Hepatitis B vaccine.

675. Mr. Robinson then started at the Police Academy on July 9, 2007.

676. During his time training with the police academy, Officer Robinson refused the Hepatitis B vaccine with no issues.

677. He worked as a police officer throughout the pandemic unvaccinated without issue.

678. When the Municipal Mandate came out, he timely applied for religious accommodation.

679. For over twenty years, Officer Robinson has been a devout practicing Old Testament Christian.

680. He and his congregation believe that Jesus is the Messiah, but they also believe they have to keep the Old Testament law.

681. As an Old Testament Christian, Officer Robinson believes in the sanctity of the blood. He believes, as is stated in the Bible that our bodies are the "Temple of God", that the Spirit of God dwells within our bodies, and that we should keep our temples pure. He also believes, as the Bible teaches, that our bodies are not our own, but God's.

682. Officer Robinson's sincere religious belief is that taking chemicals defiles the temple

which is God's, and that God directed us to use herbs to heal ourselves (Ecclesiasticus 38:4).

683. Officer Robinson believes that the Lord has commanded that it is a sin to get vaccinated because it pollutes God's temple but also because it places trust in man rather than the Lord.

684. Because of his religious beliefs, Officer Robinson does not take any vaccines and has refused the flu shot and the Hepatitis B vaccine at the NYPD. He has similarly refused intravenous pain medication when hospitalized.

685. He has previously received religious accommodation from the NYPD for his beliefs in the form of a beard accommodation.

686. The NYPD treated these requests and other types of religious or identity-based requests completely differently than the religious accommodation requests related to the Covid-19 vaccine.

687. They did not question or harass Officer Robinson or other applicants about their beliefs but instead assume the truth of the belief and engage in good faith analysis of hardship, as required by law.

688. But when it came to the Covid-19 vaccines, the NYPD changed their policy, aggressively second-guessing employees' beliefs, and substituting judgment to find reasons to deny them, even when sincere.

689. Officer Robinson was allowed to test weekly while he waited for a response.

690. In or around February 2022, NYPD denied his request for religious accommodation, without engaging in any cooperative dialogue whatsoever, on the ground that his religious beliefs were allegedly personal in nature and did not mention any history of vaccine refusal.

691. In fact, NYPD's own records show that Officer Robinson did refuse other vaccines, even those NYPD asked him to take.

692.   Officer Robinson appealed.

693.   He waited as long as he could for an answer, but then he was forced into a vested retirement in or around April 5, 2022.

694.   The reason that he had to retire was because he was vested, and he was told that he had to give thirty days' notice if he wanted to keep his pension. But the Citywide Panel was denying people and only giving them seven days to get vaccinated or face termination.

695.   Officer Robinson could not risk losing his pension, and his lease was also up. He could not sign another lease without knowing if he would have a job for the coming year.

696.   Officer Robinson also saw how arbitrary the Citywide Panel's decisions were.

697.   They accommodated one person in his unit, but denied others, with no rhyme or reason.

698.   Thousands were allowed to keep working unvaccinated throughout the pandemic, but every day was like Russian Roulette, and you never knew when your number would come up and you would suddenly have seven days to get vaccinated or lose your job and likely your pension too.

699.   Another factor was his family. Officer Robinson had a child with another NYPD employee, who worked for NYPD traffic, who shared his religious beliefs against vaccination, and was also forced out after NYPD denied her religious accommodation request.

700.   They could not survive in New York City any longer unemployed, and vaccine mandates precluded them from getting work anywhere nearby.

701.   Officer Robinson knew he could not violate his sincerely held religious beliefs and saw that it was futile to hold out hope for the Citywide Panel, who appeared to be engaging in blatant religious discrimination.

702.    He gave his notice, and on or about April 5, 2022, vested out at a fraction of the pension he would have been entitled to if he was not forced out.

703.    Because NYPD denied him religious accommodation, Officer Robinson was forced to leave New York City.

704.    Officer Robinson has gone through severe mental, emotional, and psychological stress.

705.    His partner left him, in large part due to the stress of the situation and moved with their daughter to Florida.

706.    Officer Robinson currently has no home and is couch-surfing and trying to get by on a fraction of the money he made at NYPD working as an armed security guard.

707.    He has fallen into a deep depression and feels he lost everything he had.

708.    He has no health insurance and cannot afford to see a therapist.

709.    His health is deteriorating, and his mouth is in severe pain from cavities he cannot afford to fix.

710.    The good will of others, who have let him stay from time to time, is dissipating.

711.    Officer Robinson tried to return to NYPD, but they refused to rehire him unless he signs a waiver of his right to sue and even then, he will have to start over as a rookie cop.

712.    Officer Robinson has lost everything as a result of the City's refusal to reasonably accommodate him. He will only get a fraction of his pension, and he will always have to live with the indignity and pain of having to choose between his job and his faith.

### Timothy Rivicci

713.    Timothy Rivicci ("Mr. Rivicci") is a dedicated civil servant, former NYPD police officer and was an FDNY firefighter from 2016 until he was denied religious accommodation and terminated in 2016.

714.    Rivicci is also a Born Again Christian, and active member of the Calvary Chapen in Staten Island, where he resides and used to work for the City.

715.    His faith prohibits him from receiving all vaccines.

716.    Mr. Rivicci worked throughout the pandemic in person unvaccinated without issue, testing weekly and continuing to serve as a heroic frontline worker.

717.    He got Covid-19 like most of his colleagues and has robust natural immunity.

718.    When the Municipal Mandate came out, he applied for religious accommodation.

719.    The FDNY allowed him to work in person while his request was pending so long as he tested weekly.

720.    He maintained high levels of antibodies throughout against Covid-19.

721.    Mr. Rivicci submitted an eight-page personal statement with his application for accommodation, detailing his Christian faith and his rejection of all vaccines for religious reasons. He explained that he had always been supportive and enthusiastic about vaccines until he learned several years prior to the pandemic that they used aborted fetal cell lines in their production and development. Upon learning this, he knew that he could not take vaccines. As a Christian, he believes abortion is a sin and that he cannot profit from it.

722.    With his application, Mr. Rivicci also submitted a letter from his pastor, attesting that Mr. Rivicci has strongly held faith-filled convictions against receiving the vaccine and explaining that Mr. Rivicci's religious conscience prevented him from getting the vaccine, and that he sincerely believed that it would damage his soul.

723.    After no discussion with Rivicci, and without engaging in the statutorily required cooperative dialogue, FDNY issued a boilerplate denial stating: "The request for an exemption from the vaccine mandate is denied. The asserted basis for the accommodation is

100

insufficient to grant the requested accommodation, particularly in light of the potential undue hardship to the Department."

724. Rivicci then submitted his appeal to the Citywide Panel. He included a second personal letter with his application, which stated, among other things: "To take vaccinations would not only shatter my entire relationship with Jesus Christ for the rest of my life, but it would also put my soul in jeopardy for all of eternity. If I were to receive a vaccine knowing what I know now about the foul and impure ingredients, as well as the connections to abortion by using aborted fetal cell lines to test and/or develop the vaccines, it would be a direct violation of my beliefs as a Christian."

725. Rivicci's appeal included another letter from his Pastor, which explained in pertinent part: "Timothy's objections to the Covid vaccine are based upon his strongly held faith-filled religious convictions. His objections are in line with scripture and this Church's teachings."

726. The Pastor further stated "I am in agreement with Timothy's interpretation of scripture and his religious objection to receiving the Covid vaccine. He should be granted an accommodation to protect his sincere and genuine religious beliefs. The rejection of his religious exemption when he has valid religious objections to receiving this vaccine is wrong."

727. Rivicci also submitted a statement summarizing his religious beliefs regarding vaccination.

728. Additionally, he submitted a letter from his attorney, requesting the reversal of FDNY's denial, citing to his religious beliefs, FDNY's failure to engage in any interactive process, and the lack of proof of undue hardship.

729. Because Mr. Rivicci's initial application had not been filed by October 27, 2021, he was

not allowed to test weekly and remain on payroll (like over a thousand of his colleagues) but instead had to go on leave without pay after his initial denial in November 2021 while he awaited a decision from the Citywide Panel.

730.    Eventually, in or around the end of March 2022, the Citywide Panel issued a denial, noting that the decision was solely on the basis of undue hardship, stating: "The decision classification for your appeal is as follows: Employer undue hardship."

731.    Mr. Eichenholtz admitted in sworn depositions that the FDNY had submitted no materials supporting undue hardship or arguing for it, and that the Citywide Panel did not make any independent assessments of undue hardship.

732.    In fact, it would not have been an undue hardship to accommodate Rivicci.

733.    The City's own FAQ stated that testing weekly was an accommodation that would not cause undue hardship.

734.    At least 1,176 of Mr. Rivicci's colleagues were allowed to test weekly throughout the entire mandate in lieu of vaccination.

735.    And dozens of his colleagues were granted religious accommodation.

736.    Mr. Rivicci timely filed an article 78 petition and won on October 5, 2022. The lower court found that the City made an error of law by failing to engage in a cooperative dialogue, and that the boilerplate assertion of undue hardship, absent anything in the record to support it on an individualized basis was arbitrary and capricious.

737.    Mr. Rivicci was eventually reinstated but has not been made whole yet for all of his harms available under statutory and constitutional claims.

738.    Having to choose between his job and faith caused him severe emotional and psychological trauma.

*John v. Schaefer*

739. John Schaefer ("Officer Schaefer") worked for NYPD for over sixteen years before he was denied religious accommodation and forced to retire.

740. He worked throughout the pandemic in person unvaccinated without issue in the Queens fleet services division vehicle allocation office which supplied the police department with vehicles.

741. His job was primarily administrative, with little to no public contact, and limited contact with co-workers.

742. He and his co-workers also had natural immunity and their desks were not close to each other.

743. Officer Schaefer is a devout Christian, and received the sacraments of Baptism, Confirmation, Communion and Reconciliation.

744. In his five-page single spaced letter, he detailed his faith journey, and the personal relationship he developed with God after his daughter's difficult birth.

745. He believes that abortion is a sin, and he objects to the vaccines, among other religious reasons, because they used aborted fetal cell lines in pre-licensing testing. He feels that participating in the vaccines would be participating in child sacrifice, which is an abomination.

746. He also believes that the blood and body are sacred and cannot be contaminated with products tainted by sin and unholy ingredients.

747. For this reason, he does not take any vaccines, and his three children were homeschooled for parts of 2020, and the entire 2021-2022 school year, until moving out of state. .

748. Prior to Covid, Officer Schaefer had submitted a religious exemption to the NYPD to

grow a beard. It was accepted and approved by the NYPD, showing a precedent that they had acknowledged his faith previously.

749.    Officer Schaefer was denied by NYPD on the ground that his beliefs are "personal" and "the written statement does not set forth how religious tenets conflict with the vaccine requirement" and "no demonstrated history of vaccine refusal."

750.    Upon information and belief, the NYPD reviewer did not even read his application, which sites to many tenets and Bible verses and clearly articulates a history of vaccine refusal, not just for himself but his children.

751.    Officer Schaefer appealed to the Citywide Panel. He included in his materials a ten-page letter from an attorney explaining why his religious beliefs were protected and addressing the deficiencies alleged by NYPD.

752.    He was allowed to work in person and continue testing weekly in lieu of vaccination.

753.    Officer Schaefer attempted to wait as long as he could but credibly felt that appeal to the Citywide Panel was futile, as he saw them deny officer after officer with similar beliefs.

754.    On or about July 22, 2022, still not having received an answer from the Citywide Panel, Officer Schaefer was forced to resign to keep his pension and support his family.

755.    Unable to work anywhere in New York City due to the mandates, he and his family had to move south because of the City's discrimination.

756.    The Schaefers have suffered enormous mental, physical, financial and psychological harm due to the City's denial of accommodation.

### Matthew Pasieka

757.    Matthew Pasieka (Officer Pasieka) worked with the NYPD as a police officer. During the Covid-19 pandemic, he was assigned by the NYPD to the City's office of Emergency

Management. There he worked as a liaison, interacting with other city agencies and representatives.

758.    Once the City determined that there was a pandemic emergency response, Officer Pasieka worked in a very public facing capacity, speaking and meeting with people of all walks of life.

759.    He was allowed to complete his job duties in person unvaccinated throughout the pandemic with no issues, as long as he tested weekly, which he did with no problems.

760.    On October 24, 2021, after the City mandated the Covid-19 vaccine, Officer Pasieka submitted his first request for religious accommodation.

761.    Officer Pasieka is a devout Roman Catholic. He grew up in a religious household. As a child, he was baptized, received Holy Communion, and was confirmed in the Catholic Church. Growing up, his family attended church every week and during all the holy services throughout the year.

762.    As an adult, Officer Pasieka transferred to the Cure of Ars Parish in Merrick, New York, where he continues to practice his faith.

763.    Officer Pasieka objected to taking the Covid-19 vaccine because it went against his beliefs that his body should be a holy temple for Christ.

764.    He made this determination after consulting his moral conscience.

765.    He also sat with and sought counsel from his Monsignor pastor before writing his letter for religious accommodation.

766.    In his request letter, Officer Pasieka states that as a practicing Catholic, taking the Covid-19 vaccine would go against his religious beliefs for multiple reasons.

767.    He objected to the vaccine because he believes human life is sacred. The Bible teaches

105

him that our bodies are temples, and God gives us the free will to make our own decisions on how we care for and preserve our bodies.

768. He objected to the vaccine because it was developed from aborted fetal cell lines. He stated that it is well known that Catholics are against abortion as it goes against the very sanctity of life. Officer Pasieka believes abortion is murder, and taking a vaccine that profited from such murder would go against his profoundly personal and religious conviction.

769. Officer Pasieka believes that God has a plan for each and every one of us. Abortion directly goes against God's plan.

770. In his letter, Officer Pasieka cites passages from the books of Psalm, Proverbs, Job. This demonstrates his sincere study and appreciation for the Holy Bible.

771. Officer Pasieka also cites the importance of free will as his reasoning for rejecting the Covid-19 vaccine. He believes we all have the right to decided what medical treatment, medication, and vaccination we put into our bodies. Again, he quotes three different scriptures from Genesis to further elaborate and support his point.

772. His ultimate reason for objecting to the Covid-19 vaccine mandate is that it violates his protected right to religious freedom and expression.

773. Like most other officers in the NYPD who applied for religious accommodation, Officer Pasieka's request was denied by the NYPD on November 30, 2021, not due to undue hardship, but because of a discriminatory rejection of his religious beliefs.

774. On December 6, 2021, Officer Pasieka appealed the denial.

775. He never received an answer from the appeal as he felt pressured to resign before getting fired by the NYPD.

776. Officer Pasieka was rightfully nervous to be fired with no chance of reinstatement. He saw many of his colleagues with the same beliefs as him continue to face discrimination by the Citywide Panel.

777. Discovery in related cases also showed that the Citywide Panel was rejecting concerns about abortion.

778. And so Officer Pasieka made the painful choice to resign on March 25, 2022 so he would not lose his pension. His accrued vacation days and other PTO made it possible for him to receive income until June 2022.

779. Officer Pasieka had to sell his New York condo in order to afford the costs of moving his entire life to Florida, where he worked from April 2022 through May 2023.

780. He did not make the same income once in Florida. He spent more on rent than he was previously paying on his NY condo's mortgage.

781. He is looking to recoup all that he lost during the months he had to relocate just to survive.

782. Officer Pasieka was reinstated to the NYPD on June 2, 2023. He barely retained his seniority, but because he was within the one-year mark, he made the deadline.

783. Officer Pasieka had to spend even more money than the first time to move back to New York, this time paying higher rent until he could afford another condo to mortgage. The condos were now three times more expensive than when he left.

784. Officer Pasieka lost a year's worth of his pension accruing, which now means he has to work an additional year to make up for it.

785. Officer Pasieka has lost money, time, and faith in his NYPD family to make him whole.

786. Before his religious accommodation was denied, Officer Pasieka had to complete many

hours of sensitivity training to accept others' religious habits, clothing, and beliefs. He feels betrayed that the NYPD and the City he loves and serves couldn't afford him the same consideration and sense of humanity.

### Rommel A. Perez

787.    Rommel A. Perez ("Sergeant Perez") worked for NYPD for over sixteen years, plus additional credits for military service, when he was denied religious accommodation and terminated in 2022.

788.    He worked throughout the pandemic as a Sergeant assigned to Manhattan courts.

789.    Prior to the issuance of the Municipal Mandate, Sergeant Perez was injured by a Defendant and because of a shoulder injury from the altercation, could not operate his weapon.

790.    He was officially placed on limited duty, which was supposed to require that he only did administrative work, with no prisoner contact. Accordingly, the majority of his job was administrative, and included ensuring compliance with penal code regulations, analyzing financial data, analyzing trends, and developing strategies to improve policing performance.

791.    He worked with officers and the District Attorneys' office to finalize charges and ensure defendants had timely arraignments, implemented new procedures and technologies that improved efficiency and streamlined operations, and generally oversaw operations and managed staff.

792.    Sergeant Perez is devoutly religious. He was raised Catholic, but, inspired by his wife, he converted to become a Messianic Jew in or around 2018.

793.    As a Messianic Jew, he believes in Christ but also observes the Sabbath on Saturday, wears a beard, follows the Old Testament and the Torah, and keeps a very strict diet, with

no alcohol.

794. Sergeant Perez has gotten religious accommodation from NYPD before, including for a beard accommodation which was granted without issue or question about his faith.

795. When the Municipal Mandate was issued, he timely applied for religious accommodation, with a lengthy, heartfelt letter outlining multiple reasons that the vaccines violate his religious beliefs. Some but not all are set forth here.

796. Sergeant Perez believes that the blood is sacred and that vaccines, which use animal testing, and aborted fetal cell lines in testing, among other issues, spiritually as well as physically pollute the sacred blood. He also believes the vaccines are not Kosher.

797. He believes that God wants us to turn to prayer for healing, and that we should not use proactive medical interventions to change a healthy body but only heal the sick body.

798. Sergeant Perez also believes that the vaccines have the hallmarks of the mark of the beast, and that he must not partake of them.

799. Sergeant Perez was allowed to test weekly and keep working in person while his religious accommodation request was pending.

800. The NYPD denied Sergeant Perez with the check boxes stating his beliefs were (1) personal/political/philosophical; (2) written statement does not set forth how tenets conflict with the vaccine requirement; (3) no history of medication/vaccination refusal.

801. Sergeant Perez wrote a lengthy personal letter refuting each point, delving into even more religious detail about his sincerely held religious beliefs, and pointing out that he did have a history of refusing the flu vaccine.

802. Sergeant Perez was allowed to continue working in person and testing while awaiting his appeal.

803. On or about August 31, 2022, the Citywide Panel issued a denial giving no other reason than "Does not meet criteria."

804. On or about September 6, 2022, Sergeant Perez received a follow up email stating that his appeal had been denied (again with no reason provided) and that if he did not receive at least one dose of the vaccine before September 14, 2022, he would be terminated.

805. Sergeant Perez went through the darkest period of his life as he contemplated what to do.

806. He had a family to support and he pleaded with God to let him be the sacrificial lamb, and take the shot, so that he could support them. He knew, though, that he could not. His wife and family all shared his religious beliefs and made it clear that they would disown him if he violated their faith.

807. Sergeant Perez became desperate. He felt he was worth more dead than alive to those he loved and came very close to taking his own life. In the end, he had an epiphany, and the Lord spoke to him and told him it was not worth it and he had to endure.

808. That Friday, he was fired for refusing to violate his religious beliefs.

809. Sergeant Perez was financially harmed by the City's actions. But even worse was the emotional, psychological and spiritual harm of being forced to choose between job and faith, which profoundly harmed Sergeant Perez and stay with him to this day.

810. He was able somehow to get hired back in or around November 2022 (even though there was still a mandate, and he was not granted a religious accommodation, which showed that NYPD had great discretion to follow the mandate or not as they saw fit).

811. But the NYPD did not give him his time off back and has treated him poorly, and continued to harass him about not being vaccinated.

812. He had planned to work for thirty years for the NYPD, but the harassment and deprivation of leave made it so stressful that he retired at seventeen years, forfeiting a substantial amount of pension he would have been entitled to.

*Matthew Demerest*

813. Matthew Demerest (Officer Demerest) was employed by the NYPD for six and a half years as a police officer.

814. During most of the pandemic, Officer Demerest worked full time as a police officer. He dealt with people on and off the streets, in all manner of situations such as city police officers customarily do.

815. He was allowed to complete his job duties in person unvaccinated throughout the pandemic with no issues, as long as he tested weekly, which he did with no problems.

816. On October 26, 2021, after the City mandated the Covid-19 vaccine, Officer Demerest submitted his first request for religious and medical accommodation.

817. Officer Demerest is a devout Roman Catholic. He grew up in a religious household. As a child, he was baptized, received Holy Communion, and was confirmed in the Catholic Church. Growing up, his family attended church every week.

818. As members of the Catholic faith, Officer Demerest and his family spent time considering the pros and cons of taking the Covid-19 vaccine, and with guidance from prayer and listening to God, they decided that it would go against their faith to take such measures.

819. Officer Demerest believes life begins at conception and that the early stages of human development in the womb do not make human life any less meaningful.

820. He and his family follow the Ten Commandments, including "thou shalt not murder." Abortion is murder in God's eyes and in the eyes and hearts of those who follow him.

111

821.   Officer Demerest and his family confirmed that their moral conscience would never allow them to take a vaccine that was created and developed using abortion-derived cell lines. This would go against all that they faithfully practice as a Catholic family. Furthermore, that anyone would benefit by taking such a vaccine is preposterous to a devout Catholic such as Officer Demerest.

822.   Officer Demerest believes in protecting and serving those most defenseless in this world. This belief is what motivated him to join the NYPD and the United States Military in the first place.

823.   His sense of responsibility to always defend and protect those who cannot protect themselves will continue to motivate him in his professional and spiritual life.

824.   Officer Demerest has a personal relationship to God, and he understands that as a child of God he has free will to act on his judgment and moral conscience.

825.   Officer Demerest was troubled to learn that the NYPD was coercing him to receive a vaccine that he was morally and religiously opposed to taking. Conscience is one of the central teachings of his faith, and the NYPD was asking Officer Demerest to ignore this Holy guidance.

826.   Since Officer Demerest had contracted covid and fully recuperated, it was clear he had built natural antibodies and a lasting immunity. He had tested for antibodies, proving his long-lasting immunity.

827.   He prayed that the NYPD, his second family, would honor his sincere request for religious accommodation, but on November 17, 2021, his first request was denied.

828.   Officer Demerest appealed the first denial, writing another letter reinstating his religious beliefs and his medical reasons for not wanting and/or needing the Covid-19 vaccines. He

had already contracted covid, and healed, and he did not fall under the category of those who are most susceptible to the virus.

829. Throughout the entire two years of the pandemic, Officer Demerest worked full time as a police officer.

830. Prior to the issuance of the Municipal Mandate, and for reasons wholly unrelated to Covid-19, Officer Demerest had been moved to an administrative position that was not public facing. His supervisor asked him to work in a specialized, smaller unit, which was temporary but with an assured opportunity to become permanent. It was an opportunity that he decided to take.

831. Shortly before the Municipal Mandate was issued, his supervisor began the process of making his administrative job permanent.

832. Officer Demerest promptly filed a heartfelt religious accommodation request detailing his sincerely held religious objections to the Covid-19 vaccines.

833. After he submitted the application, Officer Demerest's supervisor admitted to him that the process to be permanently moved to this smaller unit was taking longer than usual, and Officer Demerest believes that the delay was because he was asking for religious accommodation. He heard similar stories from other officers seeking religious accommodation whose paperwork for promotion or transfers was also paused without explanation.

834. On February 8, 2022, his appeal was denied by NYPD on the basis that his beliefs were allegedly "based on verifiable false information, misinformation, fear of unknown origin of vaccine or side effects", and that he had "no demonstrated history of vaccination/medicine refusal".

113

835. On February 8, 2022, Officer Demerest also received an email stating that employees denied reasonable accommodation could appeal the decision within seven days by applying to the NYPD EEOD and sending all documentation to the City Appeals Panel for review.

836. Officer Demerest appealed his religious accommodation denial, sending all his documentation as required.

837. On April 12, 2022, he received his first denial from the Citywide Panel.

838. On April 13, 2022, Officer Demerest emailed Michael Melocowsky, the Executive Director of EEOD, to follow up on his concerns that he never received an interview or had cooperative dialogue about his situation.

839. On April 13, 2022, at 12:37 p.m., Mr. Melocowsky emailed Officer Demerest stating that someone would be in touch that same day with information.

840. And approximately four minutes later, at 12:41 p.m., Officer Demerest received an email from Lieutenant Louis A. Lerebours, confirming that his religious appeal was denied.

841. On May 18, 2022, Officer Demerest received another denial.

842. On May 19, 2022, he emailed Mr. Melocowsky again to clarify that he never received an interview or engaged in cooperative dialogue regarding his requests.

843. Mr. Melocowsky informed Officer Demerest that the EEOD were not in charge of the appeals and directed his questions to DCAS.

844. Officer Demerest again asked Mr. Melocowsky for help reaching DCAS as no contact information was provided to him in his notification. Mr. Melocowsky simply replied that the link provided would allow him to leave a message.

845. Officer Demerest sent his questions and concerns through the link provided and never heard anything back from DCAS.

114

846. On June 3, 2022, Officer Demerest was terminated from a job he loved.

847. Officer Demerest suffered financial, spiritual and psychological harm as well as mental anguish.

848. If he hadn't been terminated by the NYPD in such a manner, all of his time/service credit, contributions to his 457, ITHP, and 50/50, could have been seamlessly transferred to the FDNY, which is where he found employment in 2023.

849. He would have also retained his Tier 2 status if he was never terminated. Now he has to begin again as a Tier 3 in FDNY. When he was Tier 2, Officer Demerest was set to have the option for service retirement in 2033.

850. Because of this break in service, he would have had to pay out of pocket or to get his accrued time and service back.

851. Officer Demerest did nothing wrong and his break in service was not his fault. He should not have to pay to transfer everything from NYPD to FDNY, i.e. service credit, Tier 2 status, etc.

852. Prior to becoming a police officer, Officer Demerest was in the NYS Teachers Retirement System as a substitute teacher for five years, and he was in the NYS Retirement System because he was a lifeguard, and he was able to bring all that he accrued to the NYPD. He even brought over military time. It was all bought back once, it should not have to be bought over again.

853. Firefighter Demerest continues to protect and serve those in need, and he seeks to be made whole so that he can continue to provide for himself and move on with his life.

### *Aretha Simmons*

854. Aretha Simmons ("Ms. Simmons") worked for the City for nearly sixteen years before

she was denied religious accommodation and terminated, first for other City Departments, and for the last six or seven years prior to termination, for DCAS.

855. Ms. Simmons' job could easily be done fully remote and had been done remotely for most of the pandemic.

856. She served as an administrative staff analyst and NYCAP center as a help desk representative, which is the system that handles Citywide employee documentation, passwords and other files. Her primary job duties were to answer calls related to benefits (which calls could be forwarded to her home line as they had been during most of the pandemic), work with online employee documentation, hiring, processing applications to get hired and answer emails.

857. When the Municipal Mandate came out, Ms. Simmons applied for religious accommodation.

858. She included with her application a detailed personal letter and a letter from a pastor at her church attesting to her faith and need for accommodation.

859. Ms. Simmons is a devout Judeo-Christian and also a non-denominational Minister and Christian Counselor.

860. Among other sincerely held religious beliefs that do not allow her to take the Covid-19 vaccines, a central reason Ms. Simmons set forth in her letter is that as a Christian, Ms. Simmons has religious objections to the use of aborted fetal cell lines used in testing the Covid-19 vaccines. Citing Bible versus, she explained that children are recognized by God at the point of creation and are knit together by God in the womb. Children are blessings from God and killing them or using abortion driven cells in any way, whether in the vaccine or testing, is condemned." She also explained that vaccines in general interfere in her faith

116

in the creator, and in his perfect design, as they seek to change a healthy body proactively, even though God made us perfect in his image, and that she had refused flu shots for this reason.

861. On November 9, 2021, DCAS denied her application, stating: "In your cooperative dialogue with this Office, you stated that since God is your creator and healer, getting the vaccine means that you are not trusting in God to heal you and protect you. You asserted that based on this principle, you do not get the flu vaccine. You were not able to mention any other vaccine or medical interventions that are or were derived from abortion… Based on the information provided and after careful consideration, this Office determined that you did not provide sufficient testimony to demonstrate that you have a sincerely held religious observance, belief or practice that would qualify for a religious exemption to the COVID-19 vaccine mandate."

862. Ms. Simmons was shocked. She was a supervisor and knew that this was not the typical way that religious accommodations were handled by the City or DCAS.

863. The City and the agency did not typically second guess or try to pick apart an applicant's religious beliefs. Rather, when an employee applied for accommodation, the typical response would be to assume sincerity absent a glaring reason to suspect otherwise and assess in good faith whether accommodation could be granted without undue hardship.

864. DCAS was unwilling to do that with the vaccine accommodations, however.

865. DCAS was one of the three agencies overseeing the appeals, and was responsible for training nearly every City agency on how to handle religious accommodation requests from the Municipal Mandate.

866. In emails that have emerged in discovery in other matters, reviewers routinely note that

they were instructed by DCAS to reject beliefs that are grounded in personal prayer or concerns about the use of aborted fetal cell lines.

867.    DCAS reviewers showed tremendous hostility towards these beliefs, and went so far as to say that reviewers should reject concerns about abortion even if the employee was sincere, on the basis that they were factually wrong.

868.    Ms. Simmons was given the choice to appeal to the Citywide Panel or to the SAMS arbitrators using the Stricken Standards.

869.    Ms. Simmons timely appealed to the Citywide Panel, which DCAS oversaw as one of three reviewing agencies. She submitted an additional letter, refuting the claims made by the DCAS reviewer, and reaffirming the religious nature of her concerns.

870.    The Citywide Panel denied her application without any explanation, and she was terminated on or about April 6, 2022.

871.    Ms. Simmons knows of two other members of her church with substantially similar religious objections who were accommodated – one who worked for the human resources administration and another for the Law Department. Yet, she was denied based solely on an objection to her faith, showing that reviewers had tremendous discretion.

872.    After the Municipal Mandate was repealed in February 2023, Ms. Simmons attempted repeatedly to get rehired by the City.

873.    She was forced to apply for her old job at DCAS, which she did. But she was told that they were not hiring for her position. This was not true – at the time, they were actively advertising online for openings in her position which they did not fill for quite some time.

874.    Ms. Simmons suffered severe spiritual, financial, emotional, and psychological harm and mental anguish as a result of the City's actions.

118

875. She had a pension loan at the time she was terminated, which she now owes substantial taxes on, as it was seen as a premature withdrawal when she could not pay it back immediately upon termination.

876. She could not find work despite diligent efforts. She exhausted her savings, went deeply into debt and fell into serious depression. To this day, Ms. Simmons suffers from depression and post-traumatic stress disorder from having been forced to choose between job and faith, and she struggles financially, emotionally and spiritually.

877. She hopes that through this lawsuit, she can help make herself whole, but also can help others who were mistreated by the City the way that she was.

*Brian Smith*

878. Plaintiff Brian Smith was a FDNY firefighter for 19 years and 210 days before he was forced out due to the City's denial of his religious accommodation request. He was just 155 days short of the twenty years he needed for full retirement.

879. Smith was a seated chauffer (driver) in Engine Company 236 in East New York, Brooklyn.

880. His Christian faith prohibits him from receiving the COVID-19 vaccines because they utilize aborted fetal cell lines in their testing, development, or production.

881. On November 1, 2021, Mr. Smith was put on Leave Without Pay ("LWOP").

882. On November 5, 2021, Mr. Smith submitted a request for a reasonable accommodation to the Health Commissioner's Order. Citing to scripture and the tenets of his Christian faith, he explained in his application that in accordance with his Christian faith, he denounces the COVID-19 vaccine, which he stated was created from aborted babies, because it conflicts with his religious beliefs regarding God's creation, his body being the Temple of God, and

abortion.

883.    On November 8, 2021, Mr. Smith received a letter from FDNY explaining that he was on LWOP. The letter stated:

> Employees in LWOP status retain their health and welfare fund benefits, but pension contributions and leave accruals will cease and you will not receive any wages during that time. As with other City leaves without pay, you are prohibited from engaging in gainful employment during the leave period.
> <u>Because your union has NOT entered into an agreement with the City of New York</u>, once in LWOP status, further failure to comply will result in disciplinary action, including possible termination.

(emphasis in original)

884.    On December 21, 2021, Mr. Smith's request for a reasonable accommodation was denied by the FDNY.  The only reason given for the denial was: "The asserted basis for the accommodation is insufficient to grant the requested accommodation, particularly in light of the potential undue hardship to the Department."

885.    The FDNY never contacted Mr. Smith regarding his request before denying him.

886.    Smith had no interaction with the public in the performance of his duties as a driver. Pursuant to FDNY policy, he was required to remain in the fire truck at all times and did not enter homes or businesses.

887.    Firefighters were assigned to specific Engine Companies and worked with a limited, consistent group of fellow firefighters within their designated firehouse. Operations are structured by company and geographic location, such that Smith interacted only with a small cohort rather than the broader workforce.

888.    Shortly after receiving the FDNY denial, Smith timely submitted his appeal to the City of New York's Vaccine Mandate Reasonable Accommodation Appeals Panel ("Citywide Panel").

889.    On July 11, 2022, the Citywide Panel denied Smith's appeal in an e-mail which stated:

"The decision classification for your appeal is as follows: Does Not Meet Criteria."

890. The Citywide Panel never discussed Smith's request with him before (or after) issuing this blanket denial.

891. The Citywide Panel (through Eichenholtz) denied Smith's appeal on the ground that his objection to the COVID-19 vaccination did not "qualify as a religious belief", asserting that "to qualify as a religious belief, the cited belief should be part of a comprehensive religious belief system and is not simply an isolated teaching."

892. Smith is a practicing Christian whose religious beliefs regarding the sanctity of life, the moral implications of abortion, and the Biblical teaching that the body is a temple of the Holy Spirit arise directly from Scripture and the tenets of his faith. These beliefs are neither isolated nor idiosyncratic. Rather, they are foundational Christian principles that Smith sincerely holds and applied to his decision to decline the COVID-19 vaccine.

893. In rejecting Smith's request on this basis, the Citywide Panel improperly discounted religious beliefs grounded in established Christian doctrine simply because Smith's faith does not mandate vaccination in all circumstances.

894. Despite never interviewing Smith or seeking clarification regarding his beliefs, the Citywide Panel concluded that he "appeared to either be acting on personal beliefs or selectively applying general religious principles on this one occasion." The Panel reached this determination without any inquiry into Smith's religious convictions or sincerity.

895. In doing so, the Panel improperly characterized Smith's Scripturally grounded beliefs as merely "personal," reflecting a policy and practice of dismissing individualized religious convictions that are not formally mandated by a particular denomination.

896. Smith had 19 years and 210 days qualified service time – 155 days short of the 20 years

121

needed for full retirement. Had he not retired he would have been terminated and risked losing his pension completely.

897.   Smith's pension was decreased significantly because he was forced to retire before his twenty years. He lost variable supplement funds, which are paid out every December, at $12,000 yearly when you retire regularly. He lost terminal leave pay which is a one-time payment of $15,000. Additionally, his total pension was decreased by 10% due to not being fully vested. On top of that, the amount of his total pension was lower than it should have been because he was put on LWOP since November 1, 2021, therefore eliminating his overtime hours, substantially reducing his total income for 2021-2022.

898.   On September 1, 2022, Smith's health insurance benefits were terminated. Because he retired before his full twenty years, he lost his health and dental insurance coverage. He had to purchase health insurance coverage to replace the coverage he lost.

## CLASS ACTION ALLEGATIONS

899.   The Plaintiffs bring this class action pursuant to Rule 23 in their representative capacity on behalf of themselves and the Class of all others similarly situated as defined in this complaint. Plaintiffs propose a Class consisting of all persons covered by the Mandates who have religious objections to the vaccine requirement (the "Class").

900.   This action meets the following prerequisites of Rule 23(a):

a.   Numerosity: The Class includes thousands of members. Due to the high number of class members, joinder of all members is impracticable and, indeed, virtually impossible.

b.   Ascertainability: The proposed class is ascertainable. It includes all municipal employees who sought religious accommodation to the City's Municipal Mandate

including subclasses to be determined as the case progresses.

c.  Commonality: A substantial pool of common questions of law and fact exists among the Class and subclasses, including but not limited to:

    i.  Whether the denials of accommodation are subject to strict scrutiny because the religious accommodation policies were either not neutral or not generally applicable.

    ii.  Whether the denials of religious accommodation are subject to strict scrutiny because the City violated the Establishment Clause by adopting facially discriminatory criteria for judging religious objections and imposed special disability on disfavored beliefs;

    iii.  Whether the adoption and expansion of the discriminatory religious exemption policy along with other evidence of animus towards personally held beliefs and those associated with an objection to abortion constitute "direct evidence" of discrimination, and whether Defendants can "rebut" this claim through any affirmative defense;

    iv.  Whether the religious accommodation process triggers strict scrutiny, as it provides a mechanism for individualized discretionary exemption;

    v.  Whether the City engaged in a pattern or practice of discrimination by inconsistently applying religious accommodation policies or denying exemptions based on arbitrary or pretextual grounds or applying and encouraging discriminatory criteria;

    vi.  Whether the Citywide Panel's review process constituted a centralized mechanism of discrimination by systematically rejecting religious

accommodation requests using uniform, impermissible criteria;

vii. Whether the City's religious accommodation policies are preempted by the Supremacy Clause facially or as applied, particularly with regard to their undue hardship approach;

vi. Whether the City's accommodation policies violate statutory requirements;

vii. The irrationality and arbitrariness of particular provisions of the Mandates and religious accommodation policies; and

viii. Appropriate remedies to address the discrimination that occurred.

d.  Typicality: Named Plaintiffs' claims are typical of the claims of the Class. Plaintiffs were all employed by the City of New York. The harm suffered by Plaintiffs and the cause of such harm is representative of the prospective Class.

   i.  The claims or defenses of the Named Plaintiffs and the Class arise from the same events and actions by Defendants and are based on the same legal theories.

   ii.  The Named Plaintiffs include most subgroups of the proposed Class– including inter alia impacted municipal and private employees.

e.  Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class.

f.  Plaintiffs do not have any interests that conflict with the interests of the members of the Class. Plaintiffs have engaged competent counsel who are experienced in complex litigation, including class actions.

g.  Superiority: A class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein. A class action will permit numerous similarly situated individuals to prosecute their common claims in a single

124

forum simultaneously without duplication of evidence, expense, and resources. This action will result in uniformity of decisions and avoid risk of inconsistency and incompatible standards of conduct in the judicial system. It will also more efficiently allow adjudication of the pattern and practice claims.

h.  Maintainability: This action is properly maintainable as a class action for the above-mentioned reasons and under Rule 23(b):

  i. The individual amount of restitution involved is often so insubstantial (considering the substantial cost of federal litigation against a municipality with deep pockets) that the individual remedies are impracticable and individual litigation too costly;

  ii. Individual actions would create a risk of inconsistent results and duplicative litigation;

  iii. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby rendering final injunctive relief or declaratory relief appropriate for the Class as a whole; and

  iv. Individual actions would unnecessarily burden the courts and waste judicial resources.

i.  Predominance: The questions of law or fact common to Class Members predominate over any questions that may affect only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CAUSES OF ACTION

## MUNICIPAL LIABILITY UNDER *MONELL*

901. For each of the claims below asserting liability under 42 U.S.C. § 1983, Plaintiffs assert *Monell* liability. Incorporated by reference, as if fully set forth herein in this section, are all paragraphs of this complaint and supporting documents. A summary of some but not all of the examples triggering *Monell* liability is set forth in the following paragraphs.

**I. The City Is Liable for Constitutional Violations Caused by Its Policies, Customs, and Final Policymakers**

902. Defendant City of New York is liable under 42 U.S.C. § 1983 because the constitutional violations suffered by Plaintiffs were caused by the City's official policies, longstanding customs and practices, and the acts and decisions of final municipal policymakers.

903. Plaintiffs' injuries were not the result of isolated discretionary determinations by lower-level employees, but instead flowed from centralized rules, directives, and decision-making authority established, endorsed and enforced at the highest levels of City government, including by officials vested with final policymaking authority over the vaccine mandate and religious-accommodation process.

**A. Express Municipal Policies Discriminating Against Protected Religious Exercise**

904. The City adopted and implemented written and unwritten policies governing religious accommodation that were facially discriminatory and unconstitutional. These policies included, among others:

- Adoption and enforcement of the "Stricken Standards" at nearly all City agencies which categorically privileged certain religions while excluding others and imposing clergy-letter and doctrinal-orthodoxy requirements.

- DCAS-issued guidance and instructions directing agencies to deny beliefs deemed "personal," conscience-based, abortion-related, or inconsistent with institutional religious leadership;

- Centralized written and verbal directives instructing agencies to presume insincerity, search for

bases to deny requests, and categorically exclude numerous faith traditions; and

- Implementation of the Citywide Panel framework, which replicated unconstitutional criteria and imposed an unlawful "de minimis" hardship standard, and which was instructed to continue to reject personally held beliefs and those involving abortion.

These written standards and directives constituted official municipal policy because they were created, endorsed, and enforced by City officials with policymaking authority and were uniformly applied across City agencies.

## B. Decisions and Endorsements of Final Municipal Policymakers

905.   Independent of written policy, the City is liable because final municipal policymakers themselves made, ratified, and enforced the unconstitutional conduct at issue.

906.   Commissioner Dave Chokshi exercised final policymaking authority over the vaccine mandates and actively directed denial of protected religious beliefs, including by instructing adjudicators that abortion-related religious objections were invalid and should be rejected.

907.   Defendant Banks, head of the OLR and the Mayor's chief representative with final policy making authority in the arbitration proceedings, coordinated with the unions, arbitrators and the DOE representatives to find ways to categorically deny sincerely held religious beliefs.

908.   Defendant Bray, who was a high level policy maker at City Hall, assisted Defendant Banks in this effort, as detailed in the emails, including by suggesting that the Defendants should start using Tylenol and other medications as a "test" to help deny people who did not avoid them but asserted religious objections to vaccination on that basis.

909.   Defendant Ashfar, then Chief of Staff at the DOHMH, also assisted with the effort of creating the Chokshi letter, and added back in the list of medications even though she acknowledged they could not verify that any of those medications actually used aborted fetal

127

cell lines to bring the products to market.

910.    Defendant Varma, the City's "Covid Czar" and chief Covid policy maker, ok'd the letter and approach. He also admitted that the mandates were not necessary from a public health perspective, as natural immunity provided enough protection, but were meant to harass those who would not get vaccinated.

911.    Chief Assistant Corporation Counsel Eric Eichenholtz and/or Defendant Banks: approved the discriminatory accommodation criteria later embodied in the Stricken Standards.

912.    Defendant Eihenholtzcreated and supervised the Citywide Panel, instructed reviewers to use the unlawful "de minimis" standard to affirm unsupported undue hardship claims, deny personally held and abortion-related beliefs even when sincere, and exercised final discretionary authority to affirm, modify, or reverse accommodation determinations.

913.    Mayor de Blasio endorsed the policies, announcing to the press that the City would only accommodate Christian Scientists and Jehovah's Witnesses, and would reject personally held beliefs and failing to remediate when the Second Circuit struck down these policies, but instead agreeing to expand their use at nearly every City Department.

914.    The unconstitutional denials experienced by Plaintiffs therefore represent direct acts of final policymakers, rendering the City liable under Monell without the need to prove a separate custom.

## C. Widespread, Systemic Custom and Practice Across City Agencies

915.    Even apart from formal policy and final-policymaker acts, the City maintained a pervasive and uniform custom of denying religious accommodations through coordinated agency implementation.

916. Agency-level evidence demonstrates: categorical exclusion of numerous religions and conscience-based beliefs; templated denial language repeating unconstitutional DCAS-supplied theological and scientific assertions; failure to conduct individualized undue-hardship analysis; and arbitrary disparities in treatment among similarly situated unvaccinated employees.

917. The consistency of these practices across agencies—including the Comptroller, DOB, DOC, DOI, Parks, DSNY, and FDNY—demonstrates a Citywide custom rather than random independent agency occurrence.

**D. Ratification and Deliberate Continuation After Judicial Notice of Unconstitutionality**

918. The City's liability is further established by its knowing ratification and continuation of unconstitutional practices after they were identified by courts.

919. The Second Circuit determined that the Stricken Standards were likely unconstitutional and required fresh review under lawful standards.

920. Rather than rescind or remediate the discriminatory framework, the City: expanded the use of the Stricken Standards beyond DOE, created the Citywide Panel applying similar unconstitutional criteria, and continued denying protected religious beliefs pursuant to centralized directives.

921. This conscious continuation of unconstitutional conduct constitutes deliberate indifference and ratification, independently sufficient to establish Monell liability.

**E. Causation**

922. The City's policies, customs, and final-policymaker decisions were the moving force behind the deprivation of Plaintiffs' constitutional rights.

923. Pursuant to these municipal directives, Plaintiffs were denied religious accommodation,

forced to choose between their faith and employment, and ultimately terminated, compelled to retire, or otherwise deprived of livelihood.

924. Plaintiffs' injuries were therefore directly caused by municipal action, rendering the City liable under 42 U.S.C. § 1983.

**FIRST CLAIM FOR RELIEF**

**(Liability under the Free Exercise Clause by All Plaintiffs Against All Defendants)**

925. Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

926. The Mandates are unconstitutional, facially and applied, because they violate employees' right to religious freedom under the First Amendment.

927. Laws that burden religion are subject to strict scrutiny under the Free Exercise Clause when they are not neutral or not generally applicable. The policies at issue here are neither.

928. Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature. Indicia of animus need not appear in the text of the regulation but must be examined in context through scrutiny of legislative history, related regulations and policies, implementing policies and commentary by decision-makers, among other sources.

929. Mayor de Blasio, who was the architect of these Mandates, openly expressed animus towards unorthodox religions, admitting to the press that he is convinced by the Pope that scripture does not support a religious objection to vaccination, and stating that religious objections that do not comport with orthodoxy, as the mayor interprets it, will be denied an exemption from the Mandates. Mayor Adams continued to endorse hostile viewpoints.

930. Official policies subsequently adopted by the various City departments and agencies

mirrored the mayor's admission that the City intended to impose a special disability on employees with unorthodox religious viewpoints.

931.    DCAS, the Law Department and agency heads each adopted an open policy of rejecting and discriminating against beliefs grounded in personal prayer or religious concerns about abortion.

932.    The City also showed open animus to unorthodox religions by not only failing to disavow the Stricken Standards after the Second Circuit held that they were discriminatory and unconstitutional. Instead, they began offering them as an option at most City agencies.

933.    This created two unequal tracks – one, available for Christian Scientists, which had no mechanism for denial based on undue hardship, and the other available for the disfavored religions, revealing further animus.

934.    The Municipal Mandate was not generally applicable, since it allowed agencies to make exceptions for thousands of employees for secular reasons while denying religious accommodation as set forth more fully in the complaint. As one of many examples, the Municipal Mandate provided that the appeals had to conclude in 2021, but most agencies allowed the appeals to pend until 2023, and thousands of employees with pending applications were able to continue to work unvaccinated in person due to this secular reason of administrative delay.

935.    Moreover, neither the Mandate nor the religious accommodation policies were generally applicable.

936.    A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions. As detailed in the individual sections, the government exercised great discretion at the agency

and appellate level to deny or grant accommodation requests.

937. The Municipal Mandate provide for highly individualized determinations by government officials about whether the employees' religious beliefs are valid and whether they seem sincere. Particularly given the City's adoption of brazenly discriminatory standards to judge these applications, and the widespread pattern of hostility and abuse, such unbridled discretion render the Municipal Mandate invalid as a facial matter.

938. Alternatively, even if the Mandate was generally applicable, the religious accommodation policy was not. Some were arbitrarily granted while others with the same religious beliefs or level of hardship were denied.

939. Moreover, a policy is not generally applicable if there are carve outs for secular exemptions when religious exemptions are denied, as occurs in these Mandates.

940. Strict scrutiny therefore applies.

941. A government policy can survive strict scrutiny under the Free Exercise Clause only if it advances interests of the highest order and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so.

942. Here, there is no compelling reason to mandate vaccines, as the COVID-19 vaccines cannot stop the spread of disease.

943. Moreover, to the extent that stopping the spread of COVID-19 is the interest, far more effective and less intrusive measures exist that could be adopted instead.

944. All Plaintiffs make this claim within the statute of limitations, because their final determination occurred less than three years ago and/or their time is tolled by the pending class action in the related matter *New Yorkers for Religious Liberty, Inc. v. City of New York*,

1:22-cv-00752-DG-VMS.

## SECOND CLAIM FOR RELIEF
### (Liability under the Establishment Clause By All Plaintiffs Against All Defendants)

945.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

946.   The Mandates violate the Establishment Clause because the City declared, in implementing them, that they intended to preference orthodox religious beliefs over unorthodox or personally held beliefs, and the City specifically noted that they would preference Christian Scientists. Under the Larson test, this requires strict scrutiny, which the City cannot withstand.

947.   Commissioner of Health further compounded this violation by sending a letter to the Citywide Panel and the arbitrators, as well as City agencies, instructing them to deny religious objections grounded in the use of aborted fetal cell lines in testing the vaccines. In so doing, he took an official position on a disputed religious matter, favoring the views of the Pope and other "religious leaders" that he was persuaded by and imposing special disability on those who did not share the majority viewpoint on this issue.

948.   Other decision-makers openly adopted the same discriminatory positions and instructed reviewers to deny beliefs grounded in personal prayer or objection to abortion unlawfully.

949.   The Mandates also violate the Establishment Clause because they fail the coercion test and are enforced by the City to coerce everyone with minority religious views on vaccines to violate their faith and get vaccinated or lose the ability to earn income anywhere in New York City for the foreseeable future.

## THIRD CLAIM FOR RELIEF
### (Violation of the Equal Protection Clause of the

**Fourteenth Amendment to the United States Constitution
and the New York State Constitution)**

950.     On behalf of themselves and the Class, the Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

951.     By their actions, as described herein, Defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected Plaintiffs to the deprivation of the rights, privileges, or immunities secured by the United States Constitution and New York Constitution.

952.     The religious accommodation policies adopted by the City violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (and the corresponding provisions of the New York State Constitution and New York City Charter) because they categorically discriminate against most religions, and preference Christian Scientists over those with personally held or idiosyncratic religious views.

953.     There is no rational basis for this discrimination. Christian Scientists pose no greater danger than Catholics and other disfavored religions with religious beliefs derived from a concern about abortion or guidance from prayer. Both groups are equally able to spread COVID-19.

954.     Plaintiffs face the loss of their employment, ability to practice their vocation, contractual rights and violation of civil rights and liberties as a result of the discriminatory regulation.

955.     The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

956.     While performing those duties, Defendants intentionally deprived Plaintiffs of securities, rights, privileges, liberties, and immunities secured by the Constitution of the

United States of America and the State of New York by arbitrarily discriminating against them based on their religious beliefs, and creed.

**FOURTH CLAIM FOR RELIEF**
**Violations of Title VII – Failure to Accommodate, Discrimination and Retaliation**

957. On behalf of themselves and the Class, the Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

958. They assert that Defendants violated their rights under Title VII by failing to reasonably accommodate their sincerely held religious beliefs, adopting official policies that were discriminatory against most religions, and continuing to retaliate against them for seeking religious accommodation.

959. Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

960. Plaintiffs were entitled to accommodation but were denied religious accommodation by their agencies and the City, in violation of Title VII.

961. To the extent that Defendants claim "undue hardship" as a defense, Plaintiffs reserve the right to rebut such allegations in more detail and with further evidence, as undue hardship is an affirmative defense and cannot give rise to dismissal for failure to state a claim.

962. Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

135

963. For a Title VII claim, undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

964. To prevail on this defense, Defendants must show they considered all options for accommodation in good faith and proved, prior to denial, that such options were untenable according to statutory factors and analysis of objective evidence assessed against each individual's circumstances.

965. Defendants did not meet their undue hardship burden, and the denials on this basis were pretextual.

966. They used the de minimis standard, even though that was not the standard governing the state statutory claims and is the wrong standard under Title VII.

967. They admit there was no documentation or evidence considered, and no safety or economic analysis undertaken before denying employees based on undue hardship.

968. To the extent that Defendants truly could not accommodate Plaintiffs in person or remotely without substantial hardship, Defendants could have provided other accommodations, such as allowing Plaintiffs to return without waiving their seniority or tenure, providing leave with health insurance not tied to coercive waivers, allowing them to work at other jobs during the leave, and refraining from attempting to block their efforts to collect unemployment insurance while they waited for the "emergency" to subside so they could return to work.

969. The DOE did not assess any of these potential accommodations to determine whether

they would have posed a substantial hardship.

970. The City's own written policy stated that weekly testing was not an undue hardship, the great weight of the science, as set forth in the declarations from public health experts attached and incorporated herein showed it was not a safety issue to thus accommodate employees, and thousands of employees were allowed to work unvaccinated in person in public facing jobs throughout the Muncipal Mandate's duration.

971. The City also violated Title VII by engaging in direct discrimination and imposing a disparate impact on unorthodox or disfavored religious beliefs.

972. First, the City proposed and then adopted a facially discriminatory policy that favored Christian Scientists and categorically disfavored all other religions. The Mayor publicly supported this policy and announced it was the City's intention to discriminate against personally held religious beliefs and any faiths other than Christian Scientists and Jehovah's Witnesses.

973. Second, after the Second Circuit held that this policy was unconstitutional, the City not only failed to disavow it but began offering it in most City departments.

974. Third, the City Health Commissioner drafted and sent a letter instructing decision-makers to deny all religious beliefs grounded in abortion based on his assessment that the concern did not matter, according to his review of what other religious leaders thought.

975. Fourth, the Citywide Panel used Chokshi's letter in denying religious beliefs grounded in abortion, and both DCAS and Mr. Eichenholtz, from the Law Department, instructed panelists and agency reviewers to deny beliefs grounded in concerns about religious abortion.

976. Fifth, DCAS and Mr. Eichenholtz continued to instruct the panelists and agency

reviewers to deny beliefs that were "personally" derived, such as from prayer or the moral conscience or review of scripture, rather than militated by a religious leader.

977.    Many more examples are listed in this complaint which collectively far surpass an inference of animus and rise to the level of direct evidence of discrimination.

978.    As a direct and proximate result of Defendants' failure to accommodate them, Plaintiffs suffered, and continue to suffer economic damages, including but not limited to high interest on debt, penalties and fines for measures taken to try to survive after they were wrongfully deprived of income, medical debt, loss of homes and assets, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which they are entitled to an award of monetary damages in an amount to be determined at trial.

979.    Plaintiffs are also entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

980.    Plaintiffs are also entitled to punitive damages in an amount to be determined at trial. Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

981.    And Plaintiffs are entitled to reasonable attorneys' fees and costs.

982.    Pursuant to the single filing rule, Plaintiffs are entitled to join this lawsuit because at least one of the named Plaintiffs in this lawsuit (Ms. Tunnell) timely filed complaints with the EEOC alerting the DOE and the City about class-wide discrimination and failure to accommodate, and this lawsuit was timely commenced within ninety days of these Plaintiffs' receipt of a right to sue letter.

983.    Pursuant to the same rule, all members of the proposed class are entitled to Title VII relief on the same basis without individually exhausting administrative remedies. *See Tolliver v. Xerox Corp.,* 918 F.2d 1052 (2d Cir. 1990).

984.    The claims of the rest of the proposed class and group all arise out of the same circumstances and within the same time frame. This is sufficient to allow the entire class to join in this claim pursuant to the single-filing rule. *Id.* at 1058.

## FIFTH CLAIM FOR RELIEF

### Violation of the New York City Human Rights Law

985.    Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

986.    For the same reasons set forth above, Defendants actions violate the New York City Human Rights Law.

987.    In 2005, the City Council amended the administrative code to emphasize the New York City Human Rights Law's (NYCHRL) uniquely broad and remedial purposes, and again in 2016 to clarify its intent to foster jurisprudence that maximally protects civil rights in all circumstances. Therefore, although Title VII's analytical framework is applicable to the NYCHRL, claims under the City law must be reviewed "independently from and more liberally than their federal and state counterparts."

*Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted); *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78, 947 N.E.2d 135, 922 N.Y.S.2d 244 (2011) (requiring the NYCHRL to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); *Makinen v. City of NY*, 857 F3d 491, 495 (2d Cir. 2017).

988.    Defendants have adopted an unlawful discriminatory practice by imposing vaccine mandates upon Plaintiffs and Class Members as a condition of retaining their employment, while denying their religious exemption requests, because complying with the mandates would require Plaintiffs and Class Members to violate their sincerely held religious beliefs and practices.

989.    Plaintiffs and all similarly situated Class Members have sincere religious beliefs against vaccination. They alerted the Defendants that they are unable to be vaccinated because of these beliefs but were nonetheless suspended or segregated or otherwise adversely impacted because Defendants refused to accommodate their sincerely held religious beliefs.

990.    Plaintiffs and Class Members were furthermore then harassed, retaliated against and further discriminated against as a result of their sincerely held religious beliefs and creed.

991.    The New York City Human Rights Law applies to the proceedings of the individual agencies as well as the Citywide Appeals Panel.

992.    "Importantly, in contrast to Title VII which does not define 'undue hardship' in the context of religious accommodation, the NYCHRL adopts a rigorous definition of an

140

employer's 'undue hardship' as 'an accommodation requiring significant expense or difficulty,' and mandating that '[t]he employer shall have the burden of proof to show such hardship.'" *Litzman v. New York City Police Dep't*, 2013 U.S. Dist. LEXIS 162968, *20 (S.D.N.Y. 2013) (quoting N.Y.C. Admin. Code § 8-107(3)(b)).

993. As set forth supra, Defendants used the de minimis hardship standard and failed to assess the statutory factors or prove undue hardship before denying relief.

## SIXTH CLAIM FOR RELIEF

### Violation of the New York State Human Rights Law

994. Plaintiffs reallege and incorporate by reference the allegations recited in all paragraphs of this Complaint as if fully set forth herein.

995. For the same reasons set forth in counts Four and Five, Defendants actions violate the New York State Human Rights Law, both under a failure to accommodate and disparate impact claim.

996. The NYSHRL states that an undue hardship exists when the accommodation would cause significant expense or difficulty, not "more than a minimal burden" (which is the standard the City applied).

997. As described in the Complaint and supporting exhibits, neither the city agencies nor the Citywide Appeals Panel carried their burdens to demonstrate why the requested accommodations would constitute an undue hardship under Title VII, an undue hardship under the New York State Human Rights Law, and an undue hardship under the New York City Human Rights Law—which is what the law requires.

998. In fact, neither the FDNY nor the Citywide Appeals Panel even explained why

141

accommodating FDNY plaintiffs would be more than a "potential for undue hardship"—which does not even satisfy Title VII and the EEOC guidance.

999.   Furthermore, Mr. Eichenholtz—an attorney in the City's Law Department who played a critical role in the formation of the Citywide Appeals Panel, provided consultation regarding the standards to be applied by the Citywide Appeals Panel, and served on the Citywide Appeals Panel himself—appeared to not even know that there is a heightened "undue hardship" standard in the New York State and New York City Human Rights Law and stated that the Citywide Appeals Panel followed only the EEOC guidance and the "more than a de minimus burden" standard when assessing undue hardship.

1000.   The Citywide Panel made no independent inquiry of whether accommodating applicants would pose an undue hardship to the various agencies' operations, instead relying on whatever agency description of undue hardship already existed in the record. Such descriptions were either nonexistent or threadbare, failing in each instance to incorporate the factors that EEOC guidance and the state and city human rights laws set forth for assessing whether an employer has demonstrated an undue hardship.

1001.   The Citywide Panel also did not seek information regarding whether employees posed a direct threat to others, the number of employees agencies could afford to accommodate, agencies' ability to make payroll, any additional costs of accommodating employees, the degree to which the geographic separateness or administrative or fiscal relationship of the facilities would make accommodations more difficult or expensive, agencies' capacities to work with remote workers, agencies'

142

number of available remote sites, agencies' remote site capacities, as well as whether other alternatives were explored—all factors that the state and city human rights laws set forth for assessing whether an employer has demonstrated an undue hardship.

1002. Mr. Eichenholtz testified under oath that, "I know of no legal requirement that requires at the appellate phase of a review that that sort of assessment be provided at that level of detail."

1003. Additionally, Defendants have not stated a cost of accommodating Plaintiffs, including the costs of loss of productivity and of retaining or hiring employees. In fact, Defendants' cost of not accommodating Plaintiffs itself constitutes a significant expense or difficulty on the agencies, as each agency was facing a major staffing shortage before and after the Plaintiffs and class members were terminated.

### REQUEST FOR RELIEF

Plaintiffs respectfully ask this Court for the following relief:

1. Certifying the proposed Class pursuant to Rule 23;

2. Declaring the City's religious accommodation policies unconstitutional on their face, and annulling the denials of religious accommodation for Plaintiffs and the proposed class, *nunc pro tunc*.

3. Reinstating Plaintiffs and others denied religious accommodation with no break in service, and restoring all benefits, status and accrued pension and other rights; and

4. Awarding front pay to those who can no longer return; and

5. Awarding nominal, actual consequential and punitive damages in an amount to be determined at trial; and

143

6. On all Claims for Relief: awarding relief to the Class equivalent to the relief requested for the individual named Plaintiffs identified herein.

7. On all Claims for Relief: awarding costs of suit; investigation costs; payment of reasonable attorneys' fees; declaratory relief, injunctive relief, pre-and -post judgment interest and such other and further relief as the Court may deem just and proper.

DEMAND FOR
JURY TRIAL

Plaintiffs and the Class respectfully demand a trial by jury for all issues so triable in this action.

CONCLUSION

Wherefore, Plaintiffs respectfully ask this Court for the relief set forth above and any other relief that the Court deems just and proper.

Dated: New York, New York
February 6, 2026

Respectfully submitted,

GIBSON LAW FIRM, PLLC

/s/ Sujata S. Gibson
**Sujata S. Gibson**
*Attorney for Plaintiffs and the Class*
Gibson Law Firm, PLLC
120 E Buffalo St. Suite 2
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law